

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SWISSCANTO ASSET MANAGEMENT AG and SWISSCANTO ASSET MANAGEMENT INTERNATIONAL S.A.,<br><br>      Plaintiffs,<br><br>vs.<br><br>CITIGROUP INC., CHARLES PRINCE, GARY CRITTENDEN, ROBERT DRUSKIN, THOMAS G. MAHERAS, and MICHAEL STUART KLEIN,<br><br>      Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

12 CIV 9050

RECEIVED
DEC 12 2012
U.S.D.C. S.D.N.Y.
CASHIERS

**GRANT & EISENHOFER P.A.**
Stuart M. Grant
Megan D. McIntyre
Shelly L. Friedland
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

I.  NATURE AND SUMMARY OF THE ACTION ............................................................. 1

II. JURISDICTION AND VENUE ...................................................... 8

III. THE PARTIES................................................................................................. 9

    A.  PLAINTIFFS ............................................................................... 9

    B.  DEFENDANTS ........................................................................... 10

        1.  Citigroup ................................................................. 10

        2.  Individual Defendants......................................................... 10

IV. SECURITIES PURCHASED BY PLAINTIFFS ............................................. 14

V.  BACKGROUND ALLEGATIONS PERTINENT TO ALL COUNTS........................... 18

    A.  SUBPRIME MORTGAGES BECOME ATTRACTIVE TO LENDERS ................................ 18

    B.  THE PROLIFERATION OF FINANCIAL INSTRUMENTS BACKED BY U.S.
        RESIDENTIAL MORTGAGES ...................................................... 19

    C.  CITIGROUP'S INVOLVEMENT IN MORTGAGE-RELATED ACTIVITIES...................... 23

        1.  Subprime Lending Fuels Citi's Bottom Line............................................ 23

        2.  Citi's Mortgage Portfolio Included Large Volumes Of Subprime
            And Other Risky Loans ...................................................... 24

        3.  Citigroup's CDOs ................................................................ 24

        4.  Citigroup's SIVs ................................................................ 26

    D.  INDICATORS THAT MORTGAGE MARKETS WERE DETERIORATING BY 2005 ......... 28

    E.  INDICATORS THAT SECONDARY MARKETS FOR MBS AND CDOS WERE
        DETERIORATING BY JANUARY 2007 ...................................................... 31

VI. DEFENDANTS MISREPRESENTED CITI'S FINANCIAL POSITION AND
    RESULTS, AND FAILED TO DISCLOSE MATERIAL INFORMATION
    REGARDING THE RISKS AND LOSSES TO WHICH CITI WAS EXPOSED ......... 34

    A.  DEFENDANTS DID NOT DISCLOSE THE NATURE AND EXTENT OF CITI'S
        CDO EXPOSURES................................................................ 34

B.    CITIGROUP'S FINANCIAL STATEMENTS DURING THE RELEVANT PERIOD WERE MATERIALLY UNTRUE AND VIOLATED GAAP AND SEC REGULATIONS .................................................................................... 34

      1.    Citigroup Reported Materially Understated Loan Loss Reserves In Violation Of GAAP ....................................................... 39

      2.    Citigroup Failed To Disclose Massive Concentrations Of Credit Risk From Subprime-Related Assets In Violation Of GAAP ................. 45

      3.    Citigroup Failed To Accurately Report The Value of the Assets Held By Its SIVs In Violation Of GAAP .................................. 49

      4.    Citigroup Failed To Consolidate Its Commercial Paper CDOs In Violation Of GAAP ....................................................... 50

      5.    Citigroup Overstated The Fair Value Of Its Subprime-related CDOs In Violation Of GAAP .................................................. 52

      6.    Citigroup Overstated The Fair Value Of Its Total Assets In Violation Of GAAP ....................................................... 63

      7.    Citigroup Overstated Its Capital Adequacy ............................. 65

C.    DEFENDANTS PRINCE AND CRITTENDEN SIGNED FALSE SARBANES-OXLEY CERTIFICATIONS ................................................................ 67

D.    ADDITIONAL UNTRUE STATEMENTS AND OMISSIONS ........................... 67

VII.    THE TRUE FACTS ARE SLOWLY REVEALED ................................... 83

A.    OCTOBER 2007: CITIGROUP MAKES PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING ITS GROWING LOSSES AND SUBPRIME EXPOSURE ...................................................................... 83

      1.    October 1: Citi Issues Pre-Earnings Release ........................... 83

      2.    October 15, 2007: Citi Announces Third Quarter Results ................. 84

B.    NOVEMBER 2007: CITI MAKES PARTIAL BUT INCOMPLETE DISCLOSURES REGARDING ADDITIONAL CDO EXPOSURE AND MASSIVE WRITE-DOWNS, AND SHAKES UP ITS MANAGEMENT TEAM ........................................ 86

      1.    November 4, 2007 Press Releases ....................................... 86

         a.    Citi's Overall Picture; Prince Resigns ......................... 86

         b.    CDOs ......................................................... 86

C.   JANUARY 2008: CITI DISCLOSES ADDITIONAL WRITE-DOWNS............................ 88

    1.   Citi Reports Record Losses...................................................... 88

    2.   CDOs.................................................................................... 88

    3.   Consumer Lending, Including Mortgages ................................. 90

D.   APRIL 2008: CITI REPORTS FURTHER LOSSES AND WRITE-DOWNS, BUT THE SITUATION APPEARS TO IMPROVE................................................. 92

E.   JULY 2008: CITI TAKES MORE WRITE-DOWNS ...................................... 93

F.   SEPTEMBER 2008: CITI ATTEMPTS TO REASSURE MARKET OF ITS VIABILITY, DESPITE FINANCIAL SECTOR TURMOIL ............................... 93

G.   OCTOBER 2008 ................................................................................. 94

    1.   First TARP Installment........................................................... 94

    2.   Third Quarter Results Show Still More Write-Downs, With SIVs A Primary Source.................................................................. 94

H.   NOVEMBER 2008 .............................................................................. 95

    1.   Citi Discloses Reclassification Of $80 Billion In Assets......................... 95

    2.   Citi Announces Plan To Dismantle SIVs And Purchase Remaining $17.4 Billion, Yet Reasserts Strength ....................................... 96

    3.   Federal Government Rescues Citi, With Government Guaranteeing $306 Billion Of Assets And Providing $20 Billion Cash Infusion........... 97

I.   JANUARY 2009: DETAILS OF BAIL-OUT REVEAL TRUE WEAKNESSES OF MORTGAGE-RELATED ASSETS AND CONTENTS OF $80 BILLION RECATEGORIZED IN NOVEMBER ......................................................... 97

VIII.   LOSS CAUSATION.................................................................................... 99

IX.   NON-FRAUD CLAIM UNDER ENGLISH LAW ............................................... 106

COUNT ONE FOR VIOLATIONS OF SECTION 90 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000, AS AMENDED (BY SWISSCANTO AG GAINST DEFENDANT CITIGROUP) ......................................................... 106

X.   ADDITIONAL FACTUAL ALLEGATIONS PERTINENT TO PLAINTIFFS' FRAUD-BASED COUNTS.......................................................................... 108

A.   ADDITIONAL FALSE AND MISLEADING STATEMENTS.......................... 109

B.    THE FRAUD DEFENDANTS' SCIENTER ..................................................... 111

    1.    The Fraud Defendants Knew Citi Was Exposed To Losses Via Its Subprime Holdings ................................................................. 111

        a.    The Fraud Defendants Knew The CDOs Were Not Structured To Withstand The Collapse Of The Housing Market ................................................................. 112

        b.    The Fraud Defendants Knew Citi's CDOs Were Not Immune To The Market Downturn ..................................... 114

            (1)    Citi Publicly Acknowledged Risks Associated With CDOs ................................................ 114

            (2)    Aware Of Market Developments, Citi Tried To Protect Itself ................................................ 116

            (3)    Synthetic CDOs ........................................ 118

            (4)    Repackaged CDOs ........................................ 119

        c.    The Fraud Defendants Knew Citi Was Obligated To Consolidate The Commercial Paper CDOs ............................. 122

    2.    Government Investigations Support a Strong Inference of Scienter ...... 123

        a.    The SEC's 2007 Investigation Into Citi's Accounting Practices ................................................................. 123

        b.    The SEC's 2010 Investigation of Citi's Use of "Repo 105" ...... 128

        c.    The Senate FCIC Investigation ................................... 130

    3.    Citi's Numerous Violations Of GAAP Support An Inference Of Scienter ................................................................. 132

    4.    Motive And Opportunity:  Citi Avoided The Necessary Disclosures, Write-downs, And Reserve Increases In Order To Preserve Its Tier 1 Capital Ratio ........................................... 133

C.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET DOCTRINE ................... 134

XI.    TOLLING OF THE STATUTE OF LIMITATIONS ON PLAINTIFFS' FRAUD-BASED CLAIMS ............................................................... 135

XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ......................................... 136

COUNT TWO FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT  AND RULE 10B-5 PROMULGATED THEREUNDER  (AGAINST CITIGROUP, PRINCE, CRITTENDEN, DRUSKIN, MAHERAS, AND KLEIN).................................................. 136

COUNT THREE FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST PRINCE, CRITTENDEN, DRUSKIN, MAHERAS AND KLEIN BASED ON CITIGROUP'S VIOLATION OF SECTION 10(B)) ................................................ 138

JURY DEMAND ...................................................................................................... 139

PRAYER FOR RELIEF ........................................................................................... 139

Plaintiffs Swisscanto Asset Management AG and Swisscanto Asset Management International S.A. (together, "Plaintiffs"), by their undersigned counsel, make this complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation by their counsel, which has included review and analysis of annual reports and publicly filed documents; press releases; news articles; analysts' statements; conference call transcripts and presentations; information released by the United States Senate Financial Crisis Inquiry Commission (the "FCIC") and the Securities and Exchange Commission (the "SEC"); and transcripts from speeches and remarks given by the defendants.   Plaintiffs make the following allegations against Citigroup Inc. ("Citigroup" or "Citi" or the "Company"), Charles Prince, Gary Crittenden, Robert Druskin, Thomas G. Maheras, and Michael Stuart Klein (collectively, the "Defendants").

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Plaintiffs assert both fraud and non-fraud claims to recover money damages for injuries sustained as a result of investments in Citi securities.   Due to the Defendants' repeated material untrue statements and non-disclosure of material information to investors, Plaintiffs purchased Citi securities at inflated prices during the period from August 31, 2006 through January 15, 2009 (the "Relevant Period").[1]   When the market slowly learned the truth of Citi's financial condition, Citi came close to insolvency, and Plaintiffs lost substantial amounts on their investments.

2.      Citi's near-demise had its genesis in the Company's increasing willingness to take on risks for the sake of profit, without regard for – and without disclosing – the magnitude of the downside exposure it faced if those risks materialized.   As the housing industry heated up in the

---

[1] Plaintiffs assert fraud claims based on purchases from February 1, 2007 through April 17, 2008, and non-fraud claims based on purchases throughout the Relevant Period.

early 2000s, Citi had ramped up its residential mortgage lending, both through its own sales force and through correspondent channels.  But in order to sustain the desired growth, Citi needed to lower its lending standards.  In 2005, Citi specifically chose to grow by expanding into the segment known as subprime, which includes borrowers with poor credit histories or those taking out risky loans.  Such subprime mortgages (whether originated by Citi or another lender) were then packaged into residential mortgage-backed securities ("RMBS"), and sold to investors or to banks such as Citi which packaged the subprime-based RMBS into collateralized debt obligations ("CDOs").  This expansion of subprime lending spurred Citi's growth, both through its lending activities and through the gallimaufry of derivative instruments that Citi created and sold.  As summarized by the Federal Reserve's examiner in an inspection report pertaining to calendar year 2007 (which was not released to the public until 2011):  "[S]enior management at the firm allowed its drive for additional revenue growth to eclipse proper management of risk, while Risk Management failed to serve as an effective check against these decisions."[2]

3.     In addition, starting at least by January 1, 2004, Citigroup structured and underwrote CDOs that included a feature known as a "liquidity put."  The liquidity put was an instrument that obligated Citigroup under certain circumstances to purchase commercial paper backed by certain tranches of the CDO.  Under the terms of the liquidity put arrangement, Citi's obligation to purchase that commercial paper would be triggered if there were a dramatic drop in demand for the commercial paper such that the commercial paper issuer, *i.e.*, the CDO, were unable to re-issue the commercial paper below a certain interest rate.  For Citigroup, owning the commercial paper would be the economic equivalent of holding the tranche that backed the commercial paper, subjecting Citigroup to ever-increasing exposures to the credit markets.

---

[2] Fed Reserve Bank of N.Y., Summary of Supervisory Activity & Findings for Citigroup (2008)("Fed Report"), at 3.

Citigroup did not publicly disclose the existence of these liquidity puts, or the risks they posed to Citigroup, until November 2007 – more than three years after they were first entered into.

4.      By mid-2007 as the United States housing market declined, Citi had accumulated a large portfolio of loans at a high risk of default, as well as bundles of CDOs it could not sell. While other banks began to show signs of trouble, Citi touted its ability to withstand the downturn.  Citi did not disclose that it had been unable to sell many tranches of the CDOs it had created, leaving it holding assets that were losing value as the housing market deteriorated.

5.      By the fall of 2007, Citi's loan loss reserves had dropped to a precariously low level, due to the mounting losses incurred in the Company's mortgage portfolio.  On October 15, 2007, Citi released its third quarter earnings and disclosed that it had increased its reserves by $2.24 billion, a belated yet still inadequate step.  The earnings release focused on the increased credit costs stemming from its lending activities.  Citi mentioned approximately $11.4 billion in recently-packaged CDOs and warehoused loans awaiting securitization, but continued to conceal an additional $54 billion of CDOs it was holding.  In reaction to this partial disclosure, Citi's stock price began its long decline, closing at $44.79, down from $46.24 the day before.

6.      On Sunday evening, November 4, 2007, the Company disclosed the existence of a further $43 billion in CDO exposure on Citi's balance sheet, on top of the previously-disclosed $11.4 billion (which the Company indicated had grown to $11.7 billion).  In part because the rating agencies downgraded numerous CDOs in October 2007, and these ratings directly affected Citi's holdings, Citi also stated that it expected to write down the reported fair value of its CDO portfolio between $8 billion and $11 billion.  These disclosures shocked the market, with analysts noting that "the majority of the exposure . . . has never been disclosed before . . . which

is very surprising," and that the sudden write-downs were "unsettling . . . com[ing] only 3 weeks after the company released 3Q07 earnings."

7.     The market was particularly shocked that Citi was disclosing for the first time that it was forced to repurchase $25 billion in CDOs *at face value*, due to the previously undisclosed liquidity puts it had written when it structured and sold those CDOs.  Because of the liquidity puts, Citi was required to retain these CDOs on its balance sheet when they were issued.  Further, analysts questioned why Citi was waiting until November to write down these previously undisclosed assets, given that the turmoil in the underlying housing market had caused reverberations in the RMBS and CDO market since the beginning of 2007.

8.     In light of these dramatic developments, Citi's CEO and Chairman, defendant Charles Prince, announced his resignation and Citi's stock fell 4.85% to $35.90 at the close on November 5, 2007.  By the end of the week, on November 9, 2007, the stock closed at $33.10.

9.     Citi's loss in the fall of 2007 was not limited to the CDOs and increased loan loss reserves.  Additionally, Citi had sponsored seven off-balance-sheet entities, known as structured investment vehicles ("SIVs"), which sold short-term debt and then invested in longer-term instruments such as RMBS and other subprime-related assets.  During the summer of 2007, as the credit markets tightened, Citi's sponsored SIVs found it difficult both to issue new commercial paper to refinance their operations and to sell off their assets, whose value had become questionable.  Throughout the fall of 2007, market concern increased regarding Citi's obligation to support its SIVs.  News reports discussed how banks could face liabilities for the SIVs they sponsored, and in mid-October, word leaked of a potential rescue fund that a group of banks was working to create.  In mid-December 2007, after rating agencies downgraded the debt of several SIVs and Citi conceded that the total assets of its SIVs were worth $66 billion, not the

4

$83 previously reported, the Company announced that it would "provide a support facility" for its SIVs and would consolidate the SIVs on its balance sheet for the first time.

10.     On January 15, 2008, Citi reported record-breaking losses for the fourth quarter of 2007 – a staggering $9.83 billion, resulting from write-downs of $18.1 billion and increased credit costs of $12.7 billion.  Citi disclosed another $10.5 billion in CDO exposures, which Citi had hedged through contracts with monoline insurers.  In total, Citi eventually disclosed over $65 billion in CDO exposure.  However, even when Citi disclosed its CDO exposure, it continued to misrepresent the quality and value of its remaining holdings.  In constructing its valuation model, Citi disregarded market information, industry knowledge, and even its own internal analysis as to how these assets should be valued.

11.     Along with its fourth quarter results, Citi announced various efforts undertaken to raise capital, including roughly $11.8 billion that had already been secured.  Thus, while the results were dismal, Citi gave its investors the impression that it was taking the necessary steps to reverse course.  Still, the market reacted sharply.  On January 15, 2008, the stock closed down over 7%, from $29.06 to $26.94.  By the end of that week, Citi's stock price had fallen to $24.40.

12.     What investors did not know is that the massive losses announced in January 2008 – as bad as they were – were actually understated.  If Citi had taken the appropriate write-downs and increased its loan loss reserves earlier, its losses would have been materially greater and its Tier 1 capital ratio – which measures a bank's core equity capital (its "Tier 1" capital) as a percentage of its risk-weighted assets – would have been reduced.  Similarly, its Tier 1 leverage ratio – which measures the bank's Tier 1 capital as a percentage of average total consolidated assets – would have been reduced.  Because Citi was highly leveraged, even a small increase in losses among its riskiest assets would have sent its Tier 1 capital ratio below the 6%

threshold and the leverage ratio below the 3% threshold required by regulators for a "well capitalized" bank.  Falling below either threshold would have triggered regulatory scrutiny and set off an alarm to investors, putting the bank at risk of insolvency.

13.     For the first two quarters of 2008, Citi issued public statements to the effect that the Company had turned a corner, with losses decreasing each quarter.  For example, when Citi announced its first quarter results on April 18, 2008, those losses were lower than those from the fourth quarter of 2007, with lower write-downs and a smaller increase in loss reserves.  However, as would later be revealed, Citi was required to take much more substantial write-downs and to increase its loss reserves by a greater amount during the quarter.  Had it done so, its results would have painted a far less rosy picture.  In truth, Citi's loan loss reserves continued to be inadequate in light of its mounting mortgage defaults, and it still failed to take adequate write-downs on the CDOs it had retained.

14.     By mid-September 2008, the financial markets were reeling in the wake of the Lehman Brothers collapse.  Citi executives held morale-boosting sessions with employees and floated positive messages in the press, with its Chief Executive Officer, Vikram Pandit, calling the Company a "pillar of strength in the markets."  But only a month later, on Tuesday, October 14, 2008, Citi received its first infusion of bail-out funds from the federal government.  Two days later, on October 16, the Company released its third-quarter earnings.  Citi had not, in fact, turned a corner; the Company's reported losses *increased* by $600 million, or $0.11 per share.  Citi announced yet another $4.4 billion in write-downs and another $3.9 billion increase in its loan loss reserves.  By Friday, October 17, 2008, Citi's stock had fallen from $18.62 on October 14 to $14.88, nearly double the decline in the S&P 500 during that time.

15.     The situation deteriorated further in November 2008.  On November 17, Pandit held an employee Town Hall meeting.  While he again noted Citi's strong capital position, the market was skeptical.  Then, on November 19, Citi announced it would have to unwind its SIVs, taking a $17.4 billion hit in the process.  The damage to Citi's stock was dramatic.  After word surfaced of the Town Hall meeting, the price fell from $9.52 to $8.89.  Then, after the news on the SIVs, the stock fell 23% in a single day, to $6.40.  By Friday, November 21, 2008, the stock closed at $3.77.

16.     Despite this steady trickle of bad news, Citi continued to insist that the Company was strong.  On Sunday, November 23, 2008, however, after an emergency weekend session with the government and Citi's board, the parties announced a $326 billion bail-out package.  The federal government would provide $301 billion in loan guarantees, largely to guarantee the at-risk subprime mortgages and toxic assets Citi could not sell.  Analysts noted that Citi had been touting the Company's soundness while at the same time negotiating with the government for the bail-out.

17.     Without the federal government's bail-out package the Company may well have gone under.  But even that effort was not enough to stop the stock's decline.  Starting on January 10, 2009, reports circulated about Citi's precarious condition and the prospect of it selling Smith Barney, its profitable brokerage arm, in order to generate cash.  This move signaled desperation to Citi's investors, and the stock fell from $6.75 to $5.60 on this news.

18.     Amid continued discussion of Citi's viability, on January 16, 2009, Citi released its earnings for the fourth quarter of 2008, which were worse than predicted – an $8.3 billion loss, or $ 1.72 per share.  Citi's stock price collapsed, closing at $3.50 on January 16.

19.     In less than two years, from October 15, 2007, through January 16, 2009, Citi's stock price fell almost 93%, from $47.72 to $3.50.  It performed worse than the Dow, the S&P Financial Index, and individual peers such as Bank of America, Goldman Sachs, and JPMorgan. What now remains of this former giant is Citicorp, the unit that retains its profitable business lines, and Citi Holdings, which was created largely to manage the toxic assets that were central to Citi's collapse and generated an $8.3 billion loss in 2009.  In June 2009, Citi was removed from the Dow Jones Industrial Average.  Although Citi reported positive earnings per share for the first two quarters of 2010 (compared to losses in three of the four quarters in 2009), its recovery has only begun.  Its stock still hovers in the $3.00 range (unadjusted for stock splits), gaining back little of the ground lost between 2007 and 2009.[3]

20.     In Count One of this Complaint, Plaintiffs assert a non-fraud claim pursuant to English statutory law.  Plaintiffs specifically disclaim any allegations of fraud in Count One.  In Counts Two and Three, Plaintiff Swisscanto Asset Management International S.A. asserts fraud-based claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## II.     JURISDICTION AND VENUE

21.     The claims herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated under the Exchange Act; and under the Financial Services and Markets Act 2000 (UK).

22.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331, 1332 and 1367.

---

[3] Due to a 1-for-10 reverse stock split on May 9, 2011, Citi's stock price increased ten-fold, and now trades in the $30.00 range, but this corresponds in value to $3.00 had Citi not effected the reverse split.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as Citigroup is headquartered in this District and many of the untrue statements and omissions were made in or issued from this District.  Many of the acts and transactions giving rise to the violations of law complained of occurred in this District.

24.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange and market.

## III.    THE PARTIES

### A.    PLAINTIFFS

25.     Plaintiff Swisscanto Asset Management AG ("Swisscanto AG") is an investment fund management company established under the laws of Switzerland.  Swisscanto AG is authorized under Swiss law to bring this action on behalf of the funds it manages.  During the Relevant Period, Swisscanto AG purchased Citigroup common stock on behalf of funds it managed, as well as bonds with the following ISINs:   XS0245936496, CH0018140878, CH0022549015, CH0024683192, CH0026791225, and CH0027670352.  Because Defendants' public disclosures were materially false and misleading, the funds managed by Swisscanto AG suffered substantial losses on these investments.

26.     Plaintiff Swisscanto Asset Management International S.A. ("Swisscanto International") is an investment fund management company established under the laws of Luxembourg.  Swisscanto AG is authorized under Luxembourg law to bring this action on behalf of the funds it manages.   During the Relevant Period, Swisscanto International purchased Citigroup common stock on behalf of funds it managed.  Because Defendants' public disclosures

were materially false and misleading, the funds managed by Swisscanto International suffered substantial losses on these investments.

### B.   DEFENDANTS

#### 1.   Citigroup

27.     At all relevant times herein, defendant Citigroup Inc. ("Citigroup" or "Citi" or the "Company") has been a diversified global financial services holding company, incorporated under the laws of the State of Delaware, and headquartered at 399 Park Avenue, New York, New York.  Citi offers a broad range of financial services to consumer and corporate customers, with more than 200 million customer accounts and operations in more than 100 countries.  As of December 31, 2009, Citigroup reported total assets of approximately $1.86 trillion, down from $1.9 trillion in 2008 and $2.19 trillion in 2007, and 2009 net revenues of $80 billion, down from $86 billion in 2006.  In terms of deposits, as of March 2010, Citigroup ranked as the third largest bank in the United States, behind Bank of America and JPMorgan Chase.

#### 2.   Individual Defendants

28.     Defendant Charles "Chuck" Prince ("Prince") served as Citi's Chief Executive Officer ("CEO") from October 2003 until November 4, 2007, when he resigned in the wake of revelations of large losses stemming from Citi's CDO exposure.  He also served as Citi's Chairman from April 18, 2006 through November 4, 2007.  Defendant Prince signed Citi's Form 10-K filings for the years 2003 through 2006, as well as certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act that those Form 10-K filings and Citi's Form 10-Q filings for each quarter through the third quarter of 2007 did not contain any untrue statement of material fact or omit any material fact, and that they presented fairly, in all material respects, the Company's financial condition and results of operations.  Prince was also quoted in Citi's press releases, participated in conference calls with securities and market analysts.  As the most senior

executive officer of Citi during his tenure, Defendant Prince was responsible for the day-to-day operations of the Company. Defendant Prince is responsible for Citi's untrue statements and omissions complained of herein that were made prior to November 4, 2007.

29.    Defendant Gary Crittenden ("Crittenden") served as Chief Financial Officer ("CFO") of Citi from March 12, 2007 until March 2009. He subsequently served as Chairman of Citi Holdings until July 9, 2009, when he resigned to join a private equity firm. Crittenden signed Citi's Form 10-K and 10-Q filings for 2007 and 2008, as well as certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act indicating that those Form 10-K and 10-Q filings did not contain any untrue statement of material fact or omit any material fact, and that they presented fairly, in all material respects, the Company's financial condition and results of operations. Crittenden also participated in conference calls with securities and market analysts. As a senior executive officer of Citi, Crittenden was responsible for the day-to-day operations of Citigroup and his behavior is central to Citigroup's misconduct. On July 29, 2010, the SEC filed fraud charges against Citigroup challenging Citi's repeated misleading statements about the extent of its holdings of assets backed by sub-prime mortgages in earnings calls and public filings. Throughout the period in question, Citigroup represented that its sub-prime exposure in Citigroup's investment banking unit, Citi Markets & Banking, was $13 billion or less, when in fact, at all times during that period, the investment bank's sub-prime exposure was over $50 billion. Defendant Crittenden is responsible for Citi's untrue statements and omissions complained of herein that were made after March 12, 2007, and the SEC instituted (and settled) cease-and-desist proceedings against Defendant Crittenden for his role in making, and causing Citigroup to make, certain of these misleading statements. Crittenden agreed to pay a penalty of $100,000.00.

30. Defendant Robert Druskin ("Druskin") was Chief Operating Officer ("COO") of Citigroup and a member of the Office of the Chairman from December 11, 2006 until his retirement in December 2007. During that period, he supervised all aspects of the business and was a participant in meetings regarding Citi's CDO exposure, held daily starting in July 2007. Prior to becoming COO of Citigroup, Druskin had been a senior executive in the Citigroup Corporate and Investment Banking Group ("CIB"), serving as its President and COO from August 2002 until December 2003 and as its CEO since December 2003.

31. From 2004 until October 2007, Defendant Thomas G. Maheras ("Maheras") was the CEO of the Company's Global Capital Markets, a division of Citi Markets and Banking, which arranged the CDOs and other Variable Interest Entities. From January 2007 through October 2007, Defendant Maheras was also Co-President of Citi Markets and Banking, and was Co-Chair of Citi Markets and Banking from May 2007 through October 2007. Maheras was involved in the drafting, preparation, and/or approval of Citi press releases, SEC filings, and other public statements. Defendant Maheras was also a participant in meetings regarding Citi's CDO exposure, held daily starting in July 2007.

32. Defendant Michael Stuart Klein ("Klein") was Chairman of the Institutional Clients Group and Vice Chairman of Citigroup from March 2008 until July 21, 2008. Previously, Klein was Chairman and Co-CEO of Citi Markets and Banking, and had been CEO of Global Banking from 2004 until he became Co-CEO of Citi Markets and Banking on January 20, 2007. Klein was involved in the drafting, preparation, and/or approval of Citi press releases, SEC filings, and other public statements. Defendant Klein was also a participant in meetings regarding Citi's CDO exposure, held daily starting in July 2007.

33.     Defendants Prince, Crittenden, Druskin, Maheras, and Klein are collectively referred to herein as the "Individual Defendants."

34.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Citigroup, its business, operations, operational trends, finances, and present and future business prospects.   The Individual Defendants ascertained such information through Citigroup's internal corporate documents, conversations and connections with other corporate officers, bankers, traders, risk officers, marketing experts, and employees, attendance at management and/or Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Citigroup officers and/or directors.

35.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the Company's various SEC filings, press releases and other public statements during their tenures at the Company.   Further, as officers and directors of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, risk, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

36.     It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the Company's public filings, press releases and public

statements were products of the collective actions of those Individual Defendants who were members of the Company's board of directors and/or senior management when those statements were issued.

## IV.    SECURITIES PURCHASED BY PLAINTIFFS

37.    During the Relevant Period, Plaintiffs purchased the following securities issued by the Citigroup Defendants:

(i)    Common stock issued by Citi (ISIN US1729671016) ("Common Stock");

(ii)    4.5% Fixed Rate Subordinated Sterling Notes due 2031, issued by Citi (ISIN XS0245936496) ("4.5% Sterling Notes");

(iii)    3.0% Senior Unsecured Notes Due 2014, issued by Citi (ISIN CH0018140878) ("3.0% Swiss Notes Due 2014");

(iv)    1.75% Notes Due 2010, issued by Citi (ISIN CH0022549015) ("1.75% Swiss Notes");

(v)    2.75% Fixed/Floating Rate Callable Subordinated Notes Due April 2021, issued by Citi (ISIN CH0024683192) ("2.75% Swiss Notes");

(vi)    3.125% Fixed Rate Senior Notes 2006-2021 (ISIN CH0026791225) ("3.125% Swiss Notes"); and

(vii)    Floating Rate Notes 2006-2009, issued by Citi (ISIN CH0027670352) ("Floating Rate Swiss Notes").

38.    The securities listed in the paragraph immediately above are collectively referred to herein as the "Securities."  The Securities listed in subparagraphs (ii) through (vii) above are collectively referred to herein as the "Euro Notes."

39.    Each of the Plaintiffs purchased Citigroup Common Stock in the open market during the period from February 1, 2007 through April 17, 2008 (the "Fraud Period").  The Common Stock was listed on a U.S. exchange at all times during the Fraud Period.  Plaintiffs assert fraud-based claims pursuant to Sections 10(b) and 20(a) of the Exchange Act with respect to their purchases of Common Stock during the Fraud Period.

14

40.     The 4.5% Sterling Notes (ISIN XS0245936496) were issued by Citi in a March 2, 2006 offering under the US$40 billion Programme for the issuance of Euro Medium-Term Notes, Series B (the "US$40 billion Programme").   The offering documents included Citi's October 12, 2005 Base Prospectus for the US$40 billion Programme, as supplemented and updated by supplements to the Base Prospectus dated October 28, 2005, November 14, 2005, and February 28, 2006, and by the Final Terms dated March 2, 2006.   These offering documents incorporated by reference Citi's: 2005 Form 10-K, filed February 24, 2006; and November 4, 2005 Form 10-Q (for the period ended September 30, 2005).   The offering of the 4.5% Sterling Notes is governed by the laws of England, according to its terms as set forth in the Base Prospectus for the US$40 billion Programme.   Plaintiff Swisscanto AG purchased 4.5% Sterling Notes in the secondary market during the Relevant Period.

41.     The 3.0% Swiss Notes Due 2014 (ISIN CH0018140878) were issued by Citi in a series of 4 tranches ending August 18, 2004, under the US$18 billion Programme for the Issuance of Euro Medium-Term Notes, Series B.   The offering documents included Citi's Offering Memorandum dated April 30, 2004 and the Final Term Sheet, which incorporated by reference Citi's 2003 Annual Report on Form 10-K dated March 1, 2004, and First Quarter 2004 Form 10-Q dated May 5, 2004.   The offering of the 3.0% Swiss Notes Due 2014 was governed by the laws of England pursuant to the terms of the April 30, 2004 Offering Memorandum. Plaintiff Swisscanto AG purchased 3.0% Swiss Notes Due 2014 in the secondary market during the Relevant Period.

42.     The 1.75% Swiss Notes (ISIN CH0022549015) were issued by Citi in a September 23, 2005 offering under the US$35 billion Programme for the Issuance of Euro Medium-Term Notes, Series B ("US$35 billion Programme").   The offering documents included

the Offering Memorandum dated August 30, 2004 and a Term Sheet dated on or about September 23, 2005.  These offering documents incorporated by reference Citi's 2004 Annual Report on Form 10-K dated March 18, 2005, first quarter 2005 Form 10-Q dated May 4, 2005 and second quarter 2005 Form 10-Q dated August 4, 2005.  The offering of the 1.75% Swiss Notes is governed by the laws of England pursuant to the terms of the Offering Memorandum dated August 30, 2004.  Plaintiff Swisscanto AG purchased 1.75% Swiss in the secondary market during the Relevant Period.

43.     The 2.375% Swiss Notes (ISIN CH0022549122) were issued by Citi in a September 23, 2005 offering under the US$35 billion Programme.  The offering documents included the Offering Memorandum dated August 30, 2004 and a Term Sheet dated on or about September 23, 2005.  These offering documents incorporated by reference Citi's 2004 Annual Report on Form 10-K dated March 18, 2005, first quarter 2005 Form 10-Q dated May 4, 2005 and second quarter 2005 Form 10-Q dated August 4, 2005. The offering of the 2.375% Swiss Notes is governed by the laws of England pursuant to the terms of the Offering Memorandum dated August 30, 2004.  Plaintiff Swisscanto AG purchased 2.375% Swiss Notes in the secondary market during the Relevant Period.

44.     The 2.75% Swiss Notes (ISIN CH0024683192) were issued by Citi in an April 3, 2006 offering under the US$40 billion Programme.  The offering documents included Citi's October 12, 2005 Base Prospectus for the US$40 billion Programme, as supplemented and updated by supplements to the Base Prospectus dated October 28, 2005, November 14, 2005, and February 28, 2006, and by the Final Terms dated April 3, 2006.  These offering documents incorporated by reference Citi's: 2005 Form 10-K, filed February 24, 2006; November 4, 2005 Form 10-Q (for the period ended September 30, 2005); May 5, 2006 Form 10-Q (for the period

16

ended March 31, 2006); and August 4, 2006 Form 10-Q (for the period ended June 30, 2006). The offering of the 2.75% Swiss Notes is governed by the laws of England, according to its terms as set forth in the Base Prospectus for the US$40 billion Programme and in the Final Terms dated April 3, 2006.  Plaintiff Swisscanto AG purchased 2.75% Swiss Notes in the secondary market during the Relevant Period.

45.     The 3.125% Swiss Notes (ISIN CH0026791225) were issued by Citi in a September 27, 2006 offering under the US$40 billion Programme.  The offering documents included Citi's October 12, 2005 Base Prospectus for the US$40 billion Programme, as supplemented and updated by supplements to the Base Prospectus dated October 28, 2005, November 14, 2005, February 28, 2006, and September 22, 2006, and by the Final Terms dated September 25, 2006.  These offering documents incorporated by reference Citi's: 2005 Form 10-K, filed February 24, 2006; November 4, 2005 Form 10-Q (for the period ended September 30, 2005); May 5, 2006 Form 10-Q (for the period ended March 31, 2006); and August 4, 2006 Form 10-Q (for the period ended June 30, 2006).  The offering of the 3.125% Swiss Notes is governed by the laws of England, according to its terms as set forth in the Base Prospectus and the Final Terms.  Plaintiff Swisscanto AG purchased 3.125% Swiss Notes in the secondary market during the Relevant Period.

46.     The Floating Rate Swiss Notes (ISIN CH0027670352) were issued by Citi in a November 29, 2006 offering under the US$55 billion Programme.  The offering documents included Citi's October 12, 2006 Base Prospectus for the US$55 billion Programme, as supplemented and updated by the Final Terms dated November 23, 2006.  These offering documents incorporated by reference Citi's: 2005 Form 10-K, filed February 24, 2006; 2004 Form 10-K, filed February 28, 2005; and August 4, 2006 Form 10-Q.  The offering of the

Floating Rate Swiss Notes is governed by the laws of England, according to its terms as set forth in the Base Prospectus and the Final Terms.  Plaintiff Swisscanto AG purchased Floating Rate Swiss Notes in the secondary market during the Relevant Period.

47.     Plaintiff Swisscanto AG asserts non-fraud-based claims under U.K. law based on its purchases of Euro Notes during the Relevant Period.

48.     Additional details regarding Plaintiff's purchases and sales of the Securities can be provided on a confidential basis to the Court or defense counsel.

## V.     BACKGROUND ALLEGATIONS PERTINENT TO ALL COUNTS

### A.     SUBPRIME MORTGAGES BECOME ATTRACTIVE TO LENDERS

49.     For lenders, the historically-underserved "subprime borrower" became a very attractive source of potential profit during the early-to-mid 2000s.  In broad terms, a subprime borrower is generally one who has a high debt-to-income ratio (usually 50% or greater), an impaired or minimal credit history, or some other characteristic that is associated with a higher risk of default.

50.     Lenders typically rely on the Fair Isaac Credit Organization ("FICO") credit score to classify a borrower as "prime," "nonprime," or "subprime."  FICO defines the FICO score, which ranges from 300 to 850, as "the standard measure of U.S. consumer risk" and "the recognized industry standard in consumer credit risk assessment."  A borrower with a FICO score below 660 is generally labeled "subprime."

51.     Additionally, "subprime," when used to describe mortgages, may refer to loans sharing certain underwriting characteristics that increase the likelihood of default, often because the borrower cannot satisfy the underwriting criteria employed for conforming, prime loans.  The underwriting features associated with subprime mortgages include: (1) high loan-to-value ("LTV") ratios, often in excess of 80%; (2) minimal or no down payment; (3) low introductory,

or "teaser" rates; (4) the option to pay less than the monthly principal and interest payment; and

(5) minimal or no documentation or verification of borrower income or assets (otherwise known

as "stated income," "no income/no asset verification," "NINA" or "no-doc" loans).  Depending

on the collateral and the lender's underwriting criteria, loans bearing some of these hallmarks

may be classified as "Alt-A" or "nonprime," a category falling somewhere between prime and

subprime.

52.     The LTV ratio is particularly important in assessing the risk associated with a

subprime loan.  The LTV ratio compares the amount loaned to the total appraised value of the

property.  For example, if a borrower obtains a mortgage for $70,000 to purchase a house worth

$100,000, the LTV ratio is 70%.  Lower LTV ratios are indicative of less risk for two reasons.

First, a borrower with a low loan balance relative to the value of the property is less likely to

default, because he has too much equity at stake to risk losing the property if he defaults.

Second, in the event of default, the built-in equity cushion protects the lender from loss, because

even after the costs of foreclosure are factored in, the lender is still at a greater likelihood of

recouping the original loan amount.

### B.     THE PROLIFERATION OF FINANCIAL INSTRUMENTS BACKED BY U.S. RESIDENTIAL MORTGAGES

53.     Lenders were motivated to engage in riskier lending practices, such as subprime

lending, because of the expansion in the market for securities backed by pools of mortgages.

These mortgage-backed securities ("MBS") and CDOs enabled lenders to sell mortgages to third

parties, thereby transferring the risk of delinquencies and defaults on the mortgages they

originated.  Thus, lenders could generate profits by ramping up originations, regardless of loan

quality.

54.     MBS and CDOs are types of asset-backed securities ("ABS").  ABS are not a new concept.  The Government National Mortgage Association ("Ginnie Mae") had been bundling and selling securitized mortgages as ABS for years.  However, the collateral underlying Ginnie Mae's ABS was subject to strict criteria that earned these securities AAA ratings from the credit rating agencies.  As the real estate market exploded, ABS were used as a platform to propagate new, more creative financial instruments that often bundled and re-bundled subprime mortgages or loans to borrowers with less-than-stellar credit.

55.     For instance, the RMBS bundled subprime residential mortgages.  To create an RMBS, an originator or underwriter purchased a large number of individual residential mortgages (often numbering in the thousands) from banks and/or non-bank mortgage lenders (*e.g.*, Citigroup).  Generally, the mortgages underlying an RMBS possessed similar characteristics with respect to the quality of the borrower (prime, Alt-A or subprime), so that they could be pooled together and rated accordingly.

56.     Once the originator or underwriter purchased a sufficient number of mortgage loans, it then pooled the mortgages together and sold them to a "special purpose vehicle" ("SPV").  An SPV is a separate, bankruptcy-remote legal entity created by the originator in order to transfer the risk of the mortgages off the originator's balance sheet.  The SPV takes title of the individual mortgages and issues bonds or RMBS collateralized by the transferred mortgage pool. RMBS are issued in several unequal classes called tranches, ranging from "High Grade" (AAA and AA-rated bonds), to "Mezzanine" (BBB- to B-rated bonds), to an unrated equity tranche sometimes called the "residual."

57.     The SPV is able to issue AAA-rated paper out of a pool of subprime mortgages through the prioritization of payments and the apportionment of losses among the different

classes.  Typically, the AAA-rated tranche of the RMBS receives first priority on cash flows from the borrowers on the underlying mortgages (otherwise known as "remittance payments") but receives a lower yield on the investment, reflecting less reward for less presumed risk. Conversely, the equity tranche holders receive the highest return on their investment because the equity tranche is the first tranche to experience losses in the event that the underlying pool of mortgages experiences defaults. Under the typical payment structure, the AAA-rated RMBS-holder would only experience losses if both the equity and mezzanine tranches were exhausted as a result of credit events, such as defaults, in the underlying mortgage collateral.

58.     In most instances, an RMBS originator or underwriter worked closely with one of the three rating agencies, Moody's Investors Service ("Moody's"), Standard & Poor's ("S&P") or Fitch Ratings ("Fitch"), to determine the right combination of mortgages to include as collateral for a given RMBS.  The goal for an originator or underwriter was to fill each mortgage pool with high-interest-paying but riskier collateral that would still allow for an AAA-rated class of RMBS.  Riskier Alt-A and subprime borrowers typically paid higher interest rates on their loans to compensate the lender for taking on the additional risk.  By securing an RMBS with riskier loans that carried higher interest rates, an originator theoretically maximized the amount of interest payments that were paid into the SPV.  This, in turn, allowed the SPV to issue RMBS bonds that paid higher interest rates, which placed the SPV at a competitive advantage in attracting investors.

59.     Once a payment schedule was agreed upon and the rating agency assigned ratings to the various RMBS tranches, the SPV sold the resulting RMBS to investors.  The SPV transferred proceeds from the sale of the RMBS to the originator in consideration for the

underlying collateral. Additionally, the SPV passed on the remittance payments from the individual mortgagees to the RMBS-holders by the priority dictated in the RMBS agreement.

60.     The following chart, created by the Commercial Mortgage Securities Association ("CMSA"), illustrates the structure of a typical RMBS:



61.     While the RMBS structure may seem intuitive, it was by no means the end of the line from a financial engineering perspective.  Citigroup, among others, was also involved in developing more complex structured finance products designed to profit from subprime RMBS, most notably CDOs.

62.     Essentially, a CDO invests in a group of assets and then issues securities "collateralized" by those assets.  It is created in very much the same way as RMBS, the key

difference being that while RMBS are backed by a pool of residential mortgages, the bonds issued by a CDO are collateralized by a pool of RMBS tranches.

63.     Just as with RMBS, CDO originators amassed a collection of assets for inclusion in the CDO, a process known as "warehousing" or "ramping up" the CDO.  Instead of warehousing residential mortgages, a CDO originator collected tranches of RMBS.  In the course of this process, the CDO originator had to evaluate the quality of the RMBS tranches that would be used to collateralize the CDO.  In other words, the originator had to decide if it was creating a "Mezzanine CDO," which typically would be collateralized by lower BBB/BB-rated RMBS tranches, or a "High Grade CDO," which typically would be collateralized by AAA/AA-rated RMBS tranches.  CDO originators earned higher fees for structuring Mezzanine CDOs, which also paid higher interest rates to the CDO investors.

### C.     CITIGROUP'S INVOLVEMENT IN MORTGAGE-RELATED ACTIVITIES

64.     Citigroup was an active participant in both the mortgage origination and securitization industries during the Relevant Period, and its eventual losses were precipitated by its activities on both fronts.

### 1.     Subprime Lending Fuels Citi's Bottom Line

65.     Beginning in 2005, Citi aggressively expanded its subprime lending, both through direct originations and through purchases from third parties known as "correspondent" lenders. By 2006, Citi was the fourth-largest mortgage originator, with $132.9 billion in loan originations in the first nine months of that year.  Citi's first mortgage portfolio grew to $150 billion by the end of 2007.

66.     By expanding its loan originations, Citi generated a pool of mortgages it could then bundle into RMBS, which it could then bundle into CDOs, both of which were then often

sold to Citi-sponsored SIVs.  Thus, the same loans became a source of revenue multiple times, and fueled Citi's growth in both its lending and banking businesses.

### 2. Citi's Mortgage Portfolio Included Large Volumes Of Subprime And Other Risky Loans

67.    Citi's expansion into subprime lending also expanded its exposure to risk of default.  By the end of 2007, Citi had direct exposure to roughly $24 billion in subprime first mortgages and roughly $63 billion in second mortgages.[4]  These second mortgages posed significant risk because, as a holder of a second lien, the lender is the last to be re-paid.  Thus, as housing prices declined and default rates increased, the risk and magnitude of losses on the second mortgages became more severe than on first liens.

68.    Additionally, Citi's portfolio was highly susceptible to losses from its high LTV (loan-to-value) loans.  By the end of 2007, Citi was exposed to over $50 billion in loans in the highest-risk category (*i.e.*, LTV of 90+%) and another $75 billion in the 80+% category, more than any of its peers.

### 3. Citigroup's CDOs

69.    Citigroup was heavily involved in the CDO market, and not simply as an investor. In 2006, Citi was the second-largest mortgage CDO underwriter, issuing $34 billion of such securities in a single year.  In 2007, Citi became the world's largest underwriter of mortgage CDOs, issuing $49.3 billion of such securities, eclipsing rivals Merrill Lynch and Deutsche Bank.  Citi thus had unparalleled insight into the true condition of the CDO market during the Relevant Period.  Citi also retained billions of dollars of CDOs on its books (and, as discussed below, off its books).

---

[4]  Second mortgages are substantially similar to home equity lines of credit, or "HELOCs," and the two terms are sometimes used interchangeably by the press and analysts.  Technically, however, a HELOC is a credit line and operates more like a credit card, where the balance and interest rates can fluctuate.

70. In addition to underwriting and holding real CDOs, Citi was also the world's third-largest arranger of synthetic mezzanine ABS CDOs from 2004 to 2007. According to the Wall Street Journal, Citi underwrote more than $14 billion in notional value of these derivative products, more than any other U.S. bank, including Goldman Sachs. Citi thus had almost unparalleled access to data showing that by the end of 2006, investor sentiment had started to turn sharply against these assets.

71. As discussed in more detail below, Citigroup also wrote liquidity puts on $25 billion of Commercial Paper CDOs, but did not disclose the massive exposure until Citi had already repurchased the assets (at face value).

72. Despite Citi's leading position and clear expertise in the CDO market, its true exposure to these assets was completely hidden from investors. First, Citi's CDOs were created based on an unrealistic model, in terms of assessing the probable losses and assigning the appropriate ratings to correspond to the different degrees of risk among the tranches. Second, as Citi's CDOs became harder to sell, it simply recycled unsold tranches into new issues, creating increasingly inferior products, with increasingly higher risks, despite the fact that each CDO was comprised primarily of ostensibly AAA-rated tranches.

73. Citi created its CDOs based on assumptions regarding three key factors: (1) the risk of default of the underlying asset (*i.e.*, each RMBS tranche being included in the CDO); (2) the severity of any likely loss; and (3) the degree of correlation between the underlying assets, *i.e.*, the degree to which the risk of default among the RMBS was related and not independent.

74. Citi's assumptions regarding these three factors were problematic for several reasons. Citi's assumptions regarding the risk of default and likely losses were completely unreasonable. In fact, Citi's model assumed that housing prices would continue to rise by 6%

each year in perpetuity.  When prices started to decline, the foundation of Citi's model crumbled, as both the risk of default and severity of default were bound to increase.

75.     Additionally, Citi's assumptions regarding the degree of correlation were unrealistic in any housing market.  Each CDO collected a basket of RMBS, which themselves collected thousands of mortgages.  Thus, each CDO appeared to have massive diversification. However, the CDOs did not provide the degree of non-correlation necessary to make diversification effective.  Because each RMBS tranche was comprised of subprime mortgages, which grew more similar and more risky between 2004 and 2006, each tranche was actually a basket of *highly correlated* assets.  A BBB-rated RMBS tranche contained mortgages that were somewhat likely to default; a BBB-rated CDO tranche contained tens of thousands of mortgages that shared the *same* likelihood of default.  Further, the diversification provided within each RMBS was actually reversed in the CDO, as explained in a Citigroup quantitative credit strategy and analysis group report for investors.[5]  Thus, losses were likely to spread widely across the CDO and the degree of correlation actually increased with each tranche.  Accordingly, the correlation was higher for the super senior tranches, rendering these super senior tranches quite vulnerable to losses from more junior tranches.  In this sense, these super senior tranches were far riskier than their name and AAA-rating would suggest.

### 4.     Citigroup's SIVs

76.     Citigroup also created highly risky off-balance sheet special purpose entities called SIVs.  SIVs, which were invented by Citigroup in 1988, are essentially investment companies set up as special purpose entities ("SPEs"), which generate investment returns by borrowing money at low interest rates in the short and medium term commercial paper market,

---

[5] *See CDO of ABS sub-prime exposure assessed*, STRUCTURED CREDIT INVESTOR, Mar. 28, 2007.

and investing that money in long-term fixed income instruments, such as mortgage backed securities and credit card debt, which pay higher interest rates. In other words, SIVs are set up to capture the spread between lower short-term interest rates and higher long-term interest rates, a process that has been described as "yield curve arbitrage." These SIVs also invest in CDOs and other mortgage-related securities. All of these instruments rely on the underlying soundness of the long-term securities upon which their value is ultimately based. Citigroup received significant fees in exchange for managing these SIVs.

77.     SIVs are subject to a number of risks, including the risk associated with their underlying investments.

78.     Furthermore, because SIVs fund their operations by raising short-term debt and then use these funds to purchase long-term assets, there is a classic mismatching of the duration of assets and liabilities, with the result that SIVs are subject to significant "liquidity risk." In other words, because SIVs constantly re-borrow in the short-term commercial paper market, the SIVs always face the risk that they will not be able to re-borrow if lenders in the commercial paper market withdraw. In that event, the SIVs would no longer be able to hold their long-term assets and would be required to sell them. If there were no demand for those assets, the SIVs could be forced to sell those assets at depressed prices.

79.     The ratings agencies, which rated the commercial paper issued by SIVs, explicitly analyzed liquidity risk in rating SIVs. On March 13, 2002, Standard & Poor's published "Structured Investment Vehicle Criteria," which outlined all the criteria considered by Standard & Poor's in rating an SIV. Among the criteria, Standard & Poor's cited the SIV's liquidity risk, which was described as follows:

> Liquidity risk in a SIV arises in two scenarios. While most SIVs
> issue a mixture of CP [commercial paper] and MTNs [medium

> term notes], their weighted-average liability maturity is usually
> about four to six months, whereas the assets in the vehicle will
> have considerably longer average maturities. Secondly, some of
> the SIV's assets will require due diligence by potential purchasers,
> thereby increasing the sale period for such assets.

80.     Citi was affiliated with seven SIVs, for which it provided management and other

services.   Additionally, for reputational reasons, Citi was at all material times committed to

providing a liquidity back-stop to its affiliated SIVs in the event they failed.   Because of

Citigroup's explicit and implicit commitments to its affiliated SIVs, Citigroup was a "primary

beneficiary" of the SIVs and was required to consolidate these entities' financial results on its

financial statements and to disclose the carrying amount and classification of the consolidated

assets that were collateral for the SIVs' obligations.

81.     Citigroup consolidated its seven affiliated SIVs' financial statements on its

balance sheet as of December 31, 2007, but understated the risk to which Citigroup was exposed

as a consequence of its ties to the SIVs.   The true extent of that risk did not become apparent to

investors until November 19, 2008, when Citigroup disclosed that the SIVs were so impaired that

it could not find a buyer.   Citi paid $17.4 billion to wind down the SIVs and bring the assets onto

its balance sheet.   Simultaneously, the assets were written down by another $1.1 billion.

### D.     INDICATORS THAT MORTGAGE MARKETS WERE DETERIORATING BY 2005

82.     By late 2005, three key indicators used by industry experts to assess the state of

the mortgage market pointed in the direction of a slowdown in mortgage markets.   First, as

illustrated by the chart below, the Housing Price Index, which measures changes in home prices,

peaked in mid-2005 and declined precipitously from late 2005 through 2007:



83.     Second, as housing prices declined, interest rates began to rise from their historically-low levels:



84. This combination was devastating for borrowers who had over-extended themselves by purchasing homes based on their ability to pay initial lower monthly payments marketed by lenders as part of "payment-option" loan products or other adjustable rate mortgages ("ARMs"). The original theory behind these mortgages was that as long as home values continued to rise, the borrower could use the increased equity to "catch-up" on their payments and refinance the mortgage when the low introductory or adjustable rate was about to expire.

85. Unfortunately, with rising interest rates, declining home prices and expiring introductory rates, many borrowers began to experience "payment shock" as monthly payments increased to account for recasting of interest rates and resetting of payments to fully-amortizing levels. As a result, beginning in mid-2005, mortgage default rates, the third indicator of the state of the mortgage market, rose drastically for subprime loans with variable rates, as illustrated in the chart below:



NOTE: The data are monthly. Prime-mortgage data extend through April 2007, and subprime-mortgage data extend through May 2007. Delinquency rate is the percent of loans ninety days or more past due or in foreclosure. Prime mortgages include near-prime mortgages.
SOURCE: First American LoanPerformance.

86.     Citi, which repeatedly touted its conservative approach, its sophisticated risk modeling tools, and its active and diligent risk management, was aware of the spike in loan delinquencies beginning in mid-2005 and witnessed a similar spike in delinquencies in its own mortgage loan portfolio.  These sharp increases in mortgage delinquency rates foreshadowed an increase in defaults by subprime and other ARM borrowers.

E.      **INDICATORS THAT SECONDARY MARKETS FOR MBS AND CDOS WERE DETERIORATING BY JANUARY 2007**

87.     The spike in mortgage delinquencies materially affected the value of RMBS and CDOs, which Citigroup had amassed in its loan portfolio and which were tied to the revenue streams that the underlying subprime mortgages were supposed to generate.  This rise in delinquencies, in conjunction with declining home values and rising interest rates, made it more difficult for subprime and ARM borrowers to refinance their way out of resetting mortgages they could not afford.  This, in turn, exacerbated already-deteriorating market conditions.

88.     By January 2007, if not earlier, Citi knew or should have known that this convergence of factors would materially impair even the highest rated subprime RMBS and thus even the most senior tranches of subprime-related CDOs.  This decline in value was reflected in a specialized index, the ABX.HE ("ABX Index"), which was designed in January 2006 by a consortium of banks, including Citigroup, to track the value of subprime RMBS tranches.  Specifically, the ABX Index measures the cost of purchasing protection for a subprime RMBS.  If the cost of "insuring" an RMBS increases, that suggests that the market anticipates that the RMBS will suffer future losses in value.   The American Institute of Certified Public Accountants' Center for Audit Quality has affirmed the relationship between the level of the ABX Index and the value of securities backed by subprime mortgages.

89.     The consortium created different ABX indices to correspond to different types of underlying RMBS.   Thus, the ABX.AAA was designed to correspond to the performance of AAA-rated RMBS, whereas the ABX.BBB corresponded to the performance of BBB-rated RMBS.   Additionally, in February 2007, the consortium of banks created an index called the TABX, to track the value of different tranches of Mezzanine CDOs.

90.     In June 2006, national home prices began to fall.   By the end of November 2006, the ABX posted it first "credit event" (interest-rate shortfall): borrowers were failing to make interest payments sufficient to pay off certain risky subprime bonds, the bonds typically used to fund CDOs.

91.     As set forth in the chart below, during the first half of 2007 the value of the ABX.BBB Index plummeted, evidence that the cost of insuring subprime RMBS had increased dramatically.   This corresponds to the rise in payment delinquencies reported at the same time.

**Figure 5: ABX.BBB 06-2**



Source: Markit

92.     By February and March 2007, the ABX Index for BBB and BBB- RMBS tranches had suffered substantial declines.  The ABX.BBB 06-2 index, shown above, was down to roughly 80% of par and some BBB- tranches had dropped to approximately 60% of par.  Likewise, CDO prices plummeted at every Mezzanine CDO level, including the "super senior" levels that had been retained by Citigroup during its securitization process.

93.     In addition, by the end of 2005, major Wall Street banks had stopped writing credit default swaps ("CDSs") on subprime RMBS (the types of assets used to fund most subprime CDOs).  For example, according to a book by Michael Lewis, "The Big Short," on November 4, 2005 Deutsche Bank not only stopped writing new CDSs but offered to repurchase swaps it had already written.  Three days later, on November 7, 2005, Veronica Grinstein at Goldman Sachs admitted that "management is concerned" and wanted to buy back some of its CDS exposure.  The same day, Morgan Stanley and Bank of America suddenly stopped writing CDSs on subprime RMBS.  This sudden reversal among the largest swap underwriters (including Citigroup) coincided exactly with news of massive defaults by adjustable-rate mortgage holders.  By the end of 2005 and early 2006, even AIG had stopped writing new swaps on subprime RMBS, although it retained the swaps it had already written.

94.     Within a year, by February 2007, banks had even stopped writing new CDSs on so-called "super-senior" tranches of subprime-related CDOs.

95.     Thus, the escalating risks associated with RMBS and CDOs were well understood by Wall Street insiders by early 2007.  What was unknown to investors was that Citigroup had built up billions of dollars of these securities in its portfolios because it had retained a sizeable share of the CDO tranches that it created, and that the CDOs were funded largely by subprime mortgage bonds that were quickly becoming worthless.

## VI.   DEFENDANTS MISREPRESENTED CITI'S FINANCIAL POSITION AND RESULTS, AND FAILED TO DISCLOSE MATERIAL INFORMATION REGARDING THE RISKS AND LOSSES TO WHICH CITI WAS EXPOSED

96.    The Defendants made numerous untrue statements to investors during the Relevant Period concerning the risks inherent in its loan portfolio and in its holdings of subprime-related assets.  The Defendants did not disclose Citi's full exposure to subprime-related risk, and did not take write-downs in a timely manner that reflected the deteriorating value of those assets.  Thus, throughout the Relevant Period, Citi's earnings and capital position were continually overstated because they did not take into account the degree of loss Citi would incur as a result of declining market conditions.

### A.    DEFENDANTS DID NOT DISCLOSE THE NATURE AND EXTENT OF CITI'S CDO EXPOSURES

97.    Citi issued billions of dollars worth of CDOs from 2004 through 2007.  In 2006, Citi was the second-largest underwriter of CDOs, doing $34 billion in new deals.

98.    Citi's financial statements and SEC filings indicated that its subprime securitized asset exposure (primarily CDOs) was $24 billion at the beginning of 2007, falling to $13 billion at the end of the second quarter, and declining further still during the third quarter.  Citigroup in actual fact retained a much larger volume of subprime securitized assets, primarily CDOs, on its balance sheet.  It was not until November 4, 2007 that Citi revealed an additional $43 billion in CDO-related exposures, and yet another $10.5 billion came to light in January 2008.

### B.    CITIGROUP'S FINANCIAL STATEMENTS DURING THE RELEVANT PERIOD WERE MATERIALLY UNTRUE AND VIOLATED GAAP AND SEC REGULATIONS

99.    Citigroup, in reporting its financial results during the Relevant Period, made untrue statements of material fact and omitted to state material facts necessary to make its reported financial position and results not misleading.  As set forth in detail below, Citigroup published financial statements and information that violated generally accepted accounting

34

principles ("GAAP") and SEC regulations prohibiting false and misleading public disclosures. These financial statements include the audited year-end financial statements included in Citigroup's 2004 Form 10-K, 2005 Form 10-K, 2006 Form 10-K and 2007 Form 10-K, and the financial information included in the Company's quarterly reports filed with the SEC on Form 10-Q for each of the interim quarterly periods during the years 2004 through 2008 (collectively, the "SEC Filings"). One of more of these sets of financial statements was included or incorporated by reference in the Base Prospectuses and/or supplements for each of the Euro Notes.

100. GAAP are generally accepted principles recognized by the SEC and the accounting profession as the conventions, rules and procedures necessary to define accounting practice at a particular time. GAAP is promulgated in part by the American Institute of Certified Public Accountants ("AICPA") and consists of a hierarchy of authoritative literature established by the AICPA. The highest level in the hierarchy includes Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("SFAS"), Financial Accounting Standards Board Interpretations ("FIN"), FASB Statements of Position ("FSP"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), AICPA Statements of Position ("SOP") and SEC Staff Accounting Bulletins ("SAB"). GAAP provide other authoritative pronouncements, including, among others, Statements of Financial Accounting Concepts ("SFAC"), which are standards that form the conceptual framework for financial accounting and reporting.

101. Management is responsible for preparing financial statements that conform to GAAP. As noted by AICPA auditing standards ("AU"), § 110.03:

Financial statements are management's responsibility…

Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management… Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

102.    As a publicly-traded company, Citigroup was required to maintain books and records in sufficient detail to reflect the transactions of the Company, and to maintain a system of internal controls sufficient to permit preparation of financial statements in accordance with GAAP.  Specifically, under the Exchange Act public companies must:

(i)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(ii)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that; (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets.

See Section 13(b)(2)(A) and (B).

103.    SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.   17 C.F.R. § 210.4-01(a)(1).

104.    In addition, Item 303 of SEC Regulation S-K requires, among other things, that the registrant provide information in the Management Discussion and Analysis ("MD&A") section of certain SEC filings that is sufficient to provide the reader with an understanding of what the financial statements show and do not show and to highlight important trends and risks that have shaped the past or are reasonably likely to shape the future.   Item 303 requires a registrant to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   The MD&A rules require that the registrant provide information, where appropriate, which is not otherwise required under GAAP and/or which cannot otherwise be found in the financial statements.

105.    The SEC requires the issuer to furnish information required by Item 303 of Regulation S-K in the MD&A section of every Form 10-K and 10-Q filing.   The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosures enabling investors and other users to assess the financial condition and results of operations of the company, with particular emphasis on the company's prospects for the future.   To further explain what must be included by Item 303 in MD&A, the SEC issued an interpretive release as follows:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an

> opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

106.    Thus, the SEC requires management of a public company "to make full and prompt announcements of material facts regarding the company's financial condition."  Timely Disclosure of Material Corporate Developments, Securities Act Release No. 33-5092 (Oct. 15, 1970).   The SEC has emphasized that investors "have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."   Report on Investigation In Re Sharon Steel Corp. as it related to prompt corporate disclosure, Exchange Act Release No. 18271 (Nov. 19, 1981).   The SEC also has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."   Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 33-6349 (Sept. 28, 1981).

107.    In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations:   "[I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

108.    SAB 101, Revenue Recognition in Financial Statements, reiterates the importance of MD&A in financial statements:

> Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.   This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably

be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release (FRR) 36 that **MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."** (emphasis added).

109.    The Instructions to Paragraph 303(a) of Regulation S-K further state: "The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results."

110.    Citigroup's financial statements during the Relevant Period violated GAAP in material respects and/or omitted material information required by SEC regulations to be disclosed by, among other things:

> (i)      Understating loan loss reserves;
>
> (ii)     Failing to disclose a concentration of credit risk from CDOs with direct subprime exposure;
>
> (iii)    Overstating the fair value of Citi's CDOs with direct subprime exposure;
>
> (iv)     Overstating the fair value of Citi's total assets; and
>
> (v)      Overstating the adequacy of Citi's capital.

**1.      Citigroup Reported Materially Understated Loan Loss Reserves In Violation Of GAAP**

111.    A bank sets aside loan loss reserves to provide a current reserve against credit losses. Under GAAP, Citi is required to establish loan loss reserves at a level sufficient to cover

probable losses from its lending activities, including its mortgage portfolio.  The level of reserves is an important data point for investors.

112.    Under SFAS No. 5, ACCOUNTING FOR CONTINGENCIES, Citigroup is required to set a reserve when (a) "it is *probable* that an asset had been impaired . . . at the date of the financial statements," and (b) "the amount of the loss can be reasonably estimated."  (emphasis added).  Even if losses on mortgage exposures are only "reasonably possible," SFAS No. 5 requires detailed disclosures, including estimates of losses.  Thus, GAAP required the Company to establish loss reserves that reflected the amount of loans that already had defaulted and been charged off, as well as the additional amount of loans that were likely to default but had not yet done so.

113.    Although SFAS No. 5 indicates that losses should be recognized once the events causing the losses are probable and can be reasonably estimated, the American Institute of Certified Public Accountants' (AICPA) Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies (the "AICPA Guide"), notes that there is an important caveat to that rule: "if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination."

114.    Additionally, SFAS No. 114, ACCOUNTING BY CREDITORS FOR IMPAIRMENT OF A LOAN, defines "impairment" for individual loans as "impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement."  This principle is also instructive in determining, in accordance with GAAP, when a group of pooled loans is impaired.

115.    These GAAP provisions support the "Expanded Guidance for Subprime Lending

Programs" issued by federal bank regulators (the Office of the Comptroller of the Currency, the

Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation,

the Office of Thrift Supervision, and the National Credit Union Administration) in 2001:

> The [allowance] required for subprime loans should be sufficient to absorb at least all estimated credit losses on outstanding balances over the current operating cycle, typically 12 months. The board of directors and management are expected to ensure that the institution's process for determining an adequate level for the [allowance] is based on a comprehensive and adequately documented analysis of all significant factors.  The consideration of factors should include historical loss experience, ratio analysis, peer group analysis, and other quantitative analysis, as a basis for the reasonableness of the [allowance].  To the extent that the historical net charge-off rate is used to estimate expected credit losses, *it should be adjusted for changes in trends, conditions, and other relevant factors*, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter such experience.   The allowance should represent a prudent, conservative estimate of losses that allows a reasonable margin for imprecision.  (emphasis added).

116.    The SEC also provides direct guidance on the proper accounting for loan losses.

SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues*, ("SAB 102"), issued in July 2001, states: "It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process."  Thus, pursuant to SAB 102, a loan loss allowance methodology should "[c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] [b]e based on current and reliable data[.]"

117.    In sum, GAAP required Citigroup to consider the specific composition of its mortgage portfolio and the developing trends among borrowers with similar profiles and/or loans with similar characteristics when determining the proper level of loan loss reserves, and to

include in those reserves not only loans that had already defaulted, but also those that were likely to go into default.

118.    In violation of these accounting rules, Citigroup reported loan loss reserves reflecting certain loans that had already gone into default, but excluding the increasing number of loans as to which a future default was probable and capable of reasonable estimation.  Indeed, in light of the Company's massive increase in high-risk loans, coupled with the downturn of the housing market in mid-2005, GAAP required Citigroup to increase its reserves substantially throughout 2006 and 2007.  Yet, Citigroup reduced its reserves as a percentage of its total loan balances through 2006 and 2007, as reflected in the chart below.

**Citigroup Loss Reserves and Loans: 2002-2008[6]**

| Period Ending | Reserve (millions) | Reserve Increase (Decrease) | Total Loans (millions) | Reserves as % of Total Loans |
|---|---|---|---|---|
| 12-31-2002 | $11,101 | -- | $447,805 | 2.48% |
| 12-31-2003 | $12,643 | $1,542 | $478,006 | 2.64% |
| 12-31-2004 | $11,269 | ($1,374) | $548,829 | 2.05% |
| 12-31-2005 | $ 9,782 | ($1,487) | $583,503 | 1.68% |
| 3-31-2006 | $ 9,505 | ($   277) | $605,307 | 1.57% |
| 6-30-2006 | $ 9,144 | ($   361) | $637,085 | 1.44% |
| 9-30-2006 | $ 8,979 | ($   165) | $655,832 | 1.37% |
| 12-31-2006 | $ 8,940 | ($    39) | $679,192 | 1.32% |
| 3-31-2007 | $ 9,510 | $ 570 | $693,344 | 1.37% |
| 6-30-2007 | $10,381 | $ 871 | $742,924 | 1.40% |
| 9-30-2007 | $12,728 | $2,347 | $773,969 | 1.64% |
| 12-31-2007 | $16,117 | $3,389 | $777,993 | 2.07% |
| 3-31-2008 | $18,257 | $2,140 | $789,843 | 2.31% |
| 6-30-2008 | $20,777 | $2,520 | $746,790 | 2.78% |
| 9-30-2008 | $24,005 | $3,228 | $716,955 | 3.35% |
| 12-31-2008 | $29,616 | $5,611 | $694,216 | 4.27% |

---

[6] Figures from Citigroup Form 10-Ks for 2002, 2003, 2004, 2005, 2006, 2007, and 2008; Form 10-Qs for quarters ending Mar. 31, 2006, June 30, 2006; Sept. 30, 2006; Mar. 31, 2007; June 30, 2007; Sept. 30, 2007; Mar. 31, 2008; June 30, 2008; and Sept. 30, 2008.

119.     Whereas Citi had generally maintained a ratio of losses to total loans at or above 2%, the ratio had fallen below that level for the entire year 2006 and for the first three quarters of 2007.  At the end of 2006, the Company maintained a reserve of only 1.32% of its total net loan balance – just half of the 2.64% it maintained in 2003, when the Company's loans were much less risky, and before the housing market began its decline.  Further, throughout 2006, Citi was reducing the *dollar amount* of its reserves as it increased the volume of loans, thus pushing the reserve ratio down even further.

120.     The reserves reached a low of $8.94 billion in the fourth quarter of 2006 and only increased marginally – to $9.51 billion – by the end of the first quarter of 2007, well after the downturn in the housing market (and associated increase in defaults) had become apparent.  At a minimum, Citi was required to keep its reserve ratio above the 2% level, which had been the norm before the Company significantly increased its portfolio of nonprime loans in 2005 and afterwards.  However, the reserve ratio should have been set much higher than 2% as the conditions in the market worsened.  Given that housing prices started to decline in mid-2005 and interest rates began to rise at roughly the same time, by no later than mid-2006, Defendants should have known that Citi's low reserves were inadequate, particularly in light of the large volume of adjustable-rate mortgages that were set to adjust in 2006 and 2007, triggering an increase in the default rate.  As the default rates increased, Citi was required to ***increase*** the reserve ratio above the historic averages.

121.     While Citi belatedly boosted its reserves in the third and fourth quarters of 2007, these increases were still insufficient under GAAP and Citi's loan loss reserves remained substantially understated in the fourth quarter of 2007 and in most of 2008.  By the end of 2007, the housing market had collapsed, yet Citi's 2007 Form 10-K reported that the Company's loan

loss reserves were $16.117 billion as of December 31, 2007, a mere 2.07% of its total loans. These reserves failed to account for the substantial probable losses Citi faced at year-end 2007.

122.    In an April 18, 2008 Form 8-K, Citi reported credit costs of $6.0 billion for the first quarter of 2008, comprised primarily of $3.8 billion in net credit losses and a $1.9 billion net charge to increase loan loss reserves.  It also reported total assets of approximately $2.2 trillion and a net loss of $5.1 billion, or $1.02 per share.  While the loan loss reserves were increased, the adjustment failed to keep pace with the deterioration of the market and the associated anticipated losses, meaning that Citi's losses were still understated and the value of its assets was still overstated.  Had the Company taken the appropriate charge to increase its loan loss reserves to the level necessitated by the risks in its loan portfolio, as required by GAAP, its earnings would have declined (because an increase in reserves is a charge against income), leading to an even greater net loss for the first quarter of 2008.  At the end of that quarter, the loan loss reserve percentage was 2.31%.

123.    Even at the end of the second quarter of 2008, the Company's reserves stood at 2.78%, only slightly higher than the rate of 2.64% in 2003, in a superior credit environment. This ratio would increase to 4.27% by the end of 2008, when Citi acknowledged the full extent of its exposure.

124.    By failing to increase its loan loss reserves to appropriate levels or disclose the inadequacy of those reserves, Citigroup gave the impression to investors and the public that its exposure to loan defaults was substantially less than it truly was.

125.    Additionally, because Citi understated its loan loss reserves, the Company also materially overstated the value of its assets.  Had the Company taken the appropriate charge to increase its loan loss reserves to the level necessitated by the risks in its loan portfolio in the

relevant periods, as required by GAAP, its earnings would have declined, leading to lower revenue for the reporting periods in 2006 and the first three quarters of 2007, and even greater net losses for the fourth quarter of 2007 and all of 2008.

126.    Citi materially understated its loan loss reserves and overstated its earnings in its Form 10-Q filings for the periods ending March 31, 2006, June 30, 2006, September 30, 2006, March 31, 2007, June 30, 2007, September 30, 2007, March 31, 2008, June 30, 2008 and September 30, 2008, and in its 2006 Form 10-K and 2007 Form 10-K, in violation of SFAS No. 5.

### 2.    Citigroup Failed To Disclose Massive Concentrations Of Credit Risk From Subprime-Related Assets In Violation Of GAAP

127.    Citigroup failed to disclose that it had a concentration of credit risk from CDOs, warehoused loans, and financing transactions with direct subprime exposure in its annual and quarterly financial statements for 2004, 2005, 2006, and 2007 and in its quarterly financial statements for the periods ending March 31, 2008, June 30, 2008, and September 30, 2008, in violation of GAAP.

128.    DISCLOSURES ABOUT FAIR VALUE OF FINANCIAL INSTRUMENTS, SFAS No. 107 ¶ 15A (as amended by SFAS No. 133), required Citigroup to disclose "all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties."   Thus, Citigroup was required to disclose all significant concentrations of credit risk from CDOs, loans, and financing transactions with direct subprime exposure.

129.    SFAS No. 107 ¶ 15A (as amended by SFAS No. 133) states that, "Group concentrations of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual

obligations to be similarly affected by changes in economic or other conditions."   It further requires that the following be disclosed about each significant concentration:

> (i)     Information about the (shared) activity, region, or economic characteristic that identifies the concentration;

> (ii)    The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity;

> (iii)    The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments; and

> (iv)    The entity's policy of entering into master netting arrangements for which the entity is a party, and a brief description of the terms of those arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk.

130.    TERMS OF LOAN PRODUCTS THAT MAY GIVE RISE TO A CONCENTRATION OF CREDIT RISK, FASB Staff Position No. 94-6-1 ¶ 7, states that, "The terms of certain loan products may increase a reporting entity's exposure to credit risk and thereby may result in a

concentration of credit risk as that term is used in FAS No. 107, either as an individual product type or as a group of products with similar features."  FASB Staff Position No. 94-6-1 ¶¶ 2-6 gives examples of loan terms that may increase credit risk such as negative amortization, high loan-to-value ratio, option ARMs, interest-only loans, and other loan terms that fall under the general category of subprime.  Similarly, FASB Staff Position No. 94-6-1 ¶ 7 provides the following examples of shared characteristics which may give rise to significant concentrations of credit risk:  borrowers subject to significant payment increases, loans with terms that permit negative amortization, and loans with high LTV ratios.

131.    Citigroup's CDOs with direct subprime exposure had been issued as far back as 2003.  The majority remained undisclosed, with some kept off-balance-sheet, until November 4, 2007, when Citigroup shocked the market by disclosing that it had approximately $55 billion of direct subprime exposures, consisting of $43 billion of CDO exposures that were being disclosed for the first time, and $11.7 billion in lending and structuring exposure.[7]  The $11.7 billion in lending and structuring exposure had grown from the $11.4 billion disclosed on October 15.  The $43 billion of CDO exposures disclosed on November 4, 2007 included $25 billion of Commercial Paper CDOs that Citigroup failed to consolidate on its balance sheet, $10 billion of High Grade CDOs, $8 billion of Mezzanine CDOs, and $0.2 billion of CDOs-squared, which are CDOs collateralized by other CDOs.

132.    Prior to November 4, 2007, Citigroup's financial statements violated GAAP by failing to disclose that its CDOs, loans, and financing transactions with direct subprime exposure gave rise to a concentration of credit risk.  Citigroup was required by FAS 107 and FSP SOP 94-

---

[7] Citigroup later provided detail in its 2007 Form 10-K.  Citigroup's total gross exposure to CDOs was $65.1 billion.  The super senior exposure consisted of $24.9 billion in commercial paper CDOs, $9.5 billion in high grade CDOs, $8.3 billion in mezzanine CDOs, and $0.2 billion in CDO-squared, totaling $42.9 billion, which previously had been rounded off to $43 billion.  In addition to the $42.9 of super senior exposure and the $11.7 billion of lending and structuring exposure, for the first time Citi disclosed an additional $10.5 billion of exposure via hedged CDOs.

6-1 to disclose this concentration of credit risk because these financial instruments were primarily backed by subprime RMBS collateral.  The underlying loans had terms such as negative amortization, high LTV ratio, option ARMs, and interest-only, which increased Citigroup's exposure to credit risk.  The counterparties to these loans (*i.e.*, the subprime borrowers) had similar economic characteristics, such as being subject to significant payment increases, negative amortization and high LTV ratios.  In light of these similar economic characteristics, the changes in economic conditions would similarly impact these borrowers' ability to meet the terms of these loans.

133.    The November 4, 2007 disclosure, as shocking as it was, still did not disclose the full extent of the Company's exposure to subprime mortgage-related credit risk.  The exposures that were disclosed on November 4 excluded $10.5 billion worth of super-senior CDO tranches that the Company had purportedly hedged by swapping the risk to certain insurers, even though Citigroup still had indirect exposure to losses on those CDOs.  Accordingly, the Company continued to violate GAAP by failing to disclose the "maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity," as required by SFAS No. 107 ¶ 15A.

134.    Citigroup failed to disclose completely the above concentration of credit risk from CDOs, loans and financing transactions with direct subprime exposure in its Form 10-Q and Form 10-K filings for 2004, 2005, 2006, and 2007 and in its quarterly financial statements for the periods ending March 31, 2008 June 30, 2008, and September 30, 2008, as required by FAS 107 and FSP SOP 94-6-1, violated GAAP.

### 3.      Citigroup Failed To Accurately Report The Value of the Assets Held By Its SIVs In Violation Of GAAP

135.    Citigroup created and maintained a number of SIVs during the Relevant Period. As of June 30, 2008, Citi was affiliated with seven SIVs: (1) Beta Finance Corp.; (2) Centauri Corp.; (3) Dorada Corp.; (4) Five Finance Corp.; (5) Sedna Finance Corp.; (6) Vetra Finance Corp and (7) Zela Finance Corp.  At that time, these SIVs ranged in size from about $300 million for Vetra Finance Corp. to $10.7 billion for Beta Finance Corp.  At their peak, Citi's seven SIVs collectively owned $100 billion in assets, representing 25% of the total assets held by all SIVs globally.[8]  By the end of 2008, these same seven SIVs held only $17.4 billion of assets.

136.    In a December 13, 2007 press release, which was filed with the SEC as an attachment to a December 14, 2007 Form 8-K, the Company reported that it had "committed to provide a support facility that will resolve uncertainties regarding senior debt repayment currently facing the Citi-advised Structured Investments Vehicles ('SIVs')," and reassured investors that "[g]iven the high credit quality of the SIV assets, Citi's credit exposure under its commitment is substantially limited" and that the Company expected to incur "little or no funding requirement" for the SIVs.  These statements were untrue because the SIV assets were not "high credit quality" assets that subjected the Company to "substantially limited" credit exposure.

137.    As a result of its commitment announced on December 13, 2007, Citigroup included the SIVs' assets and liabilities on its balance sheet for the first time as of December 31, 2007.  In its 2007 Form 10-K, the Company stated that consolidation of the SIVs onto the Company's balance sheet had resulted in an *increase* of Citi's asset base of $59 billion.  This was

---

[8] David Reilly, Carrick Mollenkamp & Robin Sidel, *Conduit Risks Are Hovering Over Citigroup*, WALL ST. J., Sept. 5, 2007, at C1.

untrue, as the values of the SIV assets were severely impaired.  On November 19, 2008, Citi disclosed that the SIVs were so impaired that it could not find a buyer.  Citi paid $17.4 billion to wind down the SIVs and bring the assets onto its balance sheet, writing down those assets by another $1.1 billion at the same time.

### 4. Citigroup Failed To Consolidate Its Commercial Paper CDOs In Violation Of GAAP

138.    Among the nearly $54 billion in CDO exposures that were not disclosed to investors prior to November 2007 were $25 billion in exposures relating to Commercial Paper CDOs.  Beginning in 2003 and continuing until 2006, Citigroup had issued these CDOs with "liquidity put" features that bound the Company to provide liquidity if a CDO's value declined and the CDO could not refinance its maturing debt.  In other words, Citi was bound to buy back these instruments precisely when they might be losing value.

139.    On November 5, 2007, during the analyst conference call discussing the revised results for the third quarter of 2007, Citigroup disclosed for the first time that in conjunction with structuring a particular issue of Commercial Paper CDOs, Citigroup wrote put options or "liquidity puts" protecting the holders of the put options from any losses the Commercial Paper CDOs would incur.  Citigroup's CFO, defendant Crittenden, stated[9]:

> [T]his was essentially a funding mechanism that was used as we structured CDOs up until I believe the end of 2005, so we would sell a structured CDO to a customer.  We would provide a liquidity put essentially to that customer . . . [a]nd this was all backed by subprime collateral . . . [W]e decided actually to buy the commercial paper associated with that during the course of the summer and as a result, that came back on our books . . . And so that's what the $25 billion [a portion of the just disclosed $43 billion in CDOs] is made up of.

140.    Citigroup disclosed in its 2007 Form 10-K that:

---

[9] Transcript of Citigroup Special Conf. Call at 5 (Nov. 5, 2007)

> [i]n certain CDO transactions underwritten by the Company during
> 2003-2006, the senior funding of the CDOs was in the form of
> short-term commercial paper.  In order to facilitate the issuance of
> commercial paper by the CDO, the Company wrote a put option
> ("liquidity puts") to the CDO to benefit the commercial paper
> investors, which was accounted for as a derivative.  The total
> notional amount of these written liquidity puts was approximately
> $25 billion.[10]

141.    Citigroup's Commercial Paper CDOs are variable interest entities ("VIEs")

subject to the consolidation rules set forth in FIN 46(R), CONSOLIDATION OF VARIABLE INTEREST

ENTITIES, FASB Interpretation No. 46, as Citi eventually acknowledged in its 2007 Form 10-K.

A variable interest entity is defined by the FASB Interpretation No. 46 to include entities that

have previously been referred to as special-purpose entities (SPEs) that are to be evaluated for

consolidation under GAAP.

142.    FASB Interpretation No. 46 ¶ 2(a) states that a "variable interest entity refers to

an entity subject to consolidation according to the provisions of this Interpretation."  FASB

Interpretation No. 46 ¶ 14 states that "[a]n enterprise shall consolidate a variable interest entity if

that enterprise has a variable interest  . . . that will absorb a majority of the entity's expected

losses."

143.    FASB Interpretation No. 46 ¶ B10 states that "written put options … are variable

interests if they protect holders of other interests from suffering losses."  And, "[t]o the extent the

… written put options  . . . will be called on to perform in the event expected losses occur, those

arrangements are variable interests ."

144.    Because the "liquidity puts" obligated Citi to protect the CDO investors from

losses, they were variable interests that required consolidation of the CDOs on Citi's financial

statements pursuant to FIN 46(R).  Indeed, as a result of these puts, in the summer of 2007 Citi

---

[10] Citigroup, Annual Report (Form 10-K), at 91 (Feb. 22, 2008).

repurchased $25 billion in the Commercial Paper CDOs – which were backed by subprime collateral – and added that $25 billion in exposure onto its books.  These repurchases, like the liquidity puts themselves, were not publicly disclosed until November 2007.

145.    Beginning in the fourth quarter of 2007 and continuing through the fourth quarter of 2008, Citigroup took $13.3 billion of total write-downs of its $25 billion in Commercial Paper CDOs, representing a 57% reduction in face value.  These write-downs demonstrate that the Company had been at risk for a majority of the Commercial Paper CDOs' expected losses when it issued the liquidity puts.

146.    Prior to November 2007, Citigroup failed to publicly disclose the liquidity puts, or the fact that they placed it at risk for the majority of the expected losses of the Commercial Paper CDOs.  Citigroup's omission was a violation of GAAP, as was its failure to consolidate the Commercial Paper CDOs' financial results on its annual and quarterly financial statements for 2004, 2005, and 2006 (as reported in its Form 10Q and 10K filings for those periods), and on its quarterly financial statements for the periods ending March 31, 2007 and June 30, 2007 (as reported on its Form 10Q filings for those periods), in violation of GAAP.

**5.    Citigroup Overstated The Fair Value Of Its Subprime-related CDOs In Violation Of GAAP**

147.    Citigroup's CDOs were largely collateralized by subprime RMBS.  Citigroup overstated the fair value of its CDOs with direct subprime exposures in its quarterly financial statements for March 31, 2007, June 30, 2007, September 30, 2007, in its annual financial statements in its 2007 Form 10-K, and in its quarterly financial statements for March 31, 2008, June 30, 2008, and September 30, 2008.

148.    SFAS No. 115, ACCOUNTING FOR CERTAIN INVESTMENTS IN DEBT AND EQUITY SECURITIES, states at ¶ 13 that "unrealized holding gains and losses for trading securities shall be

included in earnings."  Thus, Citigroup was required by GAAP to write down the fair value of its CDOs with direct subprime exposure and include the write-downs in its reported earnings.

149.    Citigroup adopted SFAS No. 157, FAIR VALUE MEASUREMENTS, effective January 1, 2007.  SFAS No. 157 ¶ 5 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  SFAS No. 157 ¶ 22 "prioritizes the inputs to valuation techniques used to measure fair value into three broad levels.  The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3)."  SFAS No. 157 ¶ 28 also defines an intermediate type of observable inputs, Level 2, to include "a) Quoted prices for similar assets or liabilities in active markets; b) Quoted prices for identical or similar assets or liabilities in markets that are not active…; c) Inputs other than quoted prices that are observable for the asset or liability (for example, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates); d) Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs)."

150.    SFAS No. 157 ¶ 21 makes clear that "[v]aluation techniques used to measure fair value shall maximize the use of observable inputs and minimize the use of unobservable inputs."  SFAS No. 157 ¶ 21 explains that:

> inputs refer broadly to the assumptions that market participants would use in pricing the asset or liability, including assumptions about risk, for example, the risk inherent in a particular valuation technique used to measure fair value (such as a pricing model) and/or the risk inherent in the inputs to the valuation technique. Inputs may be observable or unobservable:
>
> a.      Observable inputs are inputs that reflect the assumptions market participants would use in pricing the asset or

53

liability developed based on market data obtained from sources independent of the reporting entity.

b.     Unobservable inputs are inputs that reflect the reporting entity's own assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances.

151.    Citigroup's 2007 Form 10-K stated that "the Company accounts for its CDO super senior subprime direct exposure and the underlying securities on a fair-value basis with all changes in fair value recorded in earnings," and that the Company had "refined" its CDO valuation methodology during the fourth quarter of 2007 "to reflect ongoing unfavorable market developments."  Citigroup further stated in its 2007 Form 10-K that its CDOs with subprime exposure were not subject to valuation based on observable transactions; were Level 3 assets subject to valuation based on significant unobservable inputs; and were classified in Level 3 of the fair-value hierarchy throughout 2007.  Similarly, Citigroup's November 5, 2007 Form 10-Q stated that the super senior tranches of subprime-related CDOs were not subject to valuation based on observable market transactions.  The November 5, 2007 Form 10-Q stated that the fair value of these senior exposures was "based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value."

152.    Citi's valuation method for its CDOs was contrary to GAAP, as detailed below.

153.    *First*, much of Citi's CDO inventory was comprised of CDOs Citi could not sell.  Thus, these assets were unattractive to buyers at face value.  Citi either knew or, upon reasonable investigation should have determined, that carrying these CDOs at face value did not reflect the "price that would be received" in a transaction between market participants, as required by FAS 157.  In fact, it was not until November 2008 that Citi finally admitted it could not sell $80 billion worth of inventory and would need to reclassify the assets as "held to maturity," the

belated disclosure of which caused Citigroup's share price to drop more than 20%.  Even then, Citigroup waited until January 2009 to finally explain to investors which assets were being reclassified.

154.    ***Second***, Citi did not minimize the use of the unobservable Level 3 inputs and maximize the use of observable Level 2 inputs.

155.    Citi utterly failed to use an available observable Level 2 input – the TABX index – when valuing Mezzanine CDOs.  This index was a readily available observable indicator of the fair market value of Citigroup's CDOs with subprime exposure, particularly Citigroup's Mezzanine CDOs.  Pursuant to FAS 157, Citigroup was required to value its Mezzanine CDOs using the Level 2 observable TABX index instead of the unobservable Level 3 inputs it did use. Comparison of Citi's Mezzanine CDOs to the TABX would have led the Company to write down these assets (and reflect these write-downs in its pre-tax income pursuant to FAS 115 ¶ 13).

156.    Citigroup held $8.3 billion of undisclosed Mezzanine CDOs on its books at par value as of March 31, 2007, June 30, 2007, and September 30, 2007.  With the residential real estate market in decline and the related RMBS market also suffering at that time, Citi's CDOs were not properly valued at par.  Indeed, during 2007 the TABX index for Mezzanine CDOs suffered substantial declines to approximately:

     (i)     85% of par as of March 31, 2007, or a 15% drop in value;

     (ii)     69% of par as of June 30, 2007, or a 31% drop in value; and

     (iii)     33% of par as of September 30, 2007, or a 67% drop in value.

157.    Accordingly, Citigroup was required by FAS 157 to write down the fair value of its $8.3 billion of Mezzanine CDOs by approximately:

(i)      15%, or $1.2 billion as of March 31, 2007;

(ii)     31%, or $2.6 billion as of June 30, 2007; and

(iii)    67%, or $5.6 billion as of September 30, 2007.

158.    Thus, as of September 30, 2007, the $8.3 billion in Mezzanine CDOs should have been valued at $2.7 billion, yet still Citi valued them at face value and did not take any write-downs, thereby overstated net income.

159.    In the fourth quarter of 2007, Citigroup belatedly wrote-down the $8.3 billion face value of its Mezzanine CDOs by 63%, or $5.2 billion.  This write-down was still less than what GAAP required based on the TABX declines during the first three quarters of 2007.  Moreover, Citi's fourth quarter results revealed that 52% of Citi's Mezzanine CDOs, with a face value of $9.0 billion, were from 2006 or later – the worst years for subprime CDOs.  And, according to the breakdown provided with the first quarter earnings for 2008, 94% of the mezzanine holdings were rated BBB *or lower*.

160.    Accordingly, Citigroup's failure to write-down the fair value of its Mezzanine CDOs as of March 31, 2007, June 30, 2007, September 30, 2007, and December 31, 2007, as required by SFAS No. 157, and to include the write-downs in pre-tax income, as required by SFAS No. 115, violated GAAP.

161.    The TABX was also relevant as a value indicator for Citigroup's Commercial Paper CDOs, High Grade CDOs, CDOs Squared, and the warehoused and unsold CDOs from its lending and structuring operations.  Eighty percent of Citi's supposed "high grade" CDOs were from the particularly toxic 2006 and 2007 vintages, and 41% were rated BBB or lower.  Even the best assets among the lot – the Commercial Paper CDOs – included a substantial quantity of subprime collateral.  The TABX decline required write-downs of Citi's super senior CDOs as

well.  Citigroup violated GAAP by failing to take such write-downs and by failing to take this Level 2 input into account when valuing these super senior CDOs.

162.    Citi's failure to use the ABX indices (such as the TABX) as valuation inputs for its CDOs in 2007 is completely indefensible, in part because during Citi's January 15, 2008 investor conference call, Defendant Crittenden admitted that the ABX indices were useful in valuing its CDOs.  Analyst Guy Moszkowski pressed him on the change: "you initially said that there was really nothing observable that you could use to mark these, and yet you did at the end say that you did somehow incorporate the ABX indices.  So maybe you can clarify for us a little bit how you did that."  Crittenden admitted that the ABX index was a "useful crosscheck."

163.    In addition, Citigroup's May 2, 2008 Form 10-Q disclosed that the Company had made two "refinements" to its valuation model for CDOs.  One of these two refinements was to use the ABX index as a source of the "discount rate" to apply against Citigroup's valuation model so as to reach a determination of fair value.  That discount rate, Citigroup further added, was one of two "primary drivers" of the ultimate fair value determination.  Citigroup should have been using the ABX index in valuing its CDOs back in 2007 as well, just as every other major investment bank with CDO exposure was doing.  *See, e.g.*, JPMorgan Chase, Annual Report (Form 10-K), at 113 (Feb. 29, 2008); Goldman Sachs Group, Form10-Q, at 66 (Apr. 9, 2008); Merrill Lynch & Co., Annual Report (Form 10-K), at 28 (Feb. 25, 2008); UBS, 2007 Annual Report (Financial Statements) 77 (2007); Morgan Stanley, Annual Report (Form 10-K), at 51 (Jan. 29, 2008).  Even after Citi belatedly started to use the ABX index, Citi's write-downs were grossly inadequate throughout 2008.  For example, although the relevant indices had lost nearly all their value by early 2008, Citi had still only written down its CDO portfolio by just under half by the end of the first quarter of 2008.

164.    Citigroup also failed to use its intimate knowledge of the mortgage product credit default swap (CDS) markets, which were providing clear, unambiguous pricing signals even for securities that were not trading.  Even if most CDOs were not "liquid" within the meaning of FAS 157 Level 1, the CDS market provided sufficient market data for Citigroup to be able to re-price its CDO portfolio on a regular basis as the credit crisis progressed, using Level 2 inputs.

165.    As discussed in more detail below, the United States Senate has convened a commission to study the causes of the financial crisis.  Known as the FCIC (the Financial Crisis Inquiry Commission), the Senate has focused on many issues, but in particular the role of derivatives in the crisis.  Goldman Sachs, in particular was asked to explain how it marked to market various CDOs insured by AIG in the second half of 2007 and first half of 2008.  In addition to live testimony, Goldman provided a written memorandum detailing how it marked its CDOs positions even in the absence of Level 1 inputs.

166.    Starting on July 27, 2007, Goldman made its first CDS collateral call on AIG to reflect the massive devaluation of various CDOs that had already occurred.  The process started back on May 11, 2007, when Craig Broderick at Goldman emailed several other Goldman individuals signaling that they "were in the process of considering making significant downward adjustments to the marks on their mortgage portfolio esp. CDOs and CDO squared" and that "this will potentially have a big P&L impact on us, but also to our clients due to the marks and associated margin calls on repos, derivatives and other products."  Thus, Goldman was aware as early as May, 2007 that they would have to adjust their marks down, and that it would negatively impact their own balance sheet.  It also meant that CDS counterparties, such as AIG, would be required to post collateral at a time when the credit markets were tightening.

167.    When Goldman made its collateral demand in July 2007 (emailing an invoice for $1.8 billion), AIG strongly objected.  But the FCIC investigation has disclosed that AIG was aware of the danger even before being contacted by Goldman.  For example, on July 11, 2007, Andrew Foster at AIG called Alan Frost (also at AIG) to warn about the falling CDO values, and "the problem that we're going to face is that we're going to have just enormous downgrades on the stuff we got" and AIG "will have to mark" its books and "we're . . . f***ed basically."

168.    Soon after Goldman's collateral call, AIG gave in and accepted lower marks. Collateral calls then followed from SocGen on November 1, 2007, and another $2.8 billion call from Goldman on November 2, 2007.  By the end of November, AIG was facing calls from Goldman, SocGen, Merrill, Bank of Montreal, Calyon, and UBS, and AIG was forecasting a $5 billion impact.

169.    A CDS holder like Goldman typically has the right to demand collateral from its counterparty if the insured assets fall in value by a certain amount.  Therefore, a collateral call can only be made if the holder first determines the asset's mark.  The CDS counterparty can only comply with the collateral demand (in whole or in part) if it determines that the reduced mark is accurate.  These collateral calls at AIG, plus similar demands being made of other CDS counterparties throughout the world, established more than sufficient data for Citigroup to be able to value its CDO portfolio using Level 2 inputs.  Yet despite this market data, and despite being the world's largest CDO originator, Citigroup did not adjust its marks properly (or in some cases, at all).

170.    In a nine page memorandum prepared for the FCIC, Goldman defended its CDO valuations.  In the memo, Goldman told the Senate that it was an active market maker in cash and credit default swap mortgage products.  "This market activity provided a strong foundation

for our marks," said Goldman.  In a similar way, Citigroup's market presence as the world's largest issuer of CDOs would provide a "strong foundation" and market insight into the true value of CDOs, even absent Level 1 market data.

171.    Also in Goldman's memo to the FCIC, Goldman admitted that during 2007 and 2008, "it was not unusual for there to be an absence of transactions in RMBS, CDO securities and derivatives."  Nevertheless, Goldman found useful data that allowed precise valuation of these products, including: transactions in comparable instruments, calculating implied prices based on derivative trades, and valuation of the collateral underlying the CDOs.  When valuing the underlying collateral, Goldman looked to the applicable ABX indices, which "represented the most liquid and observable proxy for the vintage and ratings of the RMBS underlying the AIG CDO positions."  As discussed in detail above, Citigroup utterly failed to mark its CDOs in accordance with the relevant indices corresponding to the collateral held in the various CDOs.

172.    The Goldman memo shows that, using the ABX indices to value the collateral in the CDOs, it was clear that 2007 and 2006 vintage CDOs were experiencing significant prices declines by July 2007, and that some 2005 vintages of subprime RMBSs – the types held in many of Citi's supposedly "high grade" CDOs – were also collapsing in value.  Goldman stated, "the observed transactions clearly substantiated widespread re-pricing of 2005 and earlier vintage CDOs in the market."

173.    Goldman also priced its CDOs based on "increasing delinquencies and clear credit deterioration in underlying subprime RMBSs" in 2007.  On October 17, 2007, Goldman observed a trade on the subordinate ALTS 2005-1A B tranche at 70 cents on the dollar, which "clearly demonstrated that market pricing at the time reflected a significant degree of stress for 2005 vintage high-grade CDOs" in general.  By the end of November, Goldman was even

marking 2004 vintage mezzanine CDOs at 68.  Yet Citigroup failed to adjust its marks even on the riskier 2006 and 2007 vintages.

174.    By the end of 2007, Goldman observed $90 million of the super senior class from TRAIN 3A A1, a 2003 vintage mezzanine CDO, trade at approximately 70 cents on the dollar. Even though this particular bond was not in the AIG portfolio, Goldman noted that "this observation clearly substantiated the fact that even highly seasoned super senior CDO tranches traded at a significant discount to par value at the time."

175.    **Third**, even if some of Citi's CDO portfolio could be said to be Level 3 assets, Citi relied entirely on flawed modeling to value them.  As Citi insiders would later tell the New York Times, the first problem with this model was in placing "blind faith" in the passing grades the rating agencies bestowed upon these complex instruments.  As late as the summer of 2007, Citi was relying on the judgment of the rating agencies that Citi's CDO holdings faced an "extremely low probability of default (less than .01%)," despite the enormous losses that had already occurred throughout the MBS market earlier in the year, and despite the fact that Citi's CDO holdings represented, in many cases, the worst of the worst in terms of likelihood of default.[11]  Moreover, although the CDOs had not been downgraded, hundreds of tranches of BBB-rated RMBS were downgraded in July 2007.  Further, a December 13, 2006 Fitch report issued a negative ratings watch for mezzanine CDOs, and in March 2007, Moody's warned that defaults and downgrades of RMBS would have magnified consequences for CDOs invested in these RMBS.  Moody's warned that the resulting downgrade in CDOs could be as much as ten notches, *e.g.*, from AAA down to BB+ (junk status).

---

[11] *See* Eric Dash & Julie Creswell, *Citigroup Saw No Red Flags Even As It Made Bolder Bets*, N.Y. TIMES, Nov. 23, 2008.

176.    Citi's own analysis questioned the validity of the ratings, as indicated in a CDO prospectus dated March 28, 2007, which stated[12]:

> Credit ratings of debt securities represent the rating agencies' opinions regarding their credit quality and are not a guarantee of quality.  Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risks of fluctuations in market value, therefore, ***they may not fully reflect the true risks of an investment.  Also, rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that an issuer's current financial condition may be better or worse than a rating indicates.  Consequently, credit ratings of the Collateral Debt Securities will be used only as a preliminary indicator of investment quality.***  (emphasis added)

177.    Citi also modeled its valuation on the discount rates for collateralized loan obligations ("CLOs"), which are securitized packages of corporate loans.  In other words, Citi compared AAA CDOs to AAA CLOs.  However, this method was flawed because defaults on subprime mortgages (and RMBS) were skyrocketing, but not for comparably-rated corporate bonds.[13]  Citi itself recognized the flaw in making such a comparison, specifically noting that "it would not be fair to compare the prices of ABS CDO triple-B bonds to CLO triple-B bonds, even if both transactions are performing admirably."[14]  Nevertheless, Citi used the AAA CLO discount rates, which resulted in smaller write-downs.

178.    Additionally, Citi's model did not account for the possibility – which had become a reality by 2007 – of a national housing downturn or the prospect that millions of borrowers would default on their mortgages.

179.    Additionally, in January 2008 Citi disclosed the existence of an additional $10.5 billion in CDO exposure.  These CDOs had been hedged under financial guarantee contracts

---

[12] Armitage ABS CDO Prospectus, ¶ 18, Mar. 28, 2007.

[13] *See* Carrick Mollenkamp & David Reilly, *Why Citi Struggles to Tally Losses – Swelling Write-Downs Show Just How Fallible Pricing Models Can Be*, WALL ST. J., Nov. 5, 2007, at C1.

[14] Citigroup, *A GENERAL REVIEW OF CDO VALUATION METHODS*, at 7 (Feb. 15, 2006).

with monoline insurers Ambac Financial and MBIA, but when those counterparties suffered their own credit downgrades in late 2007, Citi was forced to make a $1.5 billion adjustment to account for the counterparty risk, which had the same impact as a write-down.  Given that these insurers were already distressed in late 2007, Citi was required to take write-downs sooner, and to take a more significant write-down than the $900 million write-down taken in December 2007.  Its failure to properly account for this counterparty credit risk related to its CDOs was also a violation of GAAP.

180.    In the end, Citi's losses on its CDOs were so severe that they were a prime cause of the Company's near insolvency, which was prevented only through the government bail-out.

### 6.    Citigroup Overstated The Fair Value Of Its Total Assets In Violation Of GAAP

181.    Citigroup overstated the fair value of its total assets on its financial statements for 2006 and 2007 and on its quarterly financial statements for March 31, 2008, June 30, 2008 and September 30, 2008.

182.    Pursuant to SFAS No. 115, ¶ 13 "[u]nrealized holding gains and losses for trading securities shall be included in earnings."  Thus, GAAP required Citigroup to write down the fair value of its total assets, as measured in compliance with SFAS No. 157, and to include the write-downs in its earnings.

183.    On November 4, 2007, Citigroup disclosed for the first time that it had approximately $55 billion of direct subprime exposures in its Securities and Banking division and that it anticipated taking write-downs in the range of $8 billion to $11 billion.

184.    Over the next four quarters, Citigroup took a total of $40.8 billion of write-downs in its Securities and Banking division as follows:

(i)    $17.2 billion for the fourth quarter of 2007;

63

      (ii)     $12.1 billion for the first quarter of 2008;

      (iii)    $7.1 billion for the second quarter of 2008; and

      (iv)    $4.4 billion for the third quarter of 2008.

185.    The write-downs were on a variety of Citigroup's assets, including subprime related direct exposures, monoline credit value adjustments, highly leveraged finance commitments, commercial real estate, and SIVs.

186.    Citigroup's total assets as reported on its balance sheet were:

      (i)      $2.19 trillion as of December 31, 2007;

      (ii)     $2.20 trillion as of March 31, 2008;

      (iii)    $2.10 trillion as of June 30, 2008; and

      (iv)    $2.05 trillion as of September 30, 2008.

187.    Despite the massive write-downs Citigroup had already taken, the fair value of its total assets remained overstated and, therefore, GAAP required further write-downs (with the write-downs included in earnings). Citigroup was required by SFAS No. 157 and SFAS No. 115 to write down the fair value of its total assets because the Company failed to maximize observable higher Level 2 inputs over the unobservable lower Level 3 inputs that it was using to value its total assets, and failed to implement proper controls to ensure the valuation models used with Level 3 inputs were accurate.

188.    In sum, Citigroup's failure to take adequate write-downs on the fair value of its total assets on its 2007 Form 10-K and on its Form 10-Q filings for the periods ending March 31, 2008, June 30, 2008 and September 30, 2008, as required by SFAS No. 157 and SFAS No. 115, violated GAAP and resulted in material overstatements of the Company's assets for those

periods.   The overstatement of its assets also caused Citigroup's earnings and capital to be overstated.

### 7.    Citigroup Overstated Its Capital Adequacy

189.    Capital adequacy is the level of capital a bank must hold to cover its exposure to the risk of its activities on and off balance sheet, and it is one of the primary metrics investors consider when evaluating the financial strength of institutions such as Citigroup.

190.    A bank's Tier 1 capital ratio measures its ability to withstand substantial losses, and therefore provides investors and regulators with important information regarding the Company's overall financial strength.   A bank with a Tier 1 capital ratio of 6% or greater is considered "well capitalized."   Falling below that 6% threshold triggers regulatory scrutiny and raises a red flag to investors.

191.    Each Form 10-K and 10-Q that Citigroup filed during the Relevant Period, and indeed dating back at least as far as 2004, contained a discussion of Citigroup's "Tier 1 capital ratio" and stated that Citigroup's balance sheet was "strong" and "well capitalized" under regulatory guidelines.   In the 2007 Form 10-K, for example, Citigroup stated that it had "maintained its 'well-capitalized' position with a Tier 1 Capital Ratio of 7.12% at December 31, 2007."   In the Company's July 18, 2008 earnings release, Pandit assured investors that the "Tier Capital ratio [had] increased to 8.7%, and in its Form 10-Q for the third quarter of 2008, filed on October 31, 2008, Citi stated that it had "maintained its 'well-capitalized' position with a Tier 1 Capital Ratio of 8.19% at September 30, 2008."

192.    In fact, by no later than the end of the first quarter of 2006, Citigroup's balance sheet was neither strong nor well capitalized.   If appropriate write-downs had been taken on the Company's subprime-related assets, and if the Company's loan loss reserves had been increased as required by GAAP, its reported Tier 1 capital ratio would have been materially less than the

8.59% it reported at the end of 2006, less than 7.12% in 2007, and less than 8.19% at the end of

September 2008, and investors would have realized that the Company's capital adequacy was in

serious jeopardy.  By failing to take appropriate write-downs, the Company overstated its Tier 1

capital ratio and the overall adequacy of its capital in its Form 10-Q and 10-K filings from at

least the first quarter of 2006 through the third quarter of 2008.

193.    As an examiner for the Federal Reserve Bank of New York concluded in an April

2008 annual inspection report that was sent to Pandit and the Citigroup board of directors

regarding calendar year 2007:

> Senior management did not use sufficient discipline in managing
> balance sheet usage, which led to liquidity and capital management
> issues.   Even when ***clear warning signs*** were present that
> substantial balance sheet growth, due to a rapid pace of acquisition
> activity, was straining the firm's capital position, limits were not
> enforced . . . . Senior management allowed business lines largely
> unchallenged access to the balance sheet to pursue revenue
> growth.[15] [emphasis added]

194.    On November 17, 2008, Citi suddenly announced that it would no longer measure

the fair value of $80 billion of its assets, including its CDOs.  This announcement led to a

dramatic drop in the prices of the Company's Securities, as it revealed that Citi's assets were

grossly overvalued and that the Company lacked the capital to absorb the charges to its income

that would occur if it properly marked those assets to their fair value.  Less than a week later, the

federal government was forced to guarantee $326 billion of Citi's riskiest assets to prevent the

Company from collapsing.

195.    In addition, the SEC has now identified Citigroup as one of the worst abusers of a

balance sheet "window dressing" ruse called Repo 105, discussed in more detail below.  Repo

105 transactions were used by Citigroup at the end of each quarter for the explicit purpose of

---

[15] Fed Report at 6.

managing the balance sheet and ensuring that various metrics, including the Tier 1 capital ratio, appeared stronger than it really was.

### C.   DEFENDANTS PRINCE AND CRITTENDEN SIGNED FALSE SARBANES-OXLEY CERTIFICATIONS

196.    Each of Citi's Form 10-K and Form 10-Q filings for 2007 and 2008 included certifications under the Sarbanes-Oxley Act (the "Sarbanes-Oxley Certifications") signed by Crittenden, and the Form 10-K and Form 10-Q filings during the Relevant Period prior to November 5, 2007 also contained Sarbanes-Oxley Certifications signed by Prince.   In these Sarbanes-Oxley Certifications, Crittenden and Prince certified that they had reviewed the filing and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."   These Sarbanes-Oxley Certifications were untrue because the Company's Form 10-K and 10-Q contained the untrue statements and material omissions described herein.

### D.   ADDITIONAL UNTRUE STATEMENTS AND OMISSIONS

197.    In addition to the untrue statements and omissions in the Company's financial statements, Defendants made a number of untrue statements and omissions in the textual portions of the Company's SEC filings that were incorporated by reference into the Base Prospectuses and supplements for the Euro Notes.   Among other things, Defendants failed to disclose, or inaccurately represented, Citi's continued significant exposure to subprime and other high-risk loans.

198.    On January 19, 2007, Citigroup filed a Form 8-K, attaching a press release of the same date that announced earnings for the fourth quarter of 2006 (ending December 31, 2006) and also included limited financial information for the full year 2006.   The Form 8-K was signed

by defendant Gerspach, and quoted CEO Prince as stating that the Company's 2007 priorities included "remaining highly disciplined in credit management."  This statement was false and misleading, because "remaining disciplined" was not possible when the Company had not been disciplined in its credit management to begin with.  Citigroup had engaged in risky subprime lending in order to fuel the growth of its consumer lending portfolio and to generate mortgages that could be packaged into RMBS.  Indeed, that growth in subprime lending was one reason Citi was able to increase its global consumer assets under management in the fourth quarter by 17%, as reported in the Form 8-K.

199.   The January 19, 2007 Form 8-K also reported that the Company faced a "generally stable" consumer credit environment, and the financial data supplement filed as Exhibit 99.2 to the January 2007 Form 8-K reported a $2.1 billion charge for provision of loan losses for the fourth quarter of 2006, resulting in a total allowance for credit losses of $8.94 billion.  The Company also reported income of $5.13 billion for the fourth quarter of 2006, and income of $21.25 billion for the full year 2006.  Citi also reported total assets of $1.883 trillion, which incorporated the $8.940 billion allowance for loan losses, and total liabilities of $1.76 trillion.  These figures are misleading for many of the same reasons as the 2006 Form 10-K.  As detailed above, the credit environment was deteriorating throughout 2006, and Citigroup was required to increase its loan loss reserves by a greater amount to accommodate the changing circumstances.  Citi's credit reserves actually decreased during the fourth quarter of 2006, while net credit losses rose, resulting in a lower loan loss reserve percentage at the end of that quarter.  Thus, Citi's loan loss reserves were understated and its assets were overstated.  Additionally, because Citi was required to take a greater charge to achieve the appropriate reserve level, Citi's income was overstated.  The figures for total assets and total liabilities were also misleading

because the balance sheet failed to include the Commercial Paper CDOs and the assets and liabilities of the SIVs that Citi was required to consolidate.

200. In its 2006 Form 10-K, which was filed on February 23, 2007, Citigroup stated the following with respect to its "Allowance for Loan Losses"[16]:

> For consumer loans . . . each portfolio of smaller-balance, homogeneous loans – including consumer mortgage, installment, revolving credit, and most other consumer loans – is collectively evaluated for impairment. **The allowance for credit losses attributed to these loans is established via a process that estimates the probable losses inherent in the portfolio based upon various analyses. These include migration analysis, in which historical delinquency and credit loss experience is applied to the current aging of the portfolio, together with analyses that reflect current trends and conditions**. (emphasis added)

201. These statements – which were repeated in Citigroup's 2007 Form 10-K – were false and misleading because the Company's impairment analysis ignored recent trends such as downturns in the housing market, and did not legitimately evaluate "probable losses inherent in the portfolio."

202. The 2006 Form 10-K also assured investors that Citi had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through various means:

> The Company provides a wide range of mortgage and other loan products to its customers. **In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust**. [emphasis added]

---

[16] Citigroup Annual Report (Form10-K), at 111 (Feb. 23, 2007).

203.   The 2006 Form 10-K also stated that Citi mitigated risk in its mortgage portfolio by selling most of the loans it originates:

> As with all other lending activity, this exposes Citigroup to several risks, including credit, liquidity and interest rate risks. **To manage credit and liquidity risk, Citigroup sells most of the mortgage loans it originates, but retains the servicing.** [emphasis added]

204.   In reality, however, Citigroup remained exposed to substantial subprime-related risk through its interests in CDOs and RMBS, and thus had not mitigated or transferred those risks.

205.   Citigroup materially misrepresented its CDO-related exposure throughout the Relevant Period.   For example, the 2006 Form 10-K included information regarding the Company's CDO-related exposure.   The "Off Balance Sheet Arrangements" section stated:

> OFF-BALANCE SHEET ARRANGEMENTS
>
> *        *        *
>
> Mortgages and Other Assets
>
> The Company provides a wide range of mortgage and other loan products to its customers. **In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust**.
>
> *        *        *
>
> Creation of Other Investment and Financing Products
>
> *        *        *
>
> The Company packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage collateralized debt obligations (CDOs) and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences. Typically

these instruments diversify investors' risk to a pool of assets as compared with investments in individual assets.

*     *     *

See Note 22 to the Consolidated Financial Statements on page 143 for additional information about off-balance sheet arrangements. (emphasis added)

206.   Citigroup's CDO-related disclosures in the "Securitizations and Variable Interest Entities" section of the 2006 Form 10-K (the "Note 22" referred to in the immediately preceding quote) stated:

**Securitizations and Variable Interest Entities**

The Company primarily securitizes credit card receivables and mortgages. Other types of assets securitized include corporate debt securities, auto loans, and student loans.

*     *     *

... **The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchaser of the securities issued by the trust**.

*     *     *

Variable Interest Entities

*     *     *

The following table represents the carrying amounts and classification of consolidated assets that are collateral for VIE obligations, including VIEs that were consolidated prior to the implementation of FIN 46-R under then existing guidance and VIEs that the Company became involved with after July 1, 2003:

| In billions of dollars | December 31, 2006 | December 31, 2005 |
|---|---|---|
| Cash | $    .5 | $  0.4 |
| Trading Account Assets | 31.6 | 29.7 |
| Investments | 10.1 | 6.1 |
| Loans | 6.8 | 9.5 |
| Other Assets | 5.7 | 4.7 |
| Total assets of consolidated VIEs | $54.7 | $50.4 |

71

\*      \*      \*

In addition to the VIEs that are consolidated in accordance with FIN 46-R, the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary.   These include multi-seller finance companies, collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds….

\*      \*      \*

The Company also packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences. **Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset.** The VIEs, which are issuers of CDO securities, are generally organized as limited liability corporations. The Company typically receives fees for structuring and/or distributing the securities sold to investors.  In some cases, the Company may repackage the investment with higher rated debt CDO securities or U.S. Treasury securities to provide a greater or a very high degree of certainty of the return of invested principal. A third-party manager is typically retained by the VIE to select collateral for inclusion in the pool and then actively manage it, or, in other cases, only to manage work-out credits. The Company may also provide other financial services and/or products to the VIEs for market-rate fees. These may include: the provision of liquidity or contingent liquidity facilities; interest rate or foreign exchange hedges and credit derivative instruments; and the purchasing and warehousing of securities until they are sold to the SPE. **The company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited continuing involvement and, as a result, does not consolidate their assets and liabilities in its financial statements.**

In addition to the conduits discussed above, **the following table represents the total assets of unconsolidated VIEs where the Company has significant involvement**:

| In billions of dollars | December 31, 2006 | December 31, 2005[1] |
|---|---|---|
| **CDO-type transactions** | **$ 52.1** | **$ 40.7** |
| Investment-related transactions | 122.1 | 78.0 |

72

| | | |
|---|---|---|
| Trust preferred securities | 9.8 | 6.5 |
| **Mortgage-related transactions** | **2.7** | **3.1** |
| Structured finance and other | 41.1 | 63.1 |
| Total assets of significant unconsolidated VIEs | $227.8 | $191.4 |

(1) Reclassified to conform to the current period's presentation.

\* \* \*

As mentioned above, **the Company may, along with other financial institutions, provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs. The Company may be a party to derivative contracts with VIEs, may provide loss enhancement in the form of letters of credit and other guarantees to the VIEs, may be the investment manager, and may also have an ownership interest in certain VIEs. Although actual losses are not expected to be material**, the Company's maximum exposure to loss as a result of its involvement with VIEs that are not consolidated was $109 billion and $91 billion at December 31, 2006 and 2005, respectively. For this purpose, maximum exposure is considered to be the notional amounts of credit lines, guarantees, other credit support, and liquidity facilities, the notional amounts of credit default swaps and certain total return swaps, and the amount invested where Citigroup has an ownership interest in the VIEs .... (emphasis added)

207.   The above-quoted disclosures in Citigroup's 2006 Form 10-K, which were repeated in the Company's Form 10-Q for the first quarter of 2007, filed on May 4, 2007, and in its Form 10-Q for the second quarter of 2007, filed on August 3, 2007,[17] were materially incorrect and misleading for several reasons.

(i)   First, they made it appear as though Citigroup's CDOs were distinct from its mortgage-related transactions and mortgage securitizations, when in

---

[17] The disclosures in the May 4, 2007 Form 10-Q and August 3, 2007 Form 10-Q contained the same text, with figures adjusted accordingly.  *See* May 4, 2007 Form 10-Q at 42, 98-101; August 3, 2007 Form 10-Q at 42, 63-67.

fact Citigroup's CDOs were collateralized primarily by subprime and Alt-A mortgages.

(ii)    Second, they indicated that the effect of Citigroup's mortgage securitization activities was to **reduce** Citigroup's exposure to mortgage borrowers' credit risk.   While the mortgage securitizations themselves may have transferred credit risk from Citigroup to the purchasers of the RMBS, what Citigroup did not disclose was that its own CDOs were among the largest purchasers of those RMBS.   Moreover, Citigroup was the largest purchaser of the subprime-backed CDOs that it underwrote. Thus, through its substantial retained interest in those CDOs, Citigroup therefore effectively remained subject to the very risks that it claimed it had transferred away from itself.

(iii)   Third, the 2006 Form 10-K portrayed the CDOs as being structured to "diversify investors' risk to a pool of assets as compared with investments in an individual asset."   In truth, however, Citigroup's CDOs were not diversified, but rather were based on concentrations of RMBS bearing similar subprime risk profiles.   Moreover, the degree of correlation – *i.e.*, the lack of diversification – actually increased for the more senior tranches of the CDOs.   As the primary purchaser of those CDOs, including the super senior tranches, Citigroup was subjected to those concentrated risks.

(iv)    Fourth, they did not disclose that the Company was engaged in a practice of repackaging unsellable tranches into new CDOs, in an effort – largely unsuccessful – to offload the growing risks that they carried.   Nor did they

disclose that Citigroup was amassing an ever-growing supply of unsellable, increasingly high-risk CDOs.

(v)     Fifth, while the 2006 Form 10-K contained a chart listing the total assets of the various VIEs (including CDOs) that were not consolidated on the Company's financial statements, there was no disclosure of the extent of Citigroup's interest – which was substantial – in those VIEs or in their underlying assets.  The Company represented that "actual losses are not expected to be material," and stated in hypothetical terms that it "may also have an ownership interest or other investment in certain VIEs" and that it had only "limited continuing involvement" with its VIEs.  These statements were materially incomplete and misleading because, in fact, Citi owned tens of billions of dollars worth of the super-senior tranches from the subprime-backed CDOs the Company had underwritten in recent years, and thus had substantial exposure as a result of its investments in VIEs.

(vi)    Sixth, Citigroup's statement that it "may … provide liquidity facilities, such as commercial paper backstop lines of credit to the VIEs" was incomplete and misleading because it omitted to disclose that, in fact, the Company had written liquidity puts when it structured the Commercial Paper CDOs that would require it to repurchase those CDOs in the event of a liquidity issue.  In light of these liquidity puts, the Company was required to retain these CDOs on its balance sheet when they were issued, and to take write-downs in relation to those CDOs no later than the quarter

ended June 30, 2007, given the status of the RMBS and CDO markets at that time.

208.    In a November 4, 2007 press release, Citigroup disclosed for the first time its "net" exposure to $43 billion of CDOs, together with an estimated write-down of $8 billion on those instruments.  In its Form 10-Q for the third quarter of 2007, filed on November 5, 2007, Citigroup stated that the $43 billion in CDOs were "not subject to valuation based on observable market transactions," and thus were valued based on estimates of future housing prices.  The quoted statement was not true, as there were observable, relevant indicators of the CDOs' value: the ABX indexes at the triple-B tranche level, and the TABX index at the super senior level. Both had indicated a substantial loss of value as early as February 2007, which Citigroup had not begun to record until November 2007.

209.    The November 5, 2007 Form 10-Q also stated that the $8 billion in write-downs of its CDOs "followed a series of rating agency downgrades of sub-prime U.S. mortgage related assets and other market developments, which occurred after the end of the third quarter" – *i.e.*, Citi attributed the write-downs to events occurring in October 2007.

210.    The November 5, 2007 Form 10-Q also included statements regarding the Company's CDO exposure that repeated those made in Citi's 2006 Form 10-K, May 4, 2007 Form 10-Q, and August 4, 2007 Form 10-Q, with minor changes but which otherwise were similarly inaccurate and incomplete, as follows:

OFF-BALANCE SHEET ARRANGEMENTS

\*       \*       \*

Mortgages and Other Assets

The Company provides a wide range of mortgage and other loan products to its customers.  In addition to providing a source of

liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers.

\*      \*      \*

Creation of Other Investment and Financing Products

\*      \*      \*

The Company packages and securitizes assets purchased in the financial markets in order to create new securities offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences.

\*      \*      \*

Typically these instruments diversify investors' risk to a pool of assets as compared with investments in individual assets.

At September 30, 2007 and December 31, 2006, unconsolidated CDO assets where the Company has significant involvement totaled $84.2 billion and $52.1 billion, respectively.

See Note 13 on page 68 for additional information about off-balance sheet arrangements.

211.    Citigroup's CDO-related disclosures in the "Securitizations and Variable Interest Entities" section of the November 5, 2007 Form 10-Q (the "Note 13" referred to in the immediately preceding quote) stated[18]:

**Securitizations and Variable Interest Entities**

The Company primarily securitizes credit card receivables and mortgages.  Other types of assets securitized include corporate debt securities, auto loans, and student loans.

\*      \*      \*

**The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future**

---

[18] *Id.* at 68-73.

credit losses to the purchaser of the securities issued by the trust.

\*     \*     \*

**Variable Interest Entities**

\*     \*     \*

The following table represents the carrying amounts and classification of consolidated assets that are collateral for VIE obligations, including VIEs that were consolidated prior to the implementation of FIN 46-R under existing guidance and VIEs that the Company became involved with after July 1, 2003:

| *In billions of dollars* | **Sept. 30, 2007** | December 31, 2006[1] |
|---|---|---|
| Cash | $ 1.7 | $ 0.5 |
| Trading account assets | 24.5 | 16.7 |
| Investments | 27.0 | 25.0 |
| Loans | 9.5 | 6.8 |
| Other assets | 4.2 | 5.7 |
| **Total assets of consolidated VIEs** | $66.9 | $54.7 |

(1) Reclassified to conform to the current period's presentation.

\*     \*     \*

**In addition to the VIEs that are consolidated in accordance with FIN 46-R, the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary. These include asset-backed commercial paper conduits, structured investment vehicles (SIVs), collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds.**

**The following table represents the total assets of unconsolidated VIEs where the Company has significant involvement:**

| In billions of dollars | Sept. 30, 2007 | December 31, 2006 |
|---|---|---|
| Asset-backed commercial paper (ABCP) conduits | $ 73.3 | $ 66.3 |
| Structured investment vehicles (SIVs) | 83.1 | 79.5 |
| Other investment vehicles | 27.0 | 42.6 |
| **Collateralized debt obligations (CDOs)** | 84.2 | 52.1 |
| **Mortgage-related transactions** | 11.9 | 2.7 |
| Trust preferred securities | 11.7 | 9.8 |
| Structured finance and other | 52.2 | 41.1 |
| **Total assets of significant unconsolidated VIEs** | $343.4 | $294.1 |

\*      \*      \*

The company also packages and securitizes assets purchased in the financial markets in order to create new security offerings, including arbitrage CDOs and synthetic CDOs for institutional clients and retail customers, which match the clients' investment needs and preferences.

\*      \*      \*

**Typically, these instruments diversify investors' risk to a pool of assets as compared with investments in an individual asset.** The VIEs, which are issuers of CDO securities, are generally organized as limited liability corporations. The Company typically receives fees for structuring and/or distributing the securities sold to investors. In some cases, the Company may repackage the investment with higher rated CDO securities or U.S. Treasury securities to provide a greater or a very high degree of certainty of the return of invested principal. A third-party manager is typically retained by the VIE to select collateral for inclusion in the pool and then actively manage it, or, in other cases, only to manage work-out credits. The Company may also provide other financial services and/or products to the VIEs for market-rate fees. **These may include: the provision of liquidity or contingent liquidity facilities;** interest rate or foreign exchange hedges and credit derivative instruments; and the purchasing and warehousing of securities until they are sold to the SPE. **The Company is not the primary beneficiary of these VIEs under FIN 46-R due to its limited continuing involvement and, as a result, does not**

**consolidate their assets and liabilities in its financial
statements.**

*     *     *

**As mentioned above, the Company may, along with other
financial institutions, provide liquidity facilities, such as
commercial paper backstop lines of credit to the VIEs. The
Company may be a party to derivative contracts with VIEs,
may provide loss enhancement in the form of letters of credit
and other guarantees to VIEs, may be the investment manager,
and may also have an ownership interest in certain VIEs.** The
Company's maximum exposure to loss as a result of its
involvement with VIEs that are not consolidated was $141 billion
and $109 billion at September 30, 2007 and December 31, 2006,
respectively. For this purpose, maximum exposure is considered
to be the notional amounts of credit lines, guarantees, other credit
support, and liquidity facilities, the notional amounts of credit
default swaps and certain total return swaps, and the amount
invested where Citigroup has an ownership interest in the VIEs. . .
(emphasis added)

212.    The above statements were untrue and misleading in that they (a) appeared to

draw a distinction between Citi's CDOs and its mortgage-related transactions; (b) indicated that

Citi's securitization activities reduced the Company's exposure to mortgage-related risk; (c)

indicated that the CDOs diversified the pool of risk; and (d) failed to disclose that Citi had been

repackaging unsold tranches of CDOs.

213.    In a December 13, 2007 press release, filed with the SEC on a Form 8-K filing

dated December 14, 2007, Citigroup announced that it would bring approximately $49 billion of

SIV assets onto its balance sheet. The Company maintained that one of the "key" reasons why it

consolidated its SIVs was because "[g]iven the high credit quality of the SIV assets, Citi's credit

exposure under its commitment is substantially limited." The Company further assured investors

that it expected to incur "little or no funding requirement" for the SIVs, and expected to "return

to its targeted capital ratios by the end of the second quarter of 2008." These statements led

investors to believe that the SIV assets were not impaired, when in fact they contained RMBS

80

and other subprime mortgage-backed assets that were severely impaired and not of "high credit quality." The Company knew or should have known that the impairment was likely to deepen during 2008 (which, in fact, it did). Thus, Citi's credit exposure as a result of its consolidation of the SIVs was not "substantially limited," but was actually quite significant.

214. On January 15, 2008, Citigroup issued a press release announcing its preliminary financial results for 2007. The press release was filed with the SEC as an attachment to a Form 8-K filed the same day. In the announcement, Citi disclosed a $17.4 billion write-down on its subprime-related direct exposures – nearly twice the maximum write-down claimed just two months earlier. Citi also disclosed that the Company was holding an additional $10.5 billion in exposure to subprime-backed CDOs. Because the Company had purchased insurance on this $10.5 billion of CDO securities, the Company described them as "hedged exposures." However, the Company failed to disclose that the hedges depended on the solvency of counterparties such as Ambac and MBIA, and thus investors were not made aware that this counterparty risk exposed the Company to a much higher risk of additional losses on the newly-disclosed $10.5 billion of exposure.

215. The 2007 Form 10-K also contained numerous statements – similar to those in prior SEC Filings – suggesting that the Company's involvement in mortgage securitization activities had the effect of *reducing* its exposure to subprime risk. For example, the Company stated that its involvement in cash CDOs was "typically limited to investing in a portion of the notes or loans issued by the CDO and making a market in those securities." For synthetic CDOs, the Company stated that "a substantial portion of the senior tranches of risk is typically passed on to CDO investors." In terms of its mortgage lending activities, the Company stated that "to manage credit and liquidity risk, Citigroup sells most of the mortgage loans its originates, but

retains the servicing rights."  Similarly, the Company stated that its mortgage and student loan securitizations were "primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust."  What Citi failed to disclose is that it was packaging subprime mortgages into RMBS, and that Citi's own CDOs – in which it retained significant undisclosed interests – were among the largest purchasers of these RMBS. Thus, the Company's mortgage securitizations were not truly transferring subprime-related risk away from Citi.

216.    Citigroup's April 18, 2008 earnings release and Form 8-K were also materially incomplete and/or untrue because the write-downs Citi announced on that date were inadequate. Citi had written down its CDO portfolio by just under half, while the relevant indices had lost nearly all their value by early 2008.  While Citigroup had assured investors in its January 15, 2008 earnings release and 2007 Form 10-K that it had "refined" its CDO valuation methodology "to reflect ongoing unfavorable market developments," in actual fact its valuation methodology failed to take into account the substantial decline in these indices.

217.    In the Company's July 18, 2008 earnings release, which was filed as an attachment to a Form 8-K of the same date, the Company announced its second quarter financial results and underscored that "write-downs in our Securities and Banking business [which included the Company's CDOs and SIVs] decreased by 42%" and that Citigroup had "reduced legacy assets substantially."  The earnings release further assured investors that the Company's "Tier 1 Capital ratio increased to 8.7%," substantially above the 6% benchmark for "well-capitalized" status.  On August 1, 2008, Citigroup filed a Form 10-Q that reiterated the second quarter financial results and again stated that the Company had maintained its "well-capitalized" status.  These statements portrayed the Company as being on the road to recovery, when in fact

the Company's mortgage-related assets were so severely impaired that it would have to be rescued by the federal government only a few months later.  Contrary to Defendants' statements, the Company was far from "well capitalized" in the summer of 2008, and its Tier 1 capital ratio would have been less than 6% if appropriate write-downs had been taken.

## VII.   THE TRUE FACTS ARE SLOWLY REVEALED

### A.   OCTOBER 2007:  CITIGROUP MAKES PARTIAL BUT INCOMPLETE DISCLOSURES CONCERNING ITS GROWING LOSSES AND SUBPRIME EXPOSURE

#### 1.   October 1:  Citi Issues Pre-Earnings Release

218.   In the fall of 2007, the consequences of Citi's undisclosed exposures to the subprime mortgage market began to surface.  On October 1, 2007, almost three weeks before its scheduled quarterly earnings release, Citi announced that it expected a decline in net income of roughly 60% from the third quarter of 2006, an estimate subject to finalization of third quarter figures.  This announcement came as a surprise to investors, because less than three months earlier, on July 20, 2007, Citi had announced record second quarter net income of $6.23 billion, or $1.24 per share, up 18% from the second quarter of 2006.  Thus, Citigroup had initially appeared to be stronger than its peers who were faltering as the financial crisis hit.

219.   Citi attributed its poor third quarter 2007 results to "dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment."[19]  In particular, the drop was attributed to weak performance in fixed-income credit market activities, write-downs in leveraged loan commitments, and increases in consumer credit costs.  Despite this news, Defendant Prince stated in the press release that the Company expected to return to a "normal earnings environment" in the fourth quarter.[20]  As discussed below, however, the worst

---

[19] Press Release, Citigroup, Citi Expects Substantial Decline in Third Quarter Net Income (Oct. 1, 2007).

[20] *Id.*

was yet to come.  The third quarter of 2007 would turn out to be Citi's last profitable quarter until the first quarter of 2009.

220.    In its global consumer lending unit, Citi reported an increase in credit costs of approximately $2.6 billion compared to the prior year third quarter, caused by continued deterioration in the credit environment, portfolio growth, and acquisitions.  Roughly one-fourth of the increase (approximately $650 million) was due to higher net credit losses, and the other three-fourths were attributed to a $1.95 billion increase in loan loss reserves – more than four times the $465 million increase in reserves taken in the prior quarter.

221.    In a pre-recorded message Citi posted on its website on October 1, 2007, Defendant Crittenden explained the factors necessitating the increases in loss reserves, all of which were related to the housing market downturn and broader credit crunch.  For example, Crittenden noted that the reserve build was partially necessitated by losses inherent in the portfolio, but not yet visible, such as borrowers making payments slightly later than usual or even into the grace period, which signals the possibility of future delinquencies.  Crittenden also noted macro-economic variables such as declining residential sales as another reason for increasing the reserves, as well as higher delinquency rates in the Company's overall mortgage portfolio.

222.    While Citi conveyed the impression that the conditions requiring the increased reserves had only recently developed, the Company's loss reserves had actually been inadequate far longer.

### 2.    October 15, 2007:  Citi Announces Third Quarter Results

223.    On October 15, 2007, Citi formally released its third quarter results, reporting net income of $2.2 billion, or $0.44 per share, a drop of 60% from the prior year third quarter – as predicted in the October 1, 2007 press release.  However, in the two-week span between the

earnings preview and the actual report, total write-downs increased from roughly $2.6 billion to roughly $2.9 billion.  Citi attributed this $300 million difference to a "refinement of [its] calculations" as it went through the quarter-ending closing process.[21]  Additionally, the charge to build loan loss reserves increased by $290 million from $1.95 billion to $2.24 billion, reflecting accelerating delinquencies in the Company's U.S. mortgage portfolio during the month of September.  Thus, Citi's fortunes had declined by approximately $600 million in that two-week period.

224.    In the conference call with analysts held later that day, Prince acknowledged that although the general market dislocation had caused some of the Company's problems, "some of [the Company's] losses in structured credit and credit trading were greater than would have been expected from that market dislocation and simply reflect poor performance."[22]  Crittenden echoed Prince, noting that "there is no question that [Citi] underperformed certain competitors even considering turbulent market conditions."[23]

225.    During the October 15, 2007 conference call Citi also revealed that it had been buying commercial paper from some of its SIVs and that this was one of the reasons that Citi's balance sheet had deteriorated, including a decline in Citi's reported Tier 1 capital ratio from 7.9% to 7.4% during the course of the third quarter, falling below Citi's target of 7.5%.

---

[21] Transcript of Citigroup Earnings Conf. Call at 3 (Oct. 15, 2007).

[22] *Id.* at 2.

[23] *Id.* at 7.

B.    **NOVEMBER 2007:  CITI MAKES PARTIAL BUT INCOMPLETE DISCLOSURES REGARDING ADDITIONAL CDO EXPOSURE AND MASSIVE WRITE-DOWNS, AND SHAKES UP ITS MANAGEMENT TEAM**

1.    **November 4, 2007 Press Releases**

a.    **Citi's Overall Picture; Prince Resigns**

226.    On October 31, 2007 and November 1, 2007, Citi announced that it was convening an emergency board meeting over the weekend beginning November 2, to discuss its problems.  On Sunday, November 4, 2007, Citi issued a press release announcing that its Chairman and CEO, Charles Prince, was resigning and that Robert Rubin would become Chairman of the Board.  Citi also designated Sir Win Bischoff, who had been Chairman of Citi Europe, to act as CEO.

b.    **CDOs**

227.    In another press release on November 4, 2007, Citi disclosed that its subprime-related direct exposure as of September 30, 2007 was approximately $55 billion, and not the $11.4 billion that it had previously disclosed to investors.  Citigroup's $55 billion exposure "consisted of (a) approximately $11.7 billion of subprime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) of collateralized debt obligations which are collateralized by asset-backed securities (ABS CDOs)."  Of this $55 billion exposure, Citigroup estimated that it would have to write down between $8 billion and $11 billion.

228.    The $11.7 billion of subprime exposure in the lending and structuring business represented a reduction from the $13 million that reportedly existed as of June 30, 2007.  However, the $43 billion of CDO exposure had never before been disclosed at all.  In fact, $25 billion of this new exposure was added to Citi's books during the summer, when it repurchased the Commercial Paper secured by CDOs pursuant to the liquidity put that accompanied this

particular securitization.  Crittenden conceded that the remainder of the $43 billion exposure had accumulated over time.  Yet this subprime exposure was not disclosed in the third quarter earnings release issued on October 15, 2007, the pre-earnings release issued on October 1, 2007, or any other Company disclosures that preceded it.

229.    This announcement of Citi's substantial subprime exposure, coming so soon after the Company's recent reassurances, took investors and Wall Street analysts by complete surprise. Deutsche Bank reported that "Citi . . . disclosed (we think for the first time) an additional $55B of mortgage-related structured product exposure, mostly of super senior tranches of CDOs ($43B) …"  JPMorgan reported that "[t]he majority of the exposure against which Citi is taking a charge has never been disclosed before, not even in its 3Q earnings call even to indicate its existence, which is very surprising."  On Monday, November 5, Citi's share price fell almost 5% to $35.90, and fell further by the end of the week, down to $33.10.

230.    Citi justified the November 2007 write-downs as necessary in the wake of a series of rating agency downgrades of subprime mortgage-related assets, which had occurred after the end of the third quarter of 2007.  Citi asserted that some assets were not subject to valuation based on observable market transactions, and that Citi had therefore determined their fair value based on estimates of, among other things, future housing prices, as well as discount rates updated to reflect the rating agencies downgrades of sub-prime mortgage-related assets.

231.    Citi also stated that if sales of the super senior tranches of ABS CDOs were to occur in the future, the sales might represent observable market transactions that could be used to determine the value of Citi's super senior tranches.  But the fact that the these assets were not selling was itself an indicator that they were priced too high.  Moreover, even if some portion of

these CDOs were AAA-rated, they were backed by subprime assets, which themselves were rapidly deteriorating.

### C.   JANUARY 2008:  CITI DISCLOSES ADDITIONAL WRITE-DOWNS

#### 1.   Citi Reports Record Losses

232.   On January 15, 2008, Citi reported in a press release and Form 8-K that its fourth quarter write-downs for the subprime assets totaled $18.1 billion, and reported a net loss for the quarter of $9.83 billion, or $1.99 per share – the worst performance in the Company's history. Citi's losses were attributed to the significant increase in credit costs, comprised mostly of $6.1 billion in net credit losses and a $6 billion loan loss reserve build, necessitated by the rising delinquencies that had brought the Company's loan loss reserve ratio to dangerously low levels, particularly in light of the escalating losses Citi was seeing in its consumer lending portfolio.

233.   Citi announced the layoffs of more than 20,000 employees as a result of the deterioration of its business and cost-cutting due to the size of its losses.  In addition, Citi had to raise $12.5 billion in capital and cut its dividend by 41%.  Citi also announced that its Tier 1 capital ratio had fallen to 7.12%, down from 8.2% in the first quarter of 2007.  As a result of this news, the stock price fell from $29.06 to $26.94, more than 7%, and by January 22, the price had fallen further to $24.40.

#### 2.   CDOs

234.   In the January 15, 2008, earnings release, Citigroup disclosed an additional $17.4 billion in write-downs in its sub-prime related exposure related to CDOs, with the current value estimated at $37.3 billion.  Additionally, Citi disclosed the existence of an additional $10.5 billion in CDO exposure, now bringing the total to approximately $66 billion.  These CDOs were supposedly hedged under financial guarantee contracts with monoline insurers Ambac Financial and MBIA.  However when those counterparties suffered their own credit downgrades in late

2007, Citi was forced to reveal their existence and make a $1.5 billion adjustment to account for the counterparty risk, which had the same impact as a write-down.

235.   Citi's disclosure came as a particular surprise to investors given that during the November 5, 2007 earnings call, Citi had downplayed the risk associated with the monoline insurers.  Defendant Crittenden had stated that Citi had not quantified the risk but conceded that they are "important counterparties . . . and there is obviously potentially secondary and tertiary exposures that potentially could exists [sic] for the company."  When analyst Guy Moszkowski pressed for an amount of potential disclosure, Crittenden simply answered that the Company had not disclosed that information.[24]

236.   The Company explained in the January 15, 2008 earnings release that its CDO exposures (high grade and mezzanine) were not subject to valuation based on observable transactions and that it therefore determined fair value based on estimates.  Citi noted that it had refined its valuation methodology "to reflect ongoing unfavorable market developments.  The methodology takes into account both macroeconomic factors, including estimated housing price adjustments over the next four years . . . and microeconomic factors, including loan attributes, such as age, credit scores, documentation status, loan-to-value (LTV) ratio, and debt-to-income (DTI) ratio."[25]  However, since these assets were supported by subprime mortgages with rapidly increasing delinquency rates, the assets were essentially illiquid.  Moreover, the market indices for similar securities had lost virtually all their value by early 2008, and Citi was required to write down its CDOs accordingly.

---

[24] Transcript of Citigroup Special Conf. Call at 6 (Nov. 5, 2007).

[25] Press Release, Citigroup, Reports Fourth Quarter Net Loss of $9.83 Billion, Loss Per Share of $1.99, at 12 (Jan. 15, 2008).

237.    During the January 15, 2008 earnings conference call, analyst Meredith Whitney of Oppenheimer questioned Crittenden regarding Citi's valuation approach.  Whitney questioned why Citi was valuing the mezzanine portion of its CDO holdings at $0.43 on the dollar, when the Company had admitted it did not expect a rebound in that market.  She noted that Citi's price seemed to be "above where the strike prices are, or if there is a strike price, where the market's has indicated."[26]  Crittenden's response was simply that the Company took the reductions it thought were appropriate and that their values seemed to be in the range with other investors or institutions who were valuing their portfolios.[27]

238.    While Citi continued to assert that there were no observable factors to use in valuing the CDOs, Defendant Crittenden explained during the January 15, 2008 earnings conference call that Citi had in fact begun to use the ABX indices as a reference point, as a "crosscheck against [its] cash flow model . . . [to] uncover any inconsistencies."[28]  Further, as discussed above, other market participants considered the various indices, particularly the TABX index, as a barometer of the CDOs' value.

### 3.    Consumer Lending, Including Mortgages

239.    The other significant source of Citi's losses was the $12.7 billion in credit costs, including $6.1 billion in net credit losses and a $6 billion loan loss reserve build.  The $2.6 billion increase in net credit losses was largely attributable to the increased losses in U.S. consumer credit costs, stemming from increased delinquencies on first and second mortgages, unsecured personal loans, credit cards and auto loans.  The consumer banking costs included a net charge of $2.3 billion to increase loan loss reserves.

---

[26] Transcript of Citigroup Earnings Conf. Call at 17 (Jan. 15, 2008).

[27] *Id.* at 17.

[28] *Id.* at 13.

240.    The necessity for a sharp increase in reserves was clear.  In the fourth quarter of 2006, the loan loss reserve ratio for U.S. consumer credit had dropped to 0.96% (compared to an average of 2%) and was still only at 0.99% in the second quarter of 2007.  Even after the large increase in the third quarter, the ratio had only increased to 1.29%, and it was only after the $3.3 billion infusion in the fourth quarter that the U.S. ratio once again surpassed 2.0%.[29]  However, even this increase was conservative, given that delinquency rates (defined as more than 90 days past due) for first mortgages had jumped from 1.38% in the third quarter of 2006 to 2.56% by the end of 2007.  For loans with a FICO score of less than 620, which represented 10% of the Company's U.S. consumer mortgage portfolio, the delinquency rate had reached 7.83% by the fourth quarter of 2007.[30]  As Crittenden pointed out in the January 15, 2008 earnings conference call, the delinquency rate for loans with FICO scores less than 620 was triple that of the overall first mortgage portfolio.[31]

241.    In an implicit acknowledgement that its credit standards had been too lax, Citi announced that its loan originations had declined 16%, reflecting modified loan approval criteria and curtailment of activity with third-party loan originators.  As Crittenden explained during the January 15, 2008 earnings conference call, moderating Citi's loan growth was part of the Company's risk mitigation strategy.  "The shift in origination mix, along with tightened underwriting criteria have resulted in an improved quality of originations."[32]  Crittenden also indicated that Citi had eliminated certain product offerings, undermining the Company's previous claims that its portfolio mix was appropriate.

---

[29] CITIGROUP, FOURTH QUARTER 2007 EARNINGS REVIEW 9 (Jan. 15, 2008).

[30] *Id.* at 10.

[31] Transcript of Citigroup Earnings Conf. Call at 6 (Jan. 15, 2008).

[32] *Id.* at 6.

### D.   APRIL 2008:  CITI REPORTS FURTHER LOSSES AND WRITE-DOWNS, BUT THE SITUATION APPEARS TO IMPROVE

242.   On April 18, 2008, Citi issued a press release, which it filed as an exhibit to a Form 8-K filing on the same day, announcing its results for the first quarter of 2008.  The Company posted a net loss of $5.1 billion, or $1.02 per share, compared to a profit of $1.01 per share generated in the first quarter of 2007.  The Company reported write-downs of approximately $12 billion, down from roughly $16 billion in the fourth quarter of 2007, beating many analysts' projections.  These write-downs included $6 billion on sub-prime-related direct exposures.  Citi also announced credit costs of $6 billion, consisting of $3.8 billion in net credit losses and a $1.9 billion net charge to increase loan loss reserves.

243.   Despite the extent of the loss reported for the first quarter of 2008, these results represented an improvement over the last quarter of 2007.  The Company heralded its "record earnings in transaction services," and Pandit stated that "[d]espite the negative factors in the broader markets, we continue to see strong momentum throughout the organization with robust volumes in many of our products and regions."  Further, Pandit claimed that the Company had "taken decisive and significant actions to strengthen [its] balance sheet," including raising $30 billion in capital in December and January.  Crittenden stated that there would be no additional dividend cuts or further equity raising, leading analysts and investors to conclude that the worst was over.  As a result, and in conjunction with the pledge of no future equity raises or dividend cuts, the Company's stock price increased after the earnings were reported.

244.   In truth, however, the Company faced substantial undisclosed risks and exposures, including real threats to its capital adequacy.  Its first quarter write-downs should have been far greater than they were.  For example, although the relevant indices had lost nearly

all their value by early 2008, Citi had still only written down its CDO portfolio by just under half.

### E.    JULY 2008: CITI TAKES MORE WRITE-DOWNS

245.    Citi released its second quarter earnings for 2008 in a press release and Form 8-K dated July 18, 2008, reporting a net loss of $2.2 billion, or $0.49 per share.  The Company disclosed an additional $7.2 billion in write-downs in securities and banking, including $3.4 billion in CDOs, bringing the total exposure to $22.5 billion.  Citi also reported write-downs of $585 million on highly leveraged finance commitments, $545 million on commercial real estate positions, and $325 million on Alt-A mortgages.  Yet, these write-downs were still inadequate.

### F.    SEPTEMBER 2008: CITI ATTEMPTS TO REASSURE MARKET OF ITS VIABILITY, DESPITE FINANCIAL SECTOR TURMOIL

246.    In early September, 2008, Lehman Brothers was on the verge of collapse and needed a strategic buyer or government intervention in order to survive.  However, Lehman did not find a buyer and the government chose to let the company fail.

247.    To calm market and employee fears, Citi's then-CEO, Vikram Pandit ("Pandit"), issued a letter to Citi employees, which the Wall Street Journal published on September 15.  In the letter, Pandit claimed that the Company had managed its critical priorities well over the past year, and that Citi had "tremendous capacity to make commitments to [its] clients."  Pandit also encouraged employees to remind their clients (and shareholders) that Citi had established a very strong capital base and had a strong cash position.

248.    In an interview for a September 21, 2008 article, Pandit told the New York Times that the Company had been a "pillar of strength in the markets" during the recent turmoil.  Pandit also stated that there was no reason to break up the Company into smaller units.  Pandit proclaimed: "If there's anything I'm right about 100 percent it's the strategy we're on and what

we're doing."[33]   Crittenden was quoted in the same article, putting a positive spin on the remaining $22 billion of subprime and mortgage-related securities on Citi's balance sheet, noting that most of the securities pre-dated 2006, "when mortgage lending practices really went off the rails."

### G.   OCTOBER 2008

#### 1.   First TARP Installment

249.   On October 3, 2008, President Bush signed the Emergency Economic Stabilization Act of 2008 (H.R. 1424), commonly known as "the bail-out bill," which gave the Secretary of the Treasury up to $750 billion to purchase "distressed" (*i.e.*, subprime) bank assets in order to restore liquidity and stabilization to the U.S. economy.   The bill created the federal government's Troubled Asset Relief Program ("TARP"), and funds loaned to banks became known as TARP funds.   On October 14, 2008, Citigroup received a $25 billion infusion in TARP funds.

#### 2.   Third Quarter Results Show Still More Write-Downs, With SIVs A Primary Source

250.   On October 16, 2008, Citi released its third quarter 2008 earnings in a press release and Form 8-K.   The Company announced that quarterly losses had increased from $2.2 billion to $2.8 billion, with loss per share increasing from $0.49 to $0.60.   With these results, it was apparent that Citi had not sustained the slight improvement seen in the second quarter earnings report released in July.

251.   Again, Citi's poor performance was the result of write-downs in the securities and banking operations (totaling $4.4 billion), as well as $4.9 billion in net credit losses, $1.1 billion

---

[33] Julie Creswell & Eric Dash, *Citigroup:  Above the Fray?*, N.Y. TIMES, Sept. 21, 2008.

of which was due to residential real estate losses in North America, and a $3.9 billion charge to increase loan loss reserves.

252.    While Crittenden had emphasized in his interview for the September 21, 2008 New York Times article that "most" of Citi's remaining subprime exposure was in assets pre-dating 2006, substantial exposure to toxic assets issued in or after 2006 remained.  Citi also disclosed a $2 billion write-down on its SIV holdings, leaving the Company with $27.5 billion in exposure.

### H.    NOVEMBER 2008

#### 1.    Citi Discloses Reclassification Of $80 Billion In Assets

253.    On November 17, 2008, Citigroup disclosed that it was reclassifying $80 billion in various unspecified assets by designating these assets as "held to maturity," "held for sale," or "held for investment."   This meant that the assets would no longer be marked to market in each reporting period, and the Company would not be required to take large write-downs with each decline in market value.   In essence, this reclassification was an acknowledgment that the reclassified assets had so little value that the Company could not afford to write them down. Citi did not disclose what assets were included in this $80 billion.

254.    On the same date, Citigroup held a "Town Hall" meeting, in an attempt to reassure its employees.  At that meeting, Pandit explained that the Company had reduced its risky assets while putting the Company "in a very strong capital position," and that the Company was "very well positioned from a capital standpoint to weather future potential challenges."  To the contrary, less than a week later the Company had to be rescued from collapse with a $326 billion federal government bail-out.  As *The Wall Street Journal* reported on November 24, 2008, "[e]ven as they assured employees and investors last week that the company was on sound

financial footing, Citigroup executives and directors knew they needed to do something fast to stabilize their company."

**2.     Citi Announces Plan To Dismantle SIVs And Purchase Remaining $17.4 Billion, Yet Reasserts Strength**

255.     On November 19, 2008, Citi revealed publicly that the SIVs were so impaired that it could not find a buyer.  Citi announced plans to dismantle its SIVs and repurchase their remaining $17.4 billion in assets in what was billed as a "nearly cashless" transaction.  The Company disclosed that the assets of the SIVs had been valued at $21.5 billion as of September 30, 2008, and that the decline reflected sales and maturities of $3.0 billion and a decline in market value of $1.1 billion – in just that six-week period.

256.     Citi's decision to repurchase these assets was part of the Company's program of providing support to the SIVs.  The Company indicated that the fair value of its support was $6.5 billion but that it expected to be repaid upon completion of the transaction.  Citi also indicated that it would record these assets as available for sale.  In other words, Citi was again avoiding the mark-to-market rules that would have entailed additional write-offs on the SIV assets.

257.     The market reacted harshly to this news, with Citi's stock price tumbling 23% by the close of trading on November 19.

258.     In the wake of this news, Defendants' public statements remained steadfastly upbeat.  In a statement released on November 19, Pandit stated that the Company was "entering 2009 in an even stronger position than [it] entered 2008," noting its stronger capital base and liquidity and the reduction in expenses and exposure to risky assets.  Pandit emphasized Citi's long-term operating earnings power.[34]

---

[34] *See* David Enrich, *Citi's Slide Deepens as Investors Bail Out – Shares Drop 23% as SIV Move, Analyst's Warning Spook Market*, WALL ST. J., Nov. 20, 2008, at C1.

### 3. Federal Government Rescues Citi, With Government Guaranteeing $306 Billion Of Assets And Providing $20 Billion Cash Infusion

259. Despite Citi's attempts to reassure the market that it remained solvent, it could not restore confidence. Citi's Board of Directors called an emergency meeting on Friday, November 21, 2008, and the Board spent the weekend negotiating a bail-out plan with various federal agencies.[35]

260. Ultimately, the weekend negotiations led to an announcement of a $326 billion bail-out package, announced on the evening of Sunday, November 23, 2008. Pursuant to the agreement reached with the U.S. Treasury, the Federal Reserve Board, and the FDIC, the Treasury would invest $20 billion in TARP funds in Citi preferred stock. In exchange for an additional $7 billion in preferred stock issued to the U.S. Treasury and the FDIC, the federal government would guarantee $306 billion of securities, loans, and commitments. The hundreds of billions of dollars of assets requiring the government's guarantee included assets backed by residential and commercial real estate, including subprime-related assets.

### I. JANUARY 2009: DETAILS OF BAIL-OUT REVEAL TRUE WEAKNESSES OF MORTGAGE-RELATED ASSETS AND CONTENTS OF $80 BILLION RECATEGORIZED IN NOVEMBER

261. On January 9, 2009, Citi announced that it was pursuing a plan to sell its Smith Barney brokerage unit. Among the plans under discussion was a plan to create a joint venture with Morgan Stanley, despite Pandit's previous commitment to keeping the Company whole.

262. In light of the government pressure on Citi to raise additional capital and analyst predictions of another loss for the first quarter of 2009, observers saw a deal with Morgan Stanley as likely. By January 11, 2009, the terms of a proposed deal had been made public. The plan called for Morgan Stanley to pay $2 billion to $3 billion (or possibly more) for a controlling

---

[35] *See* Bradley Keoun, *Citigroup Gets U.S. Rescue from Toxic Losses, Capital Infusion*, BLOOMBERG, Nov. 24, 2008.

stake in Smith Barney.  By January 12, a deal had apparently been reached, pursuant to which Morgan Stanley would pay $2.5 billion for a 51% stake in Smith Barney.

263.    That same day, a Wall Street Journal article reported on Citi's continuing troubles.  Fourth quarter losses were expected to be billions of dollars greater than previously anticipated.  Citi was expected to post an operating loss of at least $10 billion when it announced its fourth-quarter earnings on January 22, 2009, marking the Company's fifth consecutive quarterly loss.  Such losses would bring the Company's total 2008 losses to over $20 billion and would put it on track to post its worst year since its predecessor, City Bank of New York, was founded in 1812.

264.    On January 15, 2009, Citi filed a Form 8-K, detailing the terms of the $326 billion federal bail-out.  For the first time, Citi itemized the $301 billion[36] in assets that the government would guarantee.  These assets included $191.6 billion in consumer loans, including $154.1 billion in first and second mortgages, and $22.4 billion in unfunded second mortgage commitments.  The guarantee also covered $6.4 billion of the SIV assets that Citi had purchased.

265.    On January 16, 2009, after days of news coverage regarding the impending deal with Morgan Stanley and the possible creation of a new entity to house the toxic assets, Citi announced its fourth quarter results for 2008, with an $8.29 billion net loss, putting the Company's total losses for the year at a staggering $18.72 billion.  This quarterly loss was twice the analyst consensus.

266.    Citi also announced that it would reorganize into two business lines focused on banking and other financial services.  As part of its reorganization plans, Citi announced its

---

[36] In the Form 8-K, Citigroup indicated that the original $306 billion commitment had been reduced to $301 billion, based on adjustments in valuations of certain assets.  *See* Citigroup, Summary of Terms of USG/Citigroup Loss Sharing Program (Form 8-K, Ex. 99.1) (Jan. 15, 2009).

intention to sell its CitiFinancial consumer-lending business and Primerica Financial Services life-insurance unit.

## VIII.   LOSS CAUSATION

267.   Plaintiffs were damaged as a result of Defendants' untrue statements and omissions as set forth herein.   During the Relevant Period, Defendants issued a series of misrepresentations (and omitted material facts) relating to, *inter alia*, (i) the credit quality of Citigroup's mortgage and leveraged lending portfolios; (ii) the extent to which Citigroup was protected from subprime losses as a result of the Company's purportedly conservative underwriting standards; (iii) the amount and value of Citigroup's subprime-related holdings in its trading portfolios; and (iv) the extent to which Citigroup was exposed to a substantial degree of risk in connection with the downturn in the real estate and capital markets.

268.   As a result of Defendants' misrepresentations and omissions of material facts, the prices of Citigroup's Securities were artificially inflated throughout the Relevant Period.

269.   In reliance on Defendants' false statements and omissions and/or on the integrity of the market for the Securities, Plaintiffs purchased Securities at artificially inflated prices during the Relevant Period.   But for Defendants' misrepresentations and omissions, Plaintiffs would not have purchased Securities at these artificially inflated prices.

270.   As Defendants' various misrepresentations and omissions were gradually revealed through a series of partial corrective disclosures beginning on October 15, 2007, the price of Citigroup stock steadily declined, ultimately falling by a total of 92% as of January 16, 2009. Citigroup debt securities also lost significant value as investors began to price in a real risk of insolvency in the wake of the partial corrective disclosures.   These price declines were remarkable in an environment of declining interest rates, when bond prices otherwise should

have risen.  Citigroup subordinated debt fell the most, and some debt securities lost almost half their value in response to Citigroup's gradual and piecemeal disclosure of the truth.

271.   The declines in the Securities prices between October 15, 2007 and January 16, 2009, including, but not limited to, the declines summarized below, are largely attributable to the market absorbing information correcting Defendants' misrepresentations and omissions (and/or the materialization of risks that Defendants failed to disclose).

272.   Plaintiffs suffered economic losses as the price of Citigroup's Securities fell in response to the issuance of partial corrective disclosures and/or the materialization of risks that Defendants had failed to disclose, as summarized herein.

273.   On October 15, 2007, Citi released its third quarter earnings.  At the Company's third quarter 2007 earnings conference call later that day, it was revealed that Citi's reported net income for the quarter had declined 57% from a year earlier because of, in part, a write-down of subprime mortgage losses totaling $1.56 billion (pre-tax and net of hedges) that Citi had "warehoused for future collateralized debt obligation … securitizations" and a $2.24 billion charge to increase loan loss reserves.[37]

274.   In reaction to all of this news, Citi's stock price plummeted $3.09 per share or 6.45% over the immediately following two trading days, from $47.87 on Friday October 12, 2007 to $44.79 on Tuesday, October 16, 2007, for a loss of market capitalization of over $15 billion.

275.   On Wednesday, October 31, 2007 and Thursday, November 1, 2007, Citi announced that it was convening an emergency weekend board meeting, which was followed by news that Citi might replace its management team.  As a result, Citi's stock price declined 10.4%

---

[37] Ciitgroup Press Release, "Citigroup Reports Net Income of $2.2 Billion, Earnings Per Share of $.44" (Oct. 15, 2007).  Citigroup announced a further $5.24 billion in write-downs, relating to losses in other parts of its business, for a total write-down of approximately $6.8 billion.

from the close of $42.11 on Tuesday, October 30, 2007, to $37.73 on Friday, November 2, 2007, representing a loss in market capitalization of nearly $22 billion in two trading days.

276.    On Sunday, November 4, 2007, Citi issued two dramatic press releases.  In the first, Citi disclosed an additional $43 billion in CDO exposure and write-downs of $8 to $11 billion on its CDOs.  In the second, the Company announced the abrupt resignation of CEO Prince, effective on Monday, November 5.  On the news of Prince's sudden resignation and the increased exposure and write-downs, Citi's stock fell 4.85% to $35.90 at the close on November 5.  By the end of the week, November 9, the stock was down to $33.10.  Various Citi debt securities also started to fall in price, reflecting increasing concern among investors that default by Citi was no longer impossible.  According to an event study conducted by Raymond Wolff, Ph.D., a financial economist with the SEC, the November 4, 2007 disclosures caused a statistically significant decline in Citigroup's bond prices.

277.    On January 15, 2008, in announcing its fourth quarter 2007 results, Citi admitted to investors that its subprime losses would result in a fourth quarter loss of nearly $10 billion. During the two month period from October 12, 2007 to January 15, 2008, Citi's stock price had fallen from $47.87 to $26.94.  Over the next four trading sessions after the January 15 announcement (January 16, 17, 18, and 22, 2008), the stock price fell further as the market fully digested the details of the fourth quarter loss, temporarily bottoming out at $24.40 on January 22, 2008.

278.    The situation continued to deteriorate, particularly in the second half of 2008. Throughout August and September 2008, the stock price hovered between $18 and $22, climbing back up to $23.00 on October 1, 2008 – a high that has not been reached since.  The price then began a steady decline.  Although Citi's stock price briefly increased from $15.75 to $18.62 on

October 14, 2008, when the first infusion of TARP funds was announced, those gains could not be sustained. On October 15, 2008, the stock closed at $16.23, down almost 13%.

279. On October 16, 2008, Citigroup announced its third quarter results: a net loss of $2.8 billion (and $3.4 billion from continuing operations), largely due to another $4.4 billion in write-downs in the Securities and Banking division. In reaction, the stock price fell from $16.23 to $15.90, and closed at $14.88 on Friday, October 17. In all, during that week, Citi's stock dropped 20% from a closing price of $18.62 on October 14 to $14.88 by October 17, nearly twice the drop in the S&P financial index during that time.

280. On November 17, 2008, Pandit held an employee Town Hall meeting where he revealed that $80 billion of assets would no longer be valued, causing the stock price to drop from $9.52 to $8.89, nearly a 7% decline. The next day, the price dropped further, down to $8.36.

281. Then, on November 19, 2008, Citi announced that it would have to unwind its SIVs and take a $17.4 billion hit to do so. On this news, Citi's stock price dropped over 23% in *one day*, down to $6.40. By the end of the week, on Friday, November 21, the stock had fallen to $3.77 from its high on Monday of $9.52 – a 61% drop in five days. Moreover, the trading volume increased dramatically over the course of the week, from approximately 168 million shares on November 17, to nearly 342 million shares on November 19, up further to almost 725 million on November 20, and finally hitting the 1 billion mark on November 21. Citi bond prices also plummeted in response to the news, in varying degrees based on degrees of default risk based on the priority of the securities.

282. As Citi was on the verge of collapse, the federal government stepped in to engineer a rescue. On the evening of Sunday, November 23, 2008, the $326 billion rescue

package was announced.  The market reacted positively to this news, with the stock closing up from $3.77 to $5.95.

283.   Citi's stock price improved on this rebound over the next two weeks, generally closing between $6.50 and $8.50, yet not enough to return to the November 17 closing price of $8.89.

284.   In early January 2009, the situation deteriorated further.  Over the weekend of January 10-11, and then on Monday, January 12, several articles appeared in the business press indicating that Citi's condition was precarious.  First, the articles discussed Citi's upcoming release of its fourth quarter results, noting that some analysts expected Citi to announce a loss of up to $10 billion, far higher than the $4.1 billion previously estimated by analysts, surpassing the $9.8 billion reported in the fourth quarter of 2007, and approximately the amount of the losses incurred in the three previous quarters together.[38]  Additionally, these articles reported that the deal for Morgan Stanley to take a majority interest in Citi's Smith Barney brokerage unit was likely to be announced that week.  This news signaled to investors that Citi was desperate to generate capital, since Smith Barney was still profitable and Pandit had previously indicated that he had no interest in spinning off that part of the Company.

285.   In reaction to this news, Citi's stock price dropped from $6.75 to $5.60, with nearly 3 million shares traded, twice the volume of the previous day.  Although the price recovered slightly to close at $5.90 on Tuesday, a BusinessWeek article appearing on Wednesday, January 14, 2009, noted that Citi's key problem – its toxic assets – had yet to be addressed, and could be worth as much as $150 billion.[39]  Citi's investors reacted to this news with another sell-off, with over 500 million shares traded, compared to 274 million the day

---

[38] *See* David Enrich, *Citi Board Backs CEO as Outlook Worsens*, WALL ST. J., Jan. 12, 2009.

[39] Mara Der Hovanesian, *Citigroup: Let the Breakup Begin*, BUS. WK., Jan. 14, 2009.

before.  The price dropped from $5.90 to $4.53, a 23% decline, and fell further on January 15, closing at $3.83.

286.    On January 16, 2009, Citi released its results for the fourth quarter of 2008, reporting a loss of $8.29 billion, worse than the $4 billion predicted.  In response to this news, Citi's price fell again, down to $3.50.

287.    Between December 11, 2008, and January 16, 2009, Citi's stock price fell approximately 58%, from $8.30 to $3.50, more than double the drop experienced by Citi's peers in the Standard & Poor's financial index during that time.  Citi also achieved the dubious distinction of having the worst performance for two years in a row (2007 and 2008) among large U.S. banks, according to the KBW Bank Index.[40]

288.    Likewise, as a direct result of the market learning the truth of Citi's finances, the value of the most junior subordinated Citi debt securities was eventually cut almost in half, and even the senior Citi debt securities lost value, despite a massive reduction in interest rates in 2007 and 2008, which otherwise should have raised Citi's corporate bond prices.  For example, the Fed's discount rate fell from 6.25% to 0.5% during the Relevant Period.  That Citi's bond prices fell in this environment reflected investors' fears of an increasing likelihood of a Citi default in response to Citi's belated disclosures of the truth.

289.    In total, from October 12, 2007 through January 16, 2009, Citigroup's stock fell almost 93%, from $47.87 to $3.50.  In comparison, the stock prices of its peers, as measured by the Standard & Poors financial index, fell only 72%.

290.    From January 1, 2007 through January 16, 2009, Citi's stock fell 93%, while the S&P Financial Index fell only 73.2% and the Dow Jones Industrial Average (of which Citi was

---

[40] *See* Bradley Keoun & Christine Harper, *Citi May Book $10 Billion Gain on Morgan Stanley Deal*, BLOOMBERG, Jan. 12, 2009.

component during this period) fell only 34.6%.  Over the same period, JP Morgan fell 50.1% and Goldman Sachs declined by 64.9%.  Even another troubled bank, Bank of America, did not fare as poorly as Citi, with its stock falling by 84.5% – still 900 basis points better than Citi.  The following charts illustrate these differences in performance:





291.    In testimony before the United States Senate FCIC (discussed in more detail below), Defendant Prince admitted that Citi's write-downs of CDOs and related securities were a "substantial" cause of the collapse of Citi's share price relative to other banks.  Specifically, he testified: "Citi's write-downs on these specific securities totaled some $30 billion over a period of six quarters.  And I believe it is fair to say that this factor alone made a substantial part of the difference between Citi's ultimate problems and those of other banks."

292.    At the same hearing, Robert Rubin confirmed the same: "In my view, there were two primary causes of these problems [at Citi].  First, Citi, like other financial institutions, suffered large losses due to the financial crisis . . . the losses in Citi's businesses, other than CDOs were roughly comparable to peer firms.  Second, Citi suffered distinctively high losses as a result of its retention of so-called super senior tranches of CDOs."  Rubin further emphasized that "these losses were a substantial cause of the bank's financial problems and led to the assistance of the United States government."

## IX.    NON-FRAUD CLAIM UNDER ENGLISH LAW

### COUNT ONE
### For Violations of Section 90 of the Financial Services and Markets Act 2000, As Amended
### (By Swisscanto AG gainst Defendant Citigroup)

293.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except any allegations that the Defendants made the untrue statements and omissions intentionally or recklessly.  For the purposes of this Count, Plaintiffs expressly disclaim any claim of fraud or intentional misconduct.

294.    This Count is brought by Swisscanto AG pursuant to Section 90 of the Financial Services and Markets Act 2000 ("FSMA 2000"), as amended by Statutory Instrument 2005 No. 1433 (the "Prospectus Regulations 2005") against Citigroup, seeking damages in relation to Swisscanto AG's purchase and/or acquisition of the Euro Notes during the Relevant Period.

295.    The Euro Notes were issued pursuant to Base Prospectuses and supplements thereto which were issued by Citigroup to Swisscanto AG and other potential investors.

296.    By their terms, the Base Prospectuses and supplements for the Euro Notes are governed by English law.

297.    Citigroup made misrepresentations in the Base Prospectuses and supplements by incorporating by reference SEC filings that contained misrepresentations of material fact, as alleged herein, and omitted matters that were required to be included.

298.    Section 90 of the FSMA 2000, as amended by Section 6 of the Prospectus Regulations 2005, provides for compensation to investors who purchased securities to which a prospectus or supplementary prospectus applies, and who suffered loss as a result of any untrue or misleading statement in the prospectus or supplementary prospectus, or an omission of information required to be included by the FSMA 2000.

299.    The Base Prospectuses and supplements thereto were approved by Luxembourg's *Commission de Surveillance du Secteur Financier* (the "CSSF").  Luxembourg is a member of the European Economic Area (the "EEA"), and the CSSF is the competent authority in Luxembourg with authority to approve prospectuses under Article 18 of the Prospectus Directive (the "PD") as implemented in Luxembourg.

300.    Prospectuses approved by the competent authority in any EEA member state are treated in the same way as those approved by the FSA if the relevant competent authority provides a certificate of approval and a copy of the approved prospectus to the FSA.  The CSSF provided certificates of approval and copies of the approved Citigroup Base Prospectuses and supplements to the FSA.  The Base Prospectuses and supplements are thus treated as having been approved by the FSA.

301.    Swisscanto AG, on behalf of the funds it managed, acquired securities to which the Base Prospectuses and supplements apply.

302.    The funds managed by Swisscanto AG suffered losses as a result of the misrepresentations and omissions.

303.    Citigroup is responsible for the content of the Base Prospectuses and supplements, and is strictly liable for the misrepresentations contained or incorporated therein and for omitting matters that were required to be included.

304.    By reason of the foregoing, Citigroup is liable to Swisscanto AG for compensation as provided by Section 90 of the FSMA 2000, as amended.

305.    The statute of limitations for Swisscanto AG's Section 90 claim against Citigroup with respect to its purchases of XS0245936496, CH0024683192, CH0026791225 was suspended upon the filing of the putative class action captioned *Rentokil-Initial Pension Scheme v. Citigroup, Inc., et al.*, No. 12-cv-6653 (S.D.N.Y.) (filed August 30, 2012).  That class action asserted the same Section 90 claims against Citigroup with respect to those securities as are asserted herein, and Swisscanto AG (i) purchased those securities during the class period asserted in that class action and (ii) fall within the definition of the class on whose behalf the class action was filed and remains pending.  Plaintiffs' Section 90 claims with respect to their purchases of the other Euro Notes have been brought within the applicable six-year statute of limitations.

## X.    ADDITIONAL FACTUAL ALLEGATIONS PERTINENT TO PLAINTIFFS' FRAUD-BASED COUNTS

306.    The allegations set forth below relate exclusively to Counts Two and Three of the Complaint: Plaintiffs' claims against Citigroup, Prince, Crittenden, Druskin, Maheras, and Klein (collectively, the "Fraud Defendants") pursuant to Sections 10(b) and 20(a) of the Exchange Act.

Plaintiffs also incorporate by reference the allegations set forth above in ¶¶ 1-292 for purposes of these counts.

### A.   ADDITIONAL FALSE AND MISLEADING STATEMENTS

307.   In addition to the statements described above that were incorporated by reference in the Company's registration statements and prospectuses for the issuance of Securities, Defendants made numerous other false and misleading statements to the investing public.

308.   On July 20, 2007, during Citigroup's second quarter 2007 earnings conference call, Defendant Crittenden reassured investors that the Company was reducing its subprime exposures, stating:[41]

> Now let me spend a minute talking about two topics, the subprime secured lending market and our leveraged lending activities.  Our subprime exposure in Markets and Banking can be divided into two categories …  The first is secured lending and the second is trading.  With regards to secured lending, we have been actively managing down our exposure for some time.  We had $24 billion in assets at the end of 2006.  It was at $20 billion at the end of the first quarter and $13 billion at the end of the second quarter.

309.   Crittenden made similar statements in a recorded telephone announcement regarding Citi's October 1, 2007 pre-earnings release and in a conference call following the October 15, 2007 earnings release, stating on behalf of Citigroup that the Company had reduced its exposure to subprime CDOs from $24 billion at the beginning of the year to $13 billion at the end of June.  But this was not true.  Citigroup in actual fact retained a much larger volume of subprime securitized assets, primarily CDOs, on its balance sheet.  Just a few weeks later, on November 4, 2007 that Citi revealed an additional $43 billion in CDO exposures, and yet another $10.5 billion came to light in January 2008.  By making partial disclosures in July and October

---

[41] Transcript of Citigroup Earnings Conf. Call at 7 (July 20, 2007).

2007 that seemed complete, Citi gave its investors false comfort that they knew the limits of the exposure.

310.    Additionally, on the October 1, 2007 recorded call, Crittenden falsely claimed that the Company "typically ha[d] sold the lowest rated tranches of the CDOs and held onto most of the highest rated tranches, where historically values ha[d] been stable" and only declined during the summer when rating agencies changed their methodology and instituted certain downgrades.[42]  In reality, Citi frequently retained the riskiest tranches, which it then attempted to repackage in yet another CDO issue to avoid being stuck with these undesirable assets.  The transcript from this call, which Crittenden reviewed and approved, was incorporated in a Form 8-K filing on October 1, 2007.

311.    During a November 5, 2007 analyst conference call, the day after Citigroup announced an $8 billion write-down on its CDOs, Crittenden announced on behalf of Citigroup that the write-down was a reflection of credit rating downgrades of subprime RMBS and CDOs and declines in the ABX indices at the triple-A level, both of which occurred in October 2007 and purportedly "drove down the value then of the super senior tranches as well, something that had not occurred during the course of the first nine months of the year."  These statements were materially false and misleading because, in fact, the values of the super senior tranches had been materially impaired by February 2007, and had suffered additional, significant declines during the months that followed.  In addition, Crittenden's attribution of the write-downs to declines in the ABX triple-A index was disingenuous and misleading because that index bears no relationship to the value of the super senior CDO tranches.  Rather, that index is a measure of the value of triple-A rated RMBS, whereas the super senior CDO tranches are populated by lower-

---

[42] Citigroup, Oct. 1, 2007 Recorded Call Transcript (Form 8-K, Ex. 99.2), at 3 (Oct. 1, 2007); Transcript of Citigroup Earnings Conf. Call at 7 (Oc. 15, 2007).

rated RMBS.  The index with relevance to the super senior tranches – the TABX – had been in decline throughout 2007.

## B.  THE FRAUD DEFENDANTS' SCIENTER

312.    As alleged above, Citigroup issued SEC filings, press releases, and other public statements throughout the Relevant Period that contained material untrue statements and omitted material information.  The Fraud Defendants' positions at Citigroup, their knowledge of the true facts, their actual issuance of and/or control over Citigroup's materially false and misleading statements, and their motives to commit fraud, give rise to a strong inference that they acted with scienter – *i.e.*, that they knew or recklessly disregarded the false and misleading nature of their statements to investors, and that they knowingly or recklessly deceived Plaintiffs in connection with Plaintiffs' purchases and sales of Citigroup securities during the Fraud Period.

313.    The Fraud Defendants also knew or recklessly disregarded that the misleading statements and omissions contained in Citigroup's public statements during the Fraud Period would adversely affect the integrity of the market for its Securities and would cause the price of those Securities to be artificially inflated.  The Fraud Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiffs.

### 1.    The Fraud Defendants Knew Citi Was Exposed To Losses Via Its Subprime Holdings

314.    By the beginning of the Fraud Period, the Fraud Defendants knew that the downturn in the subprime market would adversely affect the assets created with the underlying subprime loans.  First, they knew Citi could not sell the warehoused RMBS that were awaiting securitization, but repeatedly avoided disclosing this exposure to Citi's investors.  Second, they knew Citi held unsold tranches of the CDOs it had sponsored, yet quarter after quarter, assured the market that Citi had sold off the risk associated with these subprime-related assets.  Third,

with its insider knowledge as to how the CDOs were structured, Citi knew that its CDOs could not be sold at face value, and that their value was falling throughout 2007. Fourth, Citi knew that its Commercial Paper CDOs contained liquidity puts thus exposing the bank to billions of dollars of undisclosed subprime risk. And fifth, Citi was the third-largest originator of synthetic CDOs in the world, had almost unparalleled access to information related to the both the short and long sides of the CDO trade, and thus knew better than most banks that its CDOs were overvalued throughout 2007 and 2008. Despite this knowledge, the Fraud Defendants deliberately withheld information regarding Citi's exposure until the requisite write-downs were so extreme that Citi could no longer avoid them.

### a. The Fraud Defendants Knew The CDOs Were Not Structured To Withstand The Collapse Of The Housing Market

315. As the world's largest issuer of RMBS-backed CDO securities in 2007, Citi understood better than any other bank the modeling used to create these assets. The Fraud Defendants understood that certain assumptions were made in order to assess the likely losses, which were necessary in order to create the different tranches, with each tranche's rating reflecting the expected loss.

316. The underlying assumptions were premised on optimistic conditions that did not exist. For example, Citi's model assumed that housing prices would rise by 6% annually, but by late 2005, housing prices had already begun to fall, and that assumption was no longer valid. Nonetheless, Citi continued to use this outdated model in assessing its CDO exposure at least until the end of 2006, although it was clear to others within the Company and the industry that those assumptions were no longer valid.

317. The Fraud Defendants knew that the projected losses were only reasonable if the underlying assumptions were accurate. Once the optimistic assumptions regarding housing

prices were no longer operative, the Fraud Defendants knew that the losses would be far more drastic than those projected when the CDOs were created – and rated.  Thus, the losses would easily spread beyond the BBB-rated tranches, and the so-called super senior tranches were far from immune to the overall market decline.  In essence, the ratings were no longer valid.  The Fraud Defendants knew they could no longer assume the ratings were a reliable indicator of the projected losses, but disregarded that fact in order to avoid making the necessary disclosures and taking the necessary write-downs.

318.    Indeed, it appears that Citi worked with rating agencies to manipulate the debt ratings of its CDOs and then Citi used these ratings to overvalue the assets on its balance sheet. A 2007 report, cited in an article by professor John Coffee, Jr. of Columbia University, indicates that the conflicts of interest between investment banks such as Citigroup and the ratings agencies led to massive and improper inflation in the ratings provided to CDOs.[43]  The article reports that corporate bonds rated Baa by Moody's, which is the lowest investment grade rating, had a default rate of 2.2% from 1983 to 2005.  On the other hand, CDOs given the same Baa rating by Moody's had a default rate of 24% over the same period – more than 10 times higher than the bond default rate.  According to Professor Coffee, the only possible explanation for this rate differential is that the ratings agencies, because of their conflict of interest, significantly inflated the ratings provided to CDOs at the behest of giant investment banks such as Citi.  Citi, because of its central involvement in the ratings process, knew that many of its CDOs were not investment grade, but it continued to carry them on its books as if they were – with no disclosure of the increased risks to investors.

---

[43] John Coffee, Jr., *Grade Inflation*, Nat'l L.J., Sept. 10, 2007, at 12.

319.    Additionally, Citi's valuation model was premised on a degree of correlation among CDOs that was unrealistically low.  The reality was that the correlation was much higher than that assumed in the model, and the losses were more likely to occur, were more likely to be substantial, and were more likely to reach even the super senior tranches.  No later than early 2007, the Fraud Defendants were aware of how the CDOs were likely to perform and that the Company's portfolio was likely to sustain heavy losses.

320.    Furthermore, other CDO underwriters knew of the increasing risks facing CDOs by at least early 2007.  For example, HSBC had already starting taking massive write-downs to its CDO portfolio by February 2007.  Likewise, in March of 2007, UBS conducted a secret experiment, attempting to sell a representative sample of its CDO portfolio, and discovered that market prices would have averaged 50 cents on the dollar (although UBS suppressed this information).  It is inconceivable that Citi and its senior executives were unaware of the risks facing RMBS-backed CDO securities, when Citi was the largest issuer of those securities.

**b.    The Fraud Defendants Knew Citi's CDOs Were Not Immune To The Market Downturn**

**(1)    Citi Publicly Acknowledged Risks Associated With CDOs**

321.    Citi knew that its CDOs were likely to suffer from massive defaults in the subprime arena.  During an annual credit conference in Monaco in early March 2007, Citi's head credit strategist, Matt King ("King"), explained to investors that ABS CDOs exposed them to subprime mortgage-related risks through extremely concentrated and highly correlated underlying subprime collateral.  King explained that, as a result, the risk of CDO losses due to subprime risks extended *even to the super-senior tranches* of CDOs.  King noted that some banks had set aside reserves to cover subprime losses, and that Citi was "deeply suspicious" of banks "with exposures in that space who have not declared anything like the same degree of

provisioning."   Meanwhile, Citi itself had not set aside reserves to cover its own massive, undisclosed subprime exposures, including those pertaining to its CDO holdings.

322.    In late March 2007, Citi's quantitative credit strategy and analysis group, headed by King, issued a report (the "March 2007 Report") concluding that recent subprime mortgage performance put senior CDO tranches at uniquely severe risk, and recommending that investors sell their senior tranches or hedge their risk through credit default swaps.   The March 2007 Report was spurred by two recent events in the subprime mortgage market: (1) the release of data evidencing unprecedentedly poor performance of recent subprime mortgages; and (2) falling prices for RMBS and CDO tranches, including the ABX and TABX indices.   The March 2007 Report observed that many RMBS and CDO tranches were now being sold at a discount, and that the secondary market for such instruments was starting to exhibit a wide divergence between bid and offer prices.

323.    The thesis of the March 2007 Report was twofold and correct on each count. First, the March 2007 Report concluded that the *senior* tranches of subprime-backed CDOs were uniquely exposed to severe risk as a result of subprime mortgage performance, and uniquely susceptible to severe credit ratings downgrades.   Second, the March 2007 Report stated that these senior tranche CDO risks had not yet been fully "priced in" by the market:

> Sub-prime has been one of the main focal points of the recent
> selloff ... But we reckon the effect on CDOs of ABS may be more
> interesting than that on sub-prime itself — and considerably less
> priced in.

324.    The March 2007 report explained that the uniquely severe risks faced by senior CDO tranches were a result of the fact that ABS CDOs were collateralized primarily by mezzanine tranches of subprime RMBS (i.e., the BBB tranches). While any individual RMBS tranche was somewhat diversified — insofar as it contained subprime mortgages from multiple

geographic regions — the pile-up of such tranches as the asset base for CDOs actually meant that CDO assets were *not* diversified, but rather all largely the same:  "As we see it, this creates a classic 'ball in bowl' phenomenon, in which either no ABS tranches get downgraded, or a great many do."

325.    No later than April 2007, Citi added new disclosures to the prospectuses for the CDOs it structured and sold.  Aware of its disclosure obligations with respect to potential CDO investors, Citi noted that recent trends in the RMBS market had rendered CDOs increasingly vulnerable to the following factors and risks:  (1) housing price downturn; (2) increasing mortgage defaults; (3) increase in adjustable mortgage rates resetting to levels that would trigger defaults; and (4) inability of borrowers with adjustable mortgages to refinance due to higher interest rates, stricter lending standards, and price declines.  Given its own massive CDO holdings, Citi clearly knew that its *own* portfolio was also vulnerable to these same risks, yet it made no disclosures of those CDO holdings or risks to its own investors.

326.    Additionally, Defendant Crittenden acknowledged in November 2007 that CDOs from 2006 or later were particularly weak.  While this comment was made in order to emphasize the relative strength of Citi's pre-2006 holdings, it shows that Crittenden, and the Company, were aware that Citi's 2006 and later vintage CDOs had lost value well before Citi disclosed the exposure and took the write-downs.

### (2)    Aware Of Market Developments, Citi Tried To Protect Itself

327.    Because Citi was a major participant in the securitization market, the Fraud Defendants were aware of the downturn in the TABX index and its utility in predicting losses in the super senior CDO tranches.  Despite this knowledge, Citi repeatedly assured investors that it was not vulnerable to subprime losses.  Even when Citi finally disclosed the existence of the

CDOs it had been holding, it continued to deceive the public about the quality of those assets and true likelihood that write-downs would be necessary.  Instead, Citi relied on the "super senior" label and AAA-rating to justify the delay in disclosing these assets and in taking appropriate write-downs, and implemented a strategy in which it took incremental, but insufficient and untimely, write-downs.  Citi knew that taking incremental write-downs was nothing more than a postponement of the inevitable, which allowed Citi to conceal the truth about its exposures and delay acknowledging the damage done to its balance sheet from these toxic assets.

328.    Aware of the risks associated with its super-senior CDO tranches, in the second half of 2006 and early 2007 Citi also stepped up its efforts to hedge away those risks by purchasing insurance (in the form of credit default swaps) from insurers such as Ambac.  As discussed above, in January 2008 Citi disclosed the existence of an additional $10.5 billion in CDO exposure.  These CDOs had been hedged under financial guarantee contracts with monoline insurers Ambac Financial and MBIA, but when those counterparties suffered their own credit downgrades in late 2007, Citi was forced to make a $1.5 billion adjustment to account for the counterparty risk, which had the same impact as a write-down.

329.    Investors later learned that Citi started to hedge its retained CDOs starting in May 2006 with its $2.5 billion Diversey Harbor ABS CDO.  By the end of June 2007, Citi had purchased hedges on more than $13 billion of retained risk in several different CDOs, despite the fact that Citi only retained ostensible "super senior" tranches.  These massive (and until 2008, undisclosed) hedges strongly support the inference that Citi was aware of the problems posed by retained "super-senior" risk by the beginning of the Fraud Period.

330.    Citi's knowledge of the risks associated with the Commercial Paper CDOs is further evidenced by Citi's extensive use of special purpose entities to conceal these CDOs from

investors.  For example, on or before February 9, 2007, Citi arranged an SPE called Foraois

Funding Ltd., which entered into a CDS arrangement related to one of Citi's Commercial Paper

CDOs (Grenadier Funding CDO).  In essence, Citi paid its own SPE for credit protection in

exchange for swapping off the credit risk of the liquidity put.  Naturally, Foraois could only

serve as a counterparty for this risk if it had funding, which was provided through the SPE's sale

of tranched securities collateralized by the CDS premiums that Citi agreed to pay to the SPE.

The necessary funding was obtained by the sale of junior Foraois tranches to *other Citi CDOs*.

This circular transaction and others like it clearly evidence Citi's knowledge of the risks posed

by the Commercial Paper CDOs and Citi's actions intended to conceal those risks from

investors.

331.    In July 2007, the Fraud Defendants also took steps – belatedly – to monitor Citi's

credit risk.  Defendant Prince began to hold daily meetings – attended by Crittenden, Druskin,

Klein and Maheras – to assess Citi's CDO exposure .  Any risk that merited daily meetings of the

highest-level executives to assess Citi's exposure was surely a risk that a reasonable investor

would find material.  Yet for four months, the Fraud Defendants did not disclose even the

existence of these assets, much less the degree of risk associated with them.

### (3)    Synthetic CDOs

332.    Citi was well aware by the end of 2005 that major Wall Street banks (including

itself) were so concerned about the default risk of subprime RMBS that they refused to write any

more credit default swaps on these assets, despite huge demand by investors looking for ways to

short the subprime markets.

333.    While Citi was not willing after 2006 to insure the risk that these assets might

default, it was willing to act as an intermediary between the short investors and other investors

who had not yet figured out how impaired the assets had become.  The solution was to create "synthetic CDOs."

334.   These synthetic CDOs, one of which (the Abacus 2007-AC1) was the subject of civil fraud charges against Goldman Sachs, are comprised entirely of credit default swaps designed with reference to "select" subprime RMBSs.  In the case of the Abacus synthetic, the SEC charged that the reference assets were "selected" by the short investor because they were so likely to fail, but Goldman failed to disclose this fact to the long investors.  The SEC is reportedly now investigating other synthetics to determine if the long investors were misled in a similar way.

335.   The reference assets in these synthetics are largely subprime RMBS that had similar characteristics to other RMBSs that comprised CDOs retained on Citi's balance sheet.  In fact, many of the reference assets were actually Citigroup RMBSs.  For example, in the now-infamous Abacus 2007 AC1 synthetic CDO, 6.7% of the reference assets were issued by Citigroup Mortgage Loan Trust, Inc. (CMLTI), more than almost any other issuer.

336.   Furthermore, from 2004 to 2007, banks arranged approximately $132 billion of synthetic CDOs globally, and more than half of this amount was arranged in 2006 alone, according to data obtained from Citigroup by *The Wall Street Journal*.  Of this number, Citigroup arranged more than 10%, or $14.6 billion, more than any other U.S. bank.  Citigroup thus had greater insight than any other U.S. bank by the beginning of the Fraud Period into exactly how impaired its subprime-related CDOs and RMBSs were, and yet failed to mark down these assets in conformity with the knowledge it had.

### (4)   Repackaged CDOs

337.   Throughout 2006, Citi's basic CDO strategy was to create CDOs, sell the junior tranches, including mezzanine tranches and equity, and disclose to investors that it had only

retained, at most, the "super senior" tranches.   On average, 36% of Citigroup CDO securitizations during this period were junior tranches.   By the end of 2006, however, this business model stopped working, and Citi was unable to unload the junior tranches.   Citi's response not only establishes scienter as to Citi's knowledge of the deteriorating market for CDOs by the beginning of the Fraud Period, but also establishes that Citi knew that even its "super senior" tranches were overvalued throughout all of 2007 and 2008.

338.    Citi's solution to the meltdown in the CDO market was to take the unwanted junior tranches and use them to create new "High Grade" CDOs.   The term "High Grade" was meant to convey the idea that these CDOs were somehow *safer* than the CDOs from which the assets were picked: in the original CDO, the underlying assets were typically BBB-rated mezzanine subprime RMBSs, but in the securitization, even the junior tranches were rated A or AA.   Because the new CDOs were comprised of A or AA assets, not BBB, they were called "High Grade" despite the fact that they were comprised of *junior* tranches of a CDO that was comprised entirely of medium-grade-rated assets.

339.    In the new "High Grade" CDO, Citi called the top 60% or so of the securitization "super senior" and retained them on its books without disclosing to investors that these tranches were actually composed of unwanted junior tranches of other CDOs, which in turn were typically comprised of risky subprime RMBSs.   If the junior tranches of the new CDO could not be unloaded, Citi would repackage them yet again and start the cyclical process yet again.   The chart below illustrates the process Citi utilized in 2006 and 2007 to recycle junior tranches that could not be sold:



340.   Citigroup was not the only bank that followed the practice of creating "High Grade" CDOs partially out of unwanted junior tranches of other CDOs.  From 2005 to 2007, the Basel Committee on Banking Supervision concluded that 19% of High Grade CDOs' assets, on average, were comprised of these junior tranches.  But at Citigroup, during the same period, the figure was approximately 35%.  In some Citigroup High Grade CDOs, the percentage exceeded 50%.

341.   For example, Citigroup created a "High Grade" CDO called Bonifacius, which at its peak held $2.5 billion of assets.  Approximately $777 million of these assets (approximately 33%) were actually other CDO securitizations that could not be sold.  In fact, in some instances Bonifacius purchased the majority of some junior tranches of other CDOs (purchasing the entire AA-rated junior tranche of the Pinnacle Peak CDO, and 68% of the A-rated junior tranche of the Diversity Harbor CDO).

342.    The pattern exhibited by Citi's Bonifacius CDO was repeated elsewhere.   The

Raffles Place Funding II CDO, the Armitage ABS CDO, the Pinnacle Peak CDO and the Jupiter

High Grade VII CDO all allocated 35% of their assets to other Citi CDOs.   Two Citi CDOs

allocated 90% of their assets to tranches of other CDOs (HSPI Diversified Funding I and II).

343.    Some of Citigroup's CDOs even purchased junior tranches of each other in a

Byzantine cross-securitization process that could only be designed to conceal Citi's true

exposures from investors.   For example, a Citi CDO called 888 Tactical Fund invested in various

tranches of a CDO called Class V Funding III, while Class V Funding III purchased tranches

from 888 Tactical Fund.   These two CDOs were issued simultaneously in February 2007.   888

Tactical Fund performed this same trick with other Citigroup CDOs, including the Armitage

CDO and the Ridgeway Court Funding I CDO.

344.    These reiterative repackaging schemes accounted for most CDOs that Citi created

from late 2006 to late 2007, and constituted the bulk of Citigroup's underreported "super senior"

exposure.   Because Citigroup knew that it could not sell the junior tranches, and knowingly

repackaged them into other "High Grade" CDOs, Citigroup's scienter is established as to its false

statements regarding CDO exposures and valuations.

### c.    The Fraud Defendants Knew Citi Was Obligated To Consolidate The Commercial Paper CDOs

345.    The Fraud Defendants also knew that Citi was obligated to consolidate the

Commercial Paper CDOs.   As detailed above, the accounting rules regarding consolidation are

clear that Citi's liquidity puts constituted a variable interest, meaning the rules for consolidating

a variable interest entity were applicable.    Indeed, it was exactly the circumstances that render

the rule applicable – when the put options will be called on to perform in the event expected

losses occur – that caused Citi to repurchase those CDOs (rather than deal with the liquidity

puts).  Thus, Citi's actions confirmed that Citi was required to consolidate these CDOs all along, and that Citi knew it could be "called on to perform" if the losses were to occur.

346.    Additionally, Citi admitted during the November 5, 2007 conference call that it had repurchased the Commercial Paper CDOs during the summer of 2007, yet the Fraud Defendants had made no disclosure at all regarding these assets until November 4, 2007 – revealing nothing in the October 1, 2007 pre-earnings release or in the October 15, 2007 earnings release (or the conference call held to discuss those results).  Regardless of how the Commercial Paper CDOs were classified prior to the repurchase, Citi knew by the summer of 2007 that it had acquired an additional $25 billion in CDO exposure, and chose to conceal this material fact from its investors.

### 2.    Government Investigations Support a Strong Inference of Scienter

### a.    The SEC's 2007 Investigation Into Citi's Accounting Practices

347.    As the first wave of Citi's negative disclosures hit in the fall of 2007, the SEC launched an investigation into several of Citi's accounting practices which were implicated in the disclosures of subprime exposure and the consolidation of the Commercial Paper CDOs.  Even before Defendant Prince resigned, the SEC had opened an investigation into, *inter alia*, how Citi had valued subprime-related assets and whether the Company had timely disclosed its exposure, *i.e.*, the very issues at the heart of this lawsuit.

348.    The SEC investigation remains ongoing.  In May 2009, news surfaced in *The Wall Street Journal* that the SEC was working on reaching a settlement with the Company, but was working out whether any fine could be paid using TARP funds, or other sources of capital.

Sources quoted in the article also reported that the SEC was considering bringing charges against individuals, including top executives.[44]

349.    On July 29, 2010, the SEC announced that it had reached a settlement with Citigroup and two high-ranking executives related to one aspect of the investigation, Citigroup's failure to disclose its true exposure to subprime mortgage-related assets.   The SEC filed a complaint against Citi in the District of Columbia along with a proposed "Consent of Defendant Citigroup Inc."   The SEC also commenced (and simultaneously settled) an administrative proceeding against Defendant Crittenden.   Citigroup agreed to pay a penalty of $75 million, and Crittenden agreed to pay a fine of $100,000.

350.    According to the SEC's complaint against Citi, in April 2007 Citi's investment banking group provided senior management and Investor Relations personnel, including Crittenden, with a PowerPoint presentation entitled "Overview of Subprime Exposure in the Global Structured Credit Product Business" which showed that it had approximately $10.1 billion of subprime exposure.   The presentation also showed an additional $37.8 billion of subprime exposures, consisting of $14.6 billion of CDOs, and $23.2 billion of liquidity puts written on CDOs that had been sold to customers, which were deemed to be a low risk of default and were therefore excluded from the $10.1 billion.   Despite being explicitly informed of these additional $37.8 billion in subprime exposures, Crittenden and other Citigroup executives chose not to disclose them to investors in the Company's first quarter 2007 Form 10-Q, or when announcing the quarterly financial results.   The missing exposures were also omitted from discussion during the Company's earnings call with investors and analysts.

---

[44] *See* Susan Pulliam & Randall Smith, *Citi, SEC Are In Talks To Settle Asset Probe*, WALL ST. J., May 28, 2009, at C1.

351.    In July 2007, Citigroup's investment bank prepared a PowerPoint presentation, entitled "Second Quarter 2007 Earnings Review," which contained a "Sub-prime" section that showed approximately $9.5 billion in subprime exposure from CDOs and $24.5 billion of exposure from liquidity puts.  This PowerPoint was presented during a "Flash Call" meeting attended by Crittenden and a number of other senior-level Citi executives.

352.    Immediately following the July "Flash Call" meeting, a group of senior executives met at Crittenden's request to review the subprime exposures of Citi's investment bank.   An update to the April 2007 PowerPoint was presented, showing that Citi had approximately $13 billion in subprime exposures.  By this point, the total exposure had grown to more than $50 billion, but the investment bank expressly indicated in the presentation materials that it was excluding over $39 billion of that amount from its internal analysis of subprime exposures, and thus was reporting only $13 million.  Of this excluded $39 billion, $14.7 billion was from CDOs, and $24.5 billion was from liquidity puts.   Just as in April, Citigroup executives, including Defendant Crittenden, did not report these known exposures to investors. Instead, on investor calls on July 20 and 27, 2007, Crittenden told analysts and investors that Citi's total subprime exposures had been "reduced" to $13 billion, thereby understating Citi's total subprime exposures by more than $39 million.

353.    According to the SEC complaint, these July 2007 statements about the supposed "reduction" of subprime exposures to $13 billion were misleading because a portion of that "reduction" resulted from the fact that Citigroup had taken unsold lower-rated tranches of previously underwritten CDOs, as well as warehoused subprime assets, used those assets in the creation of new CDOs, and then called them "super senior" CDOs.  These were some of the super senior CDOs that Citi deemed unlikely to default and thus failed to disclose.  As such, a

portion of the purported reduction in exposure merely resulted from moving lower tranche inventory into higher tranches, which, as stated above, Citi decided to hide from investors.

354.    In early September 2007, Crittenden met with the head of Citi's Risk Management organization (and others) to discuss valuation issues regarding the super senior CDOs, and was told that the losses on the super senior CDO tranches could be between $43 million and $1.35 billion for the third quarter 2007.  Following the meeting, Crittenden directed Citi personnel to oversee a process to determine the appropriate valuation methodology.

355.    According to the SEC, by the middle of September 2007, Crittenden and other members of senior management (including Prince, Maheras and Klein) were anticipating losses between $300 million and $500 million on the super senior tranches of the CDOs.   In anticipation of those and other losses, Citigroup decided to issue a pre-announcement of its third quarter 2007 results, and Crittenden (among others) drafted a script for a recorded call with investors and analysts to accompany the press release.  The script stated that beginning as early as January 2007, Citi saw the deterioration in the subprime markets and began the process of reducing exposure.  As outlined in the SEC's Cease and Desist Order in *In the Matter of Gary Crittenden and Arthur Tildesley*, Citi investment bank officers expressed concerns via email that the script would mislead investors to conclude that the total subprime exposures were $13 billion, when in fact that number excluded substantial exposures relating to super senior CDO tranches.  Crittenden ignored the suggestions to clarify the language and recorded the pre-announcement, which was released on October 1, 2007.

356.    The SEC complaint indicates that by October 1, 2007, Citigroup's still-undisclosed "super senior" CDOs and liquidity puts had reached $43 billion in face value.  Defendant Crittenden was aware of this exposure.  Citigroup was also aware, and reported, that

some super senior CDOs were losing value.   Yet Citigroup knowingly and fraudulently represented in its October 15, 2007 press release and earnings conference call that its subprime exposure had declined to less than $13 billion – a figure that, as in the previous quarter, wholly omitted the exposures related to CDOs and liquidity puts.  Citi's true subprime exposure at the end of the third quarter 2007 totaled over $55 billion.

357.   On October 4, 2007, Crittenden, along with other senior Citi executives, attending a meeting during which a PowerPoint presentation entitled "Third Quarter 2007 Earnings Review, October 4, 2007," was reviewed.   This presentation shows several categories of subprime exposures, including $16.1 billion of super senior CDO tranches and $27 billion in liquidity puts.  However, on the October 15, 2007 earnings call, Crittenden – reading from a script he approved – stated that Citi's subprime exposures were $13 billion at the end of the second quarter and had declined during the third quarter.  Once again, the exposures relating to the super senior CDO tranches and liquidity puts, totaling approximately $43 billion, were not disclosed.  The operator on the call introduced Prince and Crittenden by name.  Prince did not correct any misstatements made on the call by Crittenden despite knowing that they were materially false.

358.   After the October 15, 2007 press release and earnings call, certain ratings agencies downgraded tranches of the CDOs that Citi had been concealing.  Citi determined that these assets would need to be written down by $8 billion to $11 billion.  Only then did Citi finally tell investors the truth about the exposures, on the very day (November 4) that the write-downs were announced.

359.   Because of Citigroup's repeated material misrepresentations and omissions related to tens of billions of dollars worth of hidden subprime exposures, the SEC charged the

Company with violating Section 17(a)(2) of the Securities Act and Section 13(a) of the Exchange Act.  Citigroup has consented to pay a $75 million penalty.

360.    The facts alleged by the SEC, and not challenged by Citigroup, clearly support a claim of fraud and scienter by Citigroup and Defendant Crittenden.   Internal Citigroup documents repeatedly calculated the Company's true exposure to CDOs on the books and liquidity puts related to CDOs off the books, and Citi repeatedly and purposefully chose to scrub its disclosures of these assets.

### b.    The SEC's 2010 Investigation of Citi's Use of "Repo 105"

361.    On March 11, 2010, the bankruptcy examiner investigating the demise of Lehman Brothers introduced a new term into the common financial lexicon: "Repo 105."

362.    "Repos," or repurchase transactions, are used to convert securities and other assets into cash needed for a firm's various activities, such as trading.  But they can also be used to move assets off the balance sheet to make the leverage ratios appear lower, and the firm healthier.  Under an accounting rule called FAS 140, approved in 2000, if Lehman agreed to buy back the assets at 105% of their sales price, the firm could book them as sales.  Lehman used Repo 105 transactions at the end of each quarter to reduce its reported leverage, only to repurchase the assets a few days later.

363.    Lehman's use of Repo 105, according to Wharton accounting professor Brian J. Bushee, was "clearly a dodge . . . to circumvent the rules, to try to move things off the balance sheet. . . . Usually, in these kinds of situations I try to find some silver lining for the company, to say that there are some legitimate reasons to do this . . . But it clearly was to get assets off the balance sheet."

364.    On March 29, 2010, prompted by the Lehman report, the SEC sent letters to several large banks, including Citigroup, demanding information related to any similar

"repurchase agreements, securities lending transactions, or other transactions involving the transfer of financial assets with an obligation to repurchase the transferred assets" including how such transactions are accounted for.

365.    In a letter to the SEC dated April 13, 2010, Citi admitted to temporarily transferring billions of dollars off the balance sheet at the end of each quarter during the Relevant Period using repos, thus improperly reducing reported assets on the balance sheet, and misrepresenting Tier 1 leverage and Tier 1 capital.  Further, Citi has even admitted that most of these temporary quarter-end transactions (as much as $9.2 billion in one quarter) were improperly classified as "sales."

366.    The SEC specifically asked Citi to identify the business purpose for the repo transactions, and Citi could not point to any.  In fact, in the April 13, 2010 letter, Citi admitted that the repo transactions were used solely for the purpose of managing the balance sheet.  Citi admitted that the "repurchase transactions were undertaken . . .  to assist the markets business in complying with internal limits on the amount of the U.S. GAAP balance sheet made available to the global trading desks."

367.    On May 25, 2010, before the Citi and SEC letters were released to the public, *The Wall Street Journal* reported that, like Lehman, Citigroup was "among the most active at temporarily shedding debt just before reporting their finances to the public."  The article looked at 18 large banks and concluded that as a group, they had routinely used repos at the end of each quarter as "window dressing" to make their leverage ratios appear lower.  Three banks – Bank of America, Deutsche Bank and Citigroup – accounted for 25% of the "window dressing," and "showed the most consistent, repeated pattern of quarter-end declines in repo debt from average levels for the same quarters."  The article noted that these worst-offending banks lowered their

net borrowings in the repo market by an average of 41% at the ends of each of the past 10 quarters compared with average net repo borrowings for the entire quarter.  Once a new quarter began, they boosted their levels.  Citigroup was the worst: its reported repo debt fell by an average of 52% over the past 10 quarters.

368.  According to one accounting specialist contacted by *The Wall Street Journal*, the data suggest "conscious balance-sheet management."  He said the quarter-end numbers are "at best meaningless and at worst misleading and disingenuous."

369.  In a follow-up article on July 14, 2010, *The Wall Street Journal* reported the details of the letter exchange between the SEC and Citigroup.  In an article titled "Citi Explains How it Hid Risk From the Public," the *Journal* noted that Repo 105 transactions like those that Citi  admitted to "hide from investors the true risk banks are taking on."

370.  Just as with Lehman Brothers, Citi's use of repo transactions was a knowing attempt to mislead investors as to the true health of the Company's finances, and supports a strong inference of intent by Citi and its senior management to deceive investors.

### c.       The Senate FCIC Investigation

371.  On May 20, 2009, the United States Senate formed the Financial Crisis Inquiry Commission (the "FCIC") to help determine "the causes . . . of the current financial and economic crisis."  The FCIC has reviewed approximately 2 million pages of documents and subpoenaed numerous witnesses to testify.  Citigroup was a particular focus of the hearings, given that the government bailout of Citi exceeded the assistance given to any other financial institution.

372.  The FCIC confirmed that Citi knew by the end of 2006 that housing prices had fallen, and had written into its financial models the assumption that housing values would continue to fall in 2007.  As discussed above, even so-called "super-senior" CDO tranches are

impaired when housing values stop rising; worse, when housing prices actually fall, these tranches can suffer near-total impairment.  The FCIC established that Citi was assuming price declines in 2007, which confirms that Citi mispriced its CDOs in its disclosures to investors.

373.    Defendant Maheras admitted during his testimony that even in 2006, he was aware that the subprime market was collapsing and that Citi needed to reduce its exposure quickly: "We were negative on subprime, as a matter.  We were, from the very earliest part of 07 and the end of '06, we were in most of our business areas, reducing our risk around subprime . . . We weren't sitting there twiddling our thumbs and assuming that housing could never go down. **We had in our base case that housing was going down during '07 and would likely continue.**"

374.    Likewise, the FCIC established that before and during the Relevant Period, Citi was unable to sell even its so-called "super-senior" CDO tranches, which constituted a "red flag" that its valuations were significantly overstated.  FCIC Chairman Angelides stated that he intends to probe how Citi could have possibly valued its CDOs at par when it was unable to sell them: "If I have a home I think is worth $200,000 but there's no market for it and no one will pay me $200[,000], it's not worth $200[,000] . . . I think I want to probe this, because I want to understand whether . . . these things were booked at levels that just weren't reflective of reality."

375.    The FCIC also established that the Citi liquidity puts, which were not revealed to investors until November, 2007, were approved as early as 2002 in a meeting of Citi's Capital Markets Approval Committee.   These puts were approved precisely because their undisclosed, off-balance-sheet nature "allowed" Citi to avoid otherwise applicable capital requirements.

376.    As discussed above, the FCIC also examined CDS collateral calls that Goldman made on AIG starting in July 2007.  Because a CDO default swap insures the holder against the

risk that the CDO might fail, holders may demand that the counterparty post collateral when the asset prices start to fall.  The FCIC investigation revealed that Goldman and other banks were making collateral calls on AIG based on CDO prices far below Citi's marks.  That AIG eventually acquiesced to many of these calls, and Goldman was forced to mark down its own portfolio in tandem, underscores the reliability of these marks, and the indefensibility of Citigroup's refusal to report fair values of these securities.

### 3.     Citi's Numerous Violations Of GAAP Support An Inference Of Scienter

377.    As alleged herein, Citi violated numerous provisions of GAAP, as well as SEC regulations, in its financial reporting during the Relevant Period.  As a result, Citi's financial statements failed to accurately portray the Company's financial position and results of operations.

378.    Defendants Prince and Crittenden certified that they reviewed the Company's financial statements and that the financial statements conformed with GAAP and other reporting requirements.[45]    However, the nature and extent of Citigroup's accounting violations, in conjunction with the Fraud Defendants' own statements, support the inference that as senior executives with oversight of the Company's financial reporting, the Fraud Defendants knew that Citigroup was perpetrating a fraud by concealing mounting losses and hiding its actual holdings of subprime-related assets.

---

[45] Defendant Prince signed a certification for the financial statements in the 2006 Form 10-K and in the Form 10-Q filings that were made during his tenure as CEO.  Defendant Crittenden signed certifications for the financial statements in the 2007 Form 10-K and in the Form 10-Q filings made during his tenure.

4.   **Motive And Opportunity:  Citi Avoided The Necessary Disclosures, Write-downs, And Reserve Increases In Order To Preserve Its Tier 1 Capital Ratio**

379.   The Fraud Defendants' motive to inflate Citi's Tier 1 capital ratio, coupled with their opportunity to commit fraud by virtue of their control over Citi's financial reporting and public statements, raises a strong inference of scienter.   As described below, the Fraud Defendants knew that properly considering the implications of Citi's subprime exposure and of its commitments to its SIVs would reduce the Company's Tier 1 capital ratio, possibly to levels that would prompt regulatory scrutiny and investor alarm.   The Fraud Defendants concealed material information to ensure that this ratio did not cross that line.

380.   A bank's Tier 1 capital ratio provides investors and regulators essential information regarding the bank's overall financial strength, as a measure of its ability to withstand substantial losses.   A bank with a Tier 1 capital ratio of 6% or greater is considered "well capitalized."   Falling below that 6% threshold triggers regulatory scrutiny and raises a red flag to investors.

381.   Citigroup, like other banks, knew it was essential to maintain its well capitalized status, and repeatedly represented in its public statements that it maintained a well capitalized position.   Thus, it was important to the Fraud Defendants that Citi's Tier 1 capital ratio stay far above the crucial 6% mark; the Company's internal goal was 7.5%.   In fact, for the years 2002 through 2006, Citi's reported Tier 1 capital ratio averaged 8.7%, with a low of 8.59% in 2006.

382.   As Citi's losses began to increase in 2007, its reported Tier 1 capital ratio began to slide, decreasing to 8.2% in the first quarter and down further to 7.91% in the second quarter. The Fraud Defendants knew that additional undisclosed losses would bring the ratio down further, and that consolidating additional risky assets and adding to loan loss reserves would decrease that ratio even more.   Similarly, the Fraud Defendants knew that taking appropriate

write-downs on Citi's risky subprime-related assets would decrease the Company's asset base materially, putting further downward pressure on the Tier 1 capital ratio. The Fraud Defendants also knew that because Citi was highly leveraged, even a small loss in its risky assets could deplete its capital.

383.   Citi's concern over its deteriorating Tier 1 capital ratio is also evidenced by its abuse of Repo 105 transactions suspiciously close to the end of each quarter in order to temporarily move assets off the balance sheet, as discussed above.

384.   The Fraud Defendants artificially inflated Citi's reported Tier 1 capital ratio by concealing its exposure to toxic subprime assets, making inadequate increases in its loan loss reserves, and failing to consolidate off-balance-sheet entities. The Fraud Defendants' motivation to keep the Tier 1 capital ratio above the 6% threshold supports a strong inference of scienter.

### C.   PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

385.   At all relevant times, the market for Citigroup's Common Stock was an efficient market for, *inter alia*, the following reasons:

(i)   Citigroup's Common Stock met the requirements for and was listed on the New York Stock Exchange, the Tokyo Stock Exchange, and the Mexican Stock Exchange;

(ii)   The trading volume for the Common Stock was substantial, trading at an average of more than 40 million shares per day during the Relevant Period;

(iii)   As a regulated issuer, Citigroup filed periodic public reports with the SEC and NYSE;

(iv)   Citigroup regularly communicated with public investors via established market communication mechanisms, including regular dissemination of

> press releases on the national circuits of major news wire services and other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services;

(v)     The market for the Common Stock reacted swiftly to public information disseminated regarding Citigroup; and

(vi)    Citigroup was followed by numerous national securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

386.    As a result of the foregoing, the market for Citigroup's Common Stock promptly digested current information regarding Citigroup from all publicly available sources and reflected such information in the stock price at all relevant times.  Under these circumstances, Plaintiffs suffered injury through their purchases or acquisitions of Common Stock at artificially inflated prices and a presumption of reliance applies.

387.    In addition to the foregoing, Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, Citigroup failed to disclose material information regarding its business, financial results and business prospects.

## XI.   TOLLING OF THE STATUTE OF LIMITATIONS ON PLAINTIFFS' FRAUD-BASED CLAIMS

388.    The statute of limitations on Plaintiffs' Section 10(b) and 20(a) claims was tolled from November 8, 2007 through December 4, 2012, by virtue of the filing on November 8, 2007 of a putative class action, which was later consolidated with certain related class actions under the caption *In re Citigroup Inc. Securities Litigation*, Master File No. 07-cv-9901 (SHS) in the

United States District Court for the Southern District of New York. The consolidated class action asserted Section 10(b) and 20(a) claims arising from the same or substantially similar facts as are alleged herein, and all Defendants named in Plaintiffs' Section 10(b) and 20(a) claims herein were defendants in the class action. Plaintiffs fall within the definition of the class on whose behalf that putative class action was filed, and were members of that class until December 4, 2012, when they requested exclusion from the class.

## XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

**COUNT TWO**
**For Violation Of Section 10(b) Of The Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**
**(Against Citigroup, Prince, Crittenden, Druskin, Maheras, and Klein)**

389.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

390.    This Count is asserted against the Fraud Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

391.    During the Fraud Period, the Fraud Defendants: (a) deceived the investing public, including Plaintiffs, as alleged herein; (b) artificially inflated the market price of Citigroup's Common Stock; and (c) caused Plaintiffs to purchase or otherwise acquire Common Stock at artificially inflated prices.

392.    As alleged herein, each of the Fraud Defendants, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), made untrue statements of material facts and/or omitted to state material facts necessary to make the statements made not misleading, which operated as a fraud and deceit upon Plaintiff, in an effort to inflate and maintain the artificially inflated price of Citigroup's Common Stock. They did so by the use, means or instrumentalities of interstate commerce and/or of the mails.

393.    The facts alleged herein give rise to a strong inference that each of the Fraud Defendants acted with scienter.    Each of the Fraud Defendants knew or with extreme recklessness disregarded that their statements were materially false and misleading and/or omitted material facts for the reasons set forth herein.

394.    As a result of the Fraud Defendants' materially false and misleading statements and failure to disclose material facts, as set forth above, the market price of Citigroup's Common Stock was artificially inflated during the Fraud Period.

395.    Unaware that the market price of the Common Stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Fraud Defendants, or upon the integrity of the market in which the stock traded, and the truth of any representations made to appropriate agencies and to the investing public, Plaintiffs purchased or acquired Common Stock at artificially inflated prices during the Fraud Period.    At the time they acquired the Common Stock, Plaintiffs did not know and had no reasonable basis to know of the false and misleading nature of the Fraud Defendants' statements.

396.    As a direct and proximate result of the Fraud Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and sales of Citigroup Common Stock during the Fraud Period.

397.    By reason of the foregoing, the Fraud Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiffs for damages suffered in connection with Plaintiffs' transactions in Citigroup's Common Stock during the Fraud Period.

## COUNT THREE
### For Violation Of Section 20(a) Of The Exchange Act
### (Against Prince, Crittenden, Druskin, Maheras, and Klein Based On Citigroup's Violation Of Section 10(b))

398.    Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.

399.    This Count is asserted against Defendants Prince, Crittenden, Druskin, Maheras, and Klein (the "Section 20(a) Defendants") under Section 20(a) of the Exchange Act.

400.    As alleged above, Citigroup violated Section 10(b) and Rule 10b-5, promulgated thereunder, and Plaintiffs suffered damages as a direct and proximate result of those violations.

401.    The Section 20(a) Defendants acted as controlling persons of Citigroup within the meaning of Section 20(a) of the Exchange Act by reason of their positions as senior executive officers of Citigroup, their ability to approve the content and issuance of Citigroup's public statements, and their control over Citigroup's day-to-day operations.    The Section 20(a) Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein.    Each of the Section 20(a) Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same.

402.    The Section 20(a) Defendants prepared, signed, and/or approved the Company's press releases and SEC filings that contained material false and misleading statements or omitted material facts.    They were provided with or had unrestricted access to copies of those statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

403.    As alleged herein, the Section 20(a) Defendants culpably participated in Citi's violations of Section 10(b).

404.    By virtue of their positions as controlling persons of Citigroup, the Section 20(a) Defendants are jointly and severally liable to Plaintiffs pursuant to Section 20(a) of the Exchange Act for Citigroup's violations of Section 10(b).

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiffs against all of the Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, and for all damages sustained as a result of wrongdoing by persons controlled by Defendants and/or for whose conduct Defendants are responsible pursuant to principles of *respondeat superior*, in an amount to be determined at trial, together with interest thereon;

B.    Awarding Plaintiffs rescission and/or rescissory damages;

C.    Awarding Plaintiffs their fees and expenses incurred in this action, including attorneys' fees and expert fees;

D.    Awarding Plaintiffs prejudgment interest and/or opportunity cost damages; and

E.    Granting such other and further relief as the Court may deem just and proper.

Dated:  December 12, 2012

**GRANT & EISENHOFER P.A.**

_(signature)_

OF COUNSEL:

DIAZ, REUS & TARG LLP
Alexander Reus
100 SE Second Street, Suite 2610
Miami, FL 33131

*Attorneys for Plaintiffs*

Stuart M. Grant
Megan D. McIntyre
Shelly L. Friedland
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel:  (646) 722-8500
Fax:  (646) 722-8501

*Attorneys for Plaintiffs*

140